1  DOUGLAS W. DAL CIELO (SBN 157109)
   GREGORY M. GENTILE (SBN 142424)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, CA  95113
   Telephone:    (408) 287-6262
4  Facsimile:    (408) 918-4501
   ddalcielo@rmkb.com
5  ggentile@rmkb.com

6  Attorneys for Plaintiff
   NORMAN GILBERT

7

8              UNITED STATES DISTRICT COURT

9        CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

10

11  NORMAN GILBERT,                    CASE NO.  3:08-CV-03043-VRW

12              Plaintiff,             **PLAINTIFF NORMAN GILBERT'S
                                       NOTICE OF MOTION AND MOTION TO
13      v.                             REMAND ON SHORTENED TIME AND
                                       REQUEST FOR ATTORNEY'S FEES;
14  FASTSIGNS INTERNATIONAL, INC.      MEMORANDUM OF POINTS AND
    and DOES 1-20, inclusive,          AUTHORITIES IN SUPPORT THEREOF;
15                                     DECLARATION OF GREGORY M.
                Defendants.            GENTILE; PROPOSED ORDER**
16
                                       **Date:**     **July 10, 2008**
17                                     **Time:**     **2:30 p.m.**
                                       **Judge:**    **Hon. Vaughn R. Walker**
18

19  **TO THE CLERK AND THE PARTIES THROUGH THEIR COUNSEL OF RECORD:**

20      Please take notice that pursuant to U.S.C. §1447(c), Plaintiff NORMAN GILBERT

21  ("GILBERT") hereby moves the Court to remand the case entitled *Norman Gilbert v. Fastsigns*

22  *International, Inc., et al.* back to the Superior Court of the State of California for the County of

23  San Mateo as Case No. CIV473600, following that Notice of Removal filed by Defendant

24  FASTSIGNS INTERNATIONAL, INC. on June 20, 2008.

25      This Motion to Remand is made and based on 28 U.S.C. §1447(c) and on the following

26  grounds:

27      1.    Defendant removed this matter from the State Court in light of the State Court's

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  granting of a temporary restraining order ("TRO") on June 11, 2008 and Defendant is seeking an

2  alternative forum in light of the State Court's issuance of a temporary restraining order.  As a

3  consequence thereof, Defendant is forum shopping in light of its dissatisfaction with the State

4  Court's issuance of the TRO against it.

5      2.      The amount in controversy with respect to the subject action is insufficient to

6  invoke the Federal Court's jurisdiction..  Plaintiff's Complaint in the San Mateo Superior Court

7  was brought to invoke that Superior Court's jurisdiction in order for Plaintiff to obtain a

8  temporary restraining order and preliminary injunction and to preserve the status quo pending

9  binding arbitration pursuant to contract.  As a consequence thereof, Plaintiff was not seeking

10  monetary damages but only injunctive relief.

11      3.      The present dispute arises between Plaintiff-GILBERT/Franchisee and

12  Defendant/Franchisor pursuant to a Franchise Agreement in which the parties are obligated to

13  resolve disputes by binding arbitration.  Plaintiff has demanded binding arbitration.  As a

14  consequence, this action does not belong in Federal Court and should be remanded.

15      In the event Plaintiff is successful with remand, Plaintiff asks the Court to award

16  attorney's fees and costs pursuant to 28 U.S.C. §1447(c) as further set forth in the Memorandum

17  of Points and Authorities and the Declaration of Counsel.

18      This motion is made and based on the aforementioned, and on the moving papers herein,

19  including the Memorandum of Points and Authorities in support thereof, the Declaration of

20  Gregory M. Gentile, and such other evidence that may be presented at the hearing of the motion.

21  Dated:  June 30, 2008                    ROPERS, MAJESKI, KOHN & BENTLEY

22

23

24                                By _____

25                                    DOUGLAS W. DAL CIELO
                                     GREGORY M. GENTILE
                                     Attorneys for Plaintiff
                                     NORMAN GILBERT

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  DOUGLAS W. DAL CIELO (SBN 157109)
   GREGORY M. GENTILE (SBN 142424)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, CA 95113
   Telephone:    (408) 287-6262
4  Facsimile:    (408) 918-4501
   ddalcielo@rmkb.com
5  ggentile@rmkb.com

6  Attorneys for Plaintiff
   NORMAN GILBERT

7

8              UNITED STATES DISTRICT COURT

9         CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

10

11  NORMAN GILBERT,                    CASE NO.  3:08-CV-03043-VRW

12              Plaintiff,             **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF**
13       v.                            **PLAINTIFF NORMAN GILBERT'S**
                                       **MOTION TO REMAND ON SHORTENED**
14  FASTSIGNS INTERNATIONAL, INC.      **TIME AND REQUEST FOR ATTORNEY'S**
    and DOES 1-20, inclusive,          **FEES**
15                                     **[28 U.S.C. §1447(c)]**
              Defendants.
16                                     **Date:    July 10, 2008**
17                                     **Time:    2:30 p.m.**
                                       **Judge:   Hon. Vaughn R. Walker**
18

19

20

21

22

23

24

25

26

27

28

RC1/5143753.1/BL1                              Case No. 3:08-CV-03043-VRW

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Arbaugh v. Y & H Corp. (2006)*
   546 US 500, 514..............................................................................................5

*Buchner v FDIC* (5th Circuit, 1993)
   981 F.2d 816, 820 ........................................................................................4

*Gaus v. Miles Inc.* (9th Circuit, 1992)
   980 F.2d 564, 566 ........................................................................................4

*Guglielmino v. McKee Foods Corporation* (9th Circuit, 2007)
   696..........................................................................................................4,5,6

*Snapper Inc. v. Redan* (11th Circuit, 1999)
   171 F.3d 1249, 1263, fn. 26 .....................................................................4,5

*St. Paul Mercury Indemnity Co., v. Red Cab Co.* (1939)
   303 U.S. 283, 289......................................................................................5

### FEDERAL STATUTES

28 U.S.C. §1332(a) ..............................................................................................1,2,5

28 U.S.C. §1441 ......................................................................................................2

28 U.S.C. §1447(c) ..............................................................................................3,8,9

### CALIFORNIA CODES

Code of Civil Procedure §527........................................................................................5

# I. INTRODUCTION

Plaintiff NORMAN GILBERT ("Plaintiff" or "GILBERT") hereby submits this motion to remand requesting that this matter be returned to the Superior Court of San Mateo County. It is GILBERT's position that removal is improper and that the Federal Court does not have jurisdiction to hear this matter. Although Defendant claims diversity of citizenship as a basis for federal jurisdiction, diversity jurisdiction exists only where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. (28 U.S.C. §1332(a)). The subject Complaint filed by GILBERT does not seek monetary relief from the Defendant. It seeks injunctive and declaratory relief. There is no monetary damage claim. Notably, the Complaint was filed concurrently with an application for a temporary restraining order and order to show cause re preliminary injunction. The purpose of the Complaint was to invoke the Superior Court jurisdiction so that the Court could hear and decide Plaintiff's application for injunctive relief. Injunctive relief was brought to preserve the status quo pending binding arbitration pursuant a Franchise Agreement between Plaintiff and Defendant. In fact, the causes of action in the Complaint are for an injunction and declaratory relief only. Defendant has removed the Complaint to Federal Court following the Superior Court's granting of a temporary restraining order and issuing an order to show cause re preliminary injunction. The Superior Court set a hearing date for July 11, 2008. Plaintiff seeks remand of this action.

# II. RELEVANT FACTS

Plaintiff GILBERT and Defendant FASTSIGNS INTERNATIONAL, INC. ("Defendant" or "FASTSIGNS") are franchisee and franchisor respectively. At all times, the parties' rights and obligations were governed by a Franchise Agreement dated November 12, 2001. (A copy of that Agreement is attached to the Declaration of Gregory M. Gentile as Exhibit A). That Franchise Agreement states at paragraph 24A on pages 34 and 35 that the parties are to submit any dispute to binding arbitration. A dispute presently exists between the parties with respect to royalty payments. Plaintiff GILBERT has timely demanded binding arbitration of the dispute that presently exists between Plaintiff and Defendant. Thereafter, Defendant sought to terminate the Franchise Agreement and concurrently therewith cut off his businesses 'communication and

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO REMAND

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  support services.  Plaintiff was forced to seek injunctive relief from the Superior Court.

2      Specifically, on June 9, 2008, Defendant cut off all of Plaintiff's e-mail, website and

3  support communications.  Plaintiff contended that Defendant's actions were in bad faith and

4  punitive in nature.

5      Although the Franchise Agreement (Exhibit A) provides for binding arbitration in

6  paragraph A, it also provides that a party may also seek injunctive from a court of competent

7  jurisdiction. (See Exhibit A, paragraph 24B on page 35).  Since GILBERT's business is located

8  in Redwood City and in San Mateo County, Plaintiff sought and obtained a temporary restraining

9  order and order to show cause re preliminary injunction from the Superior Court of San Mateo

10 County on June 11, 2008.  (Attached as Exhibit B to the Declaration of Gregory M. Gentile is a

11 true and correct copy of both the temporary restraining order and order to show cause re

12 preliminary injunction).[1]

13     In order to invoke the Superior Court's jurisdiction, GILBERT filed a Civil Complaint

14 setting forth causes of action for injunction and declaratory relief. (Attached as Exhibit C to the

15 Declaration of Gregory M. Gentile is a true and correct copy of the civil complaint filed by

16 GILBERT on June 11, 2008).  Significantly, that Complaint does not articulate nor set forth any

17 monetary damage claim.  Again, it was filed to invoke the Superior Court's jurisdiction for

18 purposes of seeking injunctive relief and to preserve the status quo pending binding arbitration

19 pursuant to the Franchise Agreement.

20     On June 20, 2008, Defendant filed its Notice of Removal pursuant to 28 U.S.C. §§1332

21 and 1441, asserting as a basis for the removal the diversity of citizenship between Defendant and

22 Plaintiff, and also asserting that the amount in controversy exceeds the sum of $75,000.00.

23 (Attached as Exhibit D to the Declaration of Gregory M. Gentile is a true and correct copy of the

24 Notice of Removal filed by Defendant on June 20, 2008).

25     Plaintiff seeks remand of this action on three separate grounds and respectfully asks this

26 Court to remand this action back to the San Mateo County Superior Court for the following

27

28
---
[1]  This was not done in a void, but in concert with Defendant's agreement and consent to a briefing schedule in anticipation of that hearing on July 11, 2008.

RC1/5143753.1/BL1                            -2-                    Case No. 3:08-CV-03043-VRW

reasons:

1.    Defendant removed this matter from the State Court in light of the State Court's granting of a temporary restraining order ("TRO") on June 11, 2008. Defendant is now seeking an alternative forum in light of the State Court's issuance of a temporary restraining order. As a consequence thereof, Defendant is "forum shopping" in light of its dissatisfaction with the State Court's issuance of the TRO against it and the prospect that the Superior Court may issue a preliminary injunction in favor of Plaintiff.

2.    The amount in controversy with respect to the subject action of this diversity claim is insufficient to invoke the Federal Court's jurisdiction. Plaintiff's Complaint in the San Mateo Superior Court states no dollar amount as damages. In fact the Complaint seeks no damages in its prayer, but only injunctive and declaratory relief. Since a Complaint was necessary to obtain a TRO, GILBERT filed the Complaint to invoke that Superior Court's jurisdiction in order for Plaintiff to obtain a temporary restraining order and preliminary injunction in order to preserve the status quo pending binding arbitration pursuant to contract.

3.    The underlying dispute between the parties arises between Plaintiff/Franchisee and Defendant/Franchisor pursuant to a Franchise Agreement in which the parties are obligated to resolve disputes by binding arbitration. Plaintiff has timely demanded binding arbitration pursuant to that Agreement and pursuant to that same Agreement, Plaintiff sought injunctive relief as a provisional remedy pending arbitration. As a consequence, all disputes between the parties must be decided by binding arbitration and not by court action. It will be the arbitrator who will be deciding and potentially awarding any damages in this matter. In short, damages are not within the Court's province.

### III. **STATUTORY AUTHORITY**

28 U.S.C. §1447(c) states as follows:

> A motion to remand a case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a) [28 U.S.C.S. §1446(a)]. If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any expenses, including attorney's fees, incurred as a

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  result of the removal.  A certified copy of the order of remand shall
be mailed by the clerk to the clerk of the state court.  The state court
2  may thereupon proceed with such case.

3    It is settled that remand may be ordered either for lack of subject matter jurisdiction or for

4  "any defect in removal procedure."  (*Buchner v. FDIC* (5th Circuit, 1993) 981 F.2d 816, 820).

5  Moreover, it is settled that a court has an inherent authority to remand an action to state court to

6  enforce a forum selection agreement.  Such agreement waives defendant's right to remove.

7  (*Snapper Inc. v. Redan* (11th Circuit, 1999) 171 F.3d 1249, 1263, fn. 26.).  It is further settled that

8  plaintiff's motion for remand effectively forces the defendant to prove by a preponderance of the

9  evidence whatever is necessary to support the petition.  (See *Gaus v. Miles Inc.* (9th Circuit, 1992)

10  980 F.2d 564, 566).

11    A party may bring a motion to remand when the complaint shows that the jurisdictional

12  limit of $75,000.00 is lacking.  (*Guglielmino v. McKee Foods Corporation* (9th Circuit, 2007)

13  696).  Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the

14  first instance and the defendant has the burden of establishing removal is proper.  (*Gaus, supra,* at

15  p. 566).

16  ## IV.  DEFENDANT IS FORUM SHOPPING

17    Defendant is not happy with the Superior Court's granting of the TRO and assumes that

18  that Court, in light of comments made at the ex-parte application, would have issued a

19  preliminary injunction, as requested by GILBERT.  (Gentile Declaration).  Defendant's removal

20  herein and attempt to invoke the Federal Court's jurisdiction is akin to forum shopping.  Since

21  Defendant's arguments against imposing the TRO carried no weight with the Superior Court, it is

22  seeking another "bite at the apple" in making its arguments in opposition to the OSC.  It is also

23  noteworthy that Defendant's counsel agreed to a briefing schedule in the Superior Court and also

24  executed a Notice and Acknowledgement of Receipt of the Superior Court Complaint.  Now,

25  Defendant seeks to have the Federal Court be the arbiter of the injunction.  However, this matter

26  belongs before the San Mateo County Superior Court.  A diversity action such as this action,

27  where there is no monetary damage claim and where the dispute(s) are to be submitted to binding

28  arbitration should be remanded.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

## V.  THE COMPLAINT DOES NOT SEEK MONETARY DAMAGES TO SATISFY THE REQUISITE JURISDICTIONAL AMOUNT IN A DIVERSITY ACTION

It is well settled that Federal Courts are courts of limited jurisdictions, which courts will strictly construe removal. (*Guglielmino, supra,* at p. 699-700).  One necessary requirement for federal jurisdiction in a diversity action is that the amount in controversy exceed the sum or value of $75,000.00, exclusive of interest and costs.  (28 U.S.C. §1332(a)).  (*Arbaugh v. Y & H Corp* (2006) 546 US 500, 514).  The amount in controversy is determined from the allegations or the prayer in the complaint. (*St. Paul Mercury Indemnity Co., v. Red Cab Co.,* (1938) 303 U.S. 283, 289).

Here, Plaintiff's Complaint (Exhibit C) **does not** assert a damage claim that would in any way be supportive of federal jurisdiction in a diversity action.  In fact, the Complaint asserts causes of action that are not susceptible to damages, i.e., injunctive relief and declaratory relief.  There is no stated damage amount in the Complaint.  The Complaint was filed in the Superior Court merely to invoke that Court's jurisdiction to ensure that the Court could consider and rule on Plaintiff's request for a TRO and OSC re Preliminary Injunction.  In short, the Complaint was filed to satisfy the jurisdictional element pursuant to California Code of Civil Procedure §527.

Any damages sought from or against Defendant would necessarily have to be through arbitration as required by the Franchise Agreement.  Thus, the Court will not be and cannot be the arbiter of damages and the Complaint was not filed to obtain relief in the form of damages in the Superior Court.

Although Defendant asserts in its Notice of Removal that the jurisdictional amount is satisfied, this is not true.  In fact, the Complaint belies the assertions.  The Complaint does not assert causes of action for damages and notably the prayer asks the Superior Court for:  1. A TRO; 2. A preliminary injunction that Defendant refrain from interfering with GILBERT's use and enjoyment of his business operations; and 3. That vital services be restored until the arbitration of this matter and that the status quo be preserved pending that arbitration.

///

///

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1    Defendant, in its Notice of Removal, asserts that the jurisdictional damage amount is

2    satisfied and references several of the allegations in the Complaint in an attempt to provide

3    support for removal.  However, none of these allegations assert a dollar amount.  In fact,

4    Defendant actually misstates the Complaint when it asserts in the Notice that "…Gilbert contends

5    that his business is worth substantially more than $75,000.00". (Exhibit D, p. 3, line 3).  Nowhere

6    in the Complaint does GILBERT make this allegation and Defendant is clearly taking

7    unwarranted liberty with interpreting the allegations in an attempt to support removal.  Notably,

8    none of the allegations that Defendant points to support removal reflect or are susceptible of a

9    reading that there is a damage claim in the Complaint let alone a damage claim in excess of

10    $75,000.00.

11    Even assuming *arguendo* that this Court were to conclude that there may be some

12    ambiguity (which there is not since no damages are being sought). it has been recognized that

13    "[T]he removing defendant bears the burden of establishing by a preponderance of evidence that

14    the amount in controversy exceeds the jurisdictional amount." (*Guglielmino, supra,* at p. 699).

15    Pursuant to this burden, Defendant herein, must provide evidence establishing that it is more

16    likely than not that the amount in controversy exceeds that amount.  Respectfully, Defendant

17    cannot meet this burden under the circumstances of this case and its statements in the Notice of

18    Removal are clearly wrong and disingenuous and put forth in an attempt to support removal.

19    In summary, the Complaint does not seek a monetary amount of damages but is merely

20    one for a preliminary injunction and declaratory relief, pending binding arbitration.  In fact, the

21    gravamen of the Complaint is to invoke the Superior Court's jurisdiction in order for Plaintiff to

22    have moved for a temporary restraining order and order to show case re preliminary injunction

23    pending binding arbitration .  The Superior Court action was initiated pursuant to the Franchise

24    Agreement which permitted the parties to seek injunctive relief (not a claim for damages) pending

25    binding arbitration which has been timely demanded by Plaintiff.  Since the jurisdictional

26    requisite is not met in this diversity action, the Court should remand this action back to Superior

27    Court.

28    / / /

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

## VI. **THE DISPUTE BETWEEN THE PARTIES IS GOVERNED BY AN ARBITRATION AGREEMENT CALLING FOR BINDING ARBITRATION AND AN ARBITRATOR WILL DECIDE THE DISPUTE(S) BETWEEN THE PARTIES**

The dispute that presently exists between the parties must be arbitrated pursuant to the parties' Agreement dated. November 12, 2001. It bears emphasis that GILBERT has demanded arbitration with FASTSIGNS pursuant to the Franchise Agreement. (Exhibit A). (Attached hereto as Exhibit E is a true and correct copy a correspondence to Defendant sent on behalf of GILBERT demanding arbitration, sent prior to the application for injunctive relief). In short, the entire dispute must be submitted to an arbitrator.

The Franchise Agreement states at paragraph 24 in relevant part, as follows:

> A.    Arbitration.  Franchisor and Franchisee agree that, subject to Paragraph B below, any claim, controversy or dispute between Franchisor . . . and Franchisee . . . arising out of or relating to: (1) Franchisee's operation of the Center under this Agreement; (2) this Agreement or any other agreement between Franchisee and Franchisor; (3) the relationship created by this Agreement; (4) the validity of this Agreement or any other agreement between Franchisee and Franchisor; or (5) any System standard relating to the establishment of operation of the Center, will be submitted for binding arbitration before one arbitrator in accordance with the then-current commercial arbitration rules of the American Arbitration Association.  (Gentile Declaration, Exhibit A, p. 34-35)

Moreover and significant to this motion, Paragraph 24B of the Franchise Agreement states, as follows:

> B.    Injunctive Relief.  Notwithstanding any provision contained in Paragraph A above, either party may institute in a court of competent jurisdiction an action or actions **for temporary or preliminary injunctive relief;** provided, however, that such party must contemporaneously submit the dispute for arbitration on the merits as provided in Paragraph A above.  (Emphasis added).

Pursuant to Paragraph 24B, GILBERT sought temporary injunctive relief for the express purpose of insuring that his business could continue to run pending binding arbitration of the dispute.  In short, he sought to preserve the status quo pending that arbitration which GILBERT dutifully demanded.

No doubt, any claim for damages, whether it be made by either Plaintiff as franchisee or Defendant as franchisor, will be made through arbitration.  Any award of damages will be made

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO REMAND**

1  by the arbitrator. It follows that there can be no damage award in this injunctive and declaratory

2  relief action by any court, and as set forth in the Franchise Agreement and as articulated above in

3  paragraph 24A, that arbitrator will have plenary power to make a determination. Despite this

4  language and Defendant's agreement to arbitrate, Defendant is seeking to have the Federal Court

5  resolve GILBERT's request for injunctive relief, which was merely to restore vital services to his

6  business pending that arbitration. Notably, the Complaint makes this very clear at paragraphs 10

7  and 11.

8      10. Although Paragraph 24A of the aforementioned Franchise
       Agreement mandates binding arbitration with the American
9      Arbitration Association, Paragraph 24B of the Agreement sets forth
       that "notwithstanding any provision contained in Paragraph A
10     above, either party may institute in a court of competent jurisdiction
       an action nor actions for temporary or preliminary injunctive relief;
11     provided, however, that such party must contemporaneously submit
       the dispute for arbitration on the merits as provided in Paragraph A.
12
       11. At all relevant times GILBERT has satisfied the condition and
13     has demanded arbitration in writing with Defendant and in good
       faith wishes to submit the pending dispute to binding arbitration
14     pursuant to Paragraph 24A. Despite GILBERT's good faith request
       to arbitrate the dispute, Defendant has refused to restore the e-mail
15     and website communications, thereby crippling GILBERT's
       business. GILBERT requires and hereby seeks injunctive relief
16     seeking an order that Defendant restore all vital communications
       and restrain from taking any further steps inimical to the operation
17     of GILBERT's operation of the franchise and to preserve the status
       quo pending the arbitration hearing.
18
19     Clearly, given the allegations in the Complaint, the limited jurisdiction of the Federal

20  Court, and the facts giving rise to the Complaint, this action should be remanded to the Superior

       Court.
21

22     **VII. THE COURT SHOULD AWARD PLAINTIFF HIS
            ATTORNEY'S FEES PURSUANT TO STATUTE**

23     Pursuant to 28 U.S.C. §1447(c), an order remanding the case may require payment of just

24  costs and any expenses, including attorney's fees, incurred as a result of the removal.

25  Defendant's removal was improper under the circumstances of this case. The Complaint asserts

26  no damage amount and was brought merely to obtain injunctive relief pending binding

27  arbitration. Defendant took liberties in its assertion of the allegations supporting removal. For

28  instance, there is no statement or allegation in Plaintiff's Complaint that he is seeking $75,000.00

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

in damages. Plaintiff has been forced to incur fees and costs associated with making this motion to remand, as set forth in the attached Declaration of Counsel. The Court should award Plaintiff the attorney's fees he has incurred in making this motion.

### VIII.  CONCLUSION

Federal Courts are courts of limited jurisdiction. They should not be burdened with a matter that truly belongs in State Court. The purpose of the Complaint was to provide the Superior Court with the requisite jurisdiction so that the Superior Court could decide the propriety of the TRO and to issue a preliminary injunction which would preserve the status quo pending binding arbitration. It bears emphasis that the Complaint seeks injunctive relief and the causes of action pleaded are those for injunction and declaratory relief, only. There was no damage amount pleaded. The purpose of GILBERT's application to the Superior Court was to restore and maintain the vital communication system of his franchise pending arbitration. It is apparent that Defendant was unhappy with the Superior Court's granting of the TRO and that the Superior Court could very well maintain the same by granting a preliminary injunction pending arbitration. Defendant's removal to this Court is nothing less than "forum shopping". However, Federal Courts are courts of limited jurisdiction and the critical jurisdictional threshold amount is clearly lacking. The Court should remand this action to the Superior Court of San Mateo County and award attorney's fees to Plaintiff pursuant to 28 U.S.C. §1447(c).

Dated:  June 30, 2008

ROPERS, MAJESKI, KOHN & BENTLEY

By _____
DOUGLAS W. DAL CIELO
GREGORY M. GENTILE
Attorneys for Plaintiff
NORMAN GILBERT

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO REMAND

DOUGLAS W. DAL CIELO (SBN 157109)
GREGORY M. GENTILE (SBN 142424)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA  95113
Telephone:     (408) 287-6262
Facsimile:      (408) 918-4501
ddalcielo@rmkb.com
ggentile@rmkb.com

Attorneys for Plaintiff
NORMAN GILBERT

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

NORMAN GILBERT,

              Plaintiff,

v.

FASTSIGNS INTERNATIONAL, INC.
and DOES 1-20, inclusive,

              Defendants.

CASE NO.  3:08-CV-03043-VRW

**DECLARATION OF GREGORY M. GENTILE IN SUPPORT OF PLAINTIFF NORMAN GILBERT'S MOTION TO REMAND ON SHORTENED TIME AND REQUEST FOR ATTORNEY'S FEES**

**Date:**  July 10, 2008
**Time:**  2:30 p.m.
**Judge:**  Hon. Vaughn R. Walker

I, Gregory M. Gentile, declare:

1.     I am one of the attorneys of record for Plaintiff and Moving Party NORMAN GILBERT ("Plaintiff" or "GILBERT").  I make this Declaration in support of GILBERT's motion to remand and request for attorney's fees and costs pursuant to 28 U.S.C. §1447(c).  If called upon as a witness, I could competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of the Franchise Agreement dated November 12, 2001 which Plaintiff GILBERT and Defendant FASTSIGNS INTERNATIONAL, INC. ("FASTSIGNS") entered into on or about November 12, 2001.  As set forth on pages 34 and 35, the parties are to arbitrate disputes between them.

3.     Attached hereto as Exhibit B is a true and correct copy of the Temporary Restraining Order and Order to Show Cause re Preliminary Injunction that was obtained by

-1-

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  GILBERT on June 11, 2008 from the San Mateo County Superior Court, with Notice of Entry of

2  Order being made as to these two Orders on June 12, 2008.

3        4.    Attached hereto as Exhibit C is a true and correct copy of the Civil Complaint filed

4  by GILBERT on June 11, 2008 in San Mateo County Superior Court.

5        5.    Attached hereto as Exhibit D is a true and correct copy of Defendant

6  FASTSIGNS' Notice of Removal pursuant to 28 U.S.C. §§1332 and 1441, removing the Civil

7  Complaint to the Federal District Court for the Northern District of California, San Francisco

8  Division.

9        6.    Attached hereto as Exhibit E is a true and correct copy of Plaintiff GILBERT's

10  demand to arbitrate sent to FASTSIGNS on June 2, 2008, prior to GILBERT initiating an action

11  for injunctive relief.

12        7.    On June 11, 2008, I appeared ex-parte in the San Mateo County Superior Court

13  seeking a temporary restraining order and order to show cause re preliminary injunction in favor

14  of Plaintiff. Prior to proceeding before the Court, I filed the subject Complaint with the San

15  Mateo County Superior Court Clerk to invoke that Court's jurisdiction so that it may hear the

16  Plaintiff's request for injunctive relief.

17        8.    Upon presenting the application to the Court's research attorney in the department

18  of the Presiding Judge (Judge Foiles), the research attorney made multiple comments with respect

19  to the position taken by Defendant, and the propriety of the temporary restraining order by

20  GILBERT. That research attorney did not agree with the arguments advanced by Defendant and

21  she appeared to be favoring Plaintiff's application. For instance, she stated that the entire dispute

22  belongs in arbitration.

23        9.    Based on the comments made by the research attorney, who was the conduit to

24  Judge Foiles, it appeared to me that the Superior Court would be predisposed to granting an

25  injunction in light of the statements that the arbitrator should be the arbiter of the issues presented

26  by the TRO.

27        10.    I am also asking this Court to award my client attorney's fees and costs in having

28  to prepare, file, and argue this motion to remand in light of 28 U.S.C. §1447(c).

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

11.     Plaintiff's Complaint is not seeking monetary damage, but only injunctive relief pending arbitration.  A diversity action such as the one involved herein must meet the jurisdictional threshold dollar amount, and the fact that there is no damage claim or amount set forth in Plaintiff's Complaint, evinces that remand is appropriate and that the removal was improper.

12.     Moreover, the statements attributed to the Complaint in Defendant's Notice of Removal indicating that Plaintiff contends that his business is worth substantially more than $75,000.00 are inaccurate.  The Complaint makes no such statement, averment, or allegation.  GILBERT's request was that Defendant merely restore his business communications services pending arbitration of the dispute.

13.     As a consequence thereof, I am asking the Court to award attorney's fees in the amount of $6,750.00.  The amount of attorney's fees is premised on my hourly rate in this matter of $375.00.  It has taken me ten hours to research, prepare, and file this motion.  I anticipate three to four hours (inclusive of travel time) in appearing at the Federal Court in San Francisco to argue this motion.  I also anticipate three to four hours to prepare a Reply Memorandum.  Accordingly, I ask that the Court award attorney's fees in the amount of $6,750.00 pursuant to the aforementioned statute in the event it orders remand.  My client would not have had to incur fees and costs had Defendant not improperly removed this matter.

I declare under penalty of perjury that the foregoing is true and correct and, if called upon as a witness, could competently testify thereto.  Executed this 30th day of June, 2008, in San Jose, California.

GREGORY M. GENTILE

RC1/5142183.1/BL1

-3-

Case No. 3:08-CV-03043-VRW

**DECLARATION IN SUPPORT OF MOTION TO REMAND**

**EXHIBIT A**



FASTSIGNS INTERNATIONAL, INC.

FRANCHISE AGREEMENT

Norman Gilbert

State of California

fm.6.26.01

FASTSIGNS INTERNATIONAL, INC.
FRANCHISE AGREEMENT

## TABLE OF CONTENTS

SECTION                                                                 Page

1.      Franchise Grant ................................................................................................1

2.      Term and Renewal .............................................................................................2

3.      Fees .....................................................................................................................3

4.      Advertising .........................................................................................................5

5.      Franchisee Organization ...................................................................................7

6.      Site Selection; Lease; Plans and Construction ...............................................9

7.      Duties of Franchisor .......................................................................................10

8.      Training ............................................................................................................12

9.      Center Operations ...........................................................................................12

10.     Insurance ..........................................................................................................15

11.     Taxes, Permits and Indebtedness ..................................................................17

12.     Records and Reports .......................................................................................17

13.     Proprietary Marks ...........................................................................................18

14.     Confidential Manuals ......................................................................................20

15.     Confidential Information .................................................................................21

16.     Default and Termination .................................................................................21

17.     Obligations Upon Termination or Expiration ..............................................24

18.     Transfer of Interest .........................................................................................26

19.     Covenants .........................................................................................................30

20.     Independent Contractor and Indemnification ..............................................32

21.     Entire Agreement and Modification ..............................................................34

22.     Approvals .........................................................................................................34

23.     Non-Waiver and Remedies .............................................................................34

24.     Dispute Resolution ..........................................................................................34

25.   Notices ................................................................................................................... 35

26.   Limitations of Claims ............................................................................................ 36

27.   Severability and Construction ............................................................................... 36

28.   Force Majeure ......................................................................................................... 37

29.   Acknowledgments .................................................................................................. 37


Attachment "A" - Approved Location and Territory
Attachment "B" - Statement of Ownership Interests
Attachment "C" - Lease Addendum
Attachment "D" - Confidentiality and Ancillary Non-Compete Agreement
Attachment "E" - Telephone Irrevocable Power of Attorney
Attachment "F" - Internet Irrevocable Power of Attorney
Attachment "G" - Tax Irrevocable Power of Attorney
Attachment "H" – Franchise Agreement Renewal Amendment
Attachment "I" – Franchise Agreement Transfer of Interest Amendment
Attachment "J" – Franchise Agreement Conversion Franchise Amendment
Attachment "K" – Electronic Funds Transfer

# FASTSIGNS INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is made and entered into this _13th_ day of _November_, 2001, by and between FASTSIGNS INTERNATIONAL, INC., a Texas corporation ("Franchisor"), and Norman Gilbert (individually and collectively referred to as "Franchisee").

### WITNESSETH:

WHEREAS, Franchisor, as the result of the expenditures of time, skill, effort and money, has developed a unique and comprehensive system for the promotion, development and operation of businesses which specialize in the production and marketing of signs, graphics, banners, ready-to-apply lettering, trade show displays, digital imaging and other complementary products and services, and which emphasize convenience and one-day service ("System"). Said System provides competitive and economic advantages to Franchisor and its Franchisees;

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; uniform standards, technology, know-how and procedures for production of signs, graphics, digital imaging and banners; quality and consistency of products and services; inventory, management and financial control methods; training and assistance; and advertising and promotional programs, all of which may be changed, improved and further developed by Franchisor from time to time;

WHEREAS, Franchisor identifies the System by means of certain trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin including, without limitation, the mark "FASTSIGNS", "FASTSIGNS", The One Day Sign & Lettering Experts", "FASTSIGNS, For A Quality Sign That's Right. On Time" and "Quality Signs. Done Right. On Time.", "Sign and Graphic Solutions Made Simple", and such other trade names, trademarks and service marks as Franchisor may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and the System and representing the System's high standards of quality, appearance and service (collectively, "Proprietary Marks");

WHEREAS, Franchisee desires to use the System in connection with the operation of a FASTSIGNS Center, at the location specified herein, upon the terms and subject to the conditions hereinafter set forth;

NOW THEREFORE, in consideration of the premises and of the mutual undertakings, obligations and commitments contained herein, it is agreed between the parties as follows:

1. <u>Franchise Grant</u>

   A. Franchisor hereby grants to Franchisee the right, and Franchisee hereby undertakes the obligation, upon the terms and subject to the conditions hereinafter set forth, to develop and operate a FASTSIGNS Center (the "Center") and to use solely in connection therewith the Proprietary Marks and the System, as such may be changed, improved and further developed from time to time, only at the approved location described in Attachment "A" hereto.

   B. Franchisee shall not relocate the Center without the express prior written consent of Franchisor. This Agreement does not grant to Franchisee the right to franchise or operate the Center or to offer or sell any products or services described hereunder at or from any other location. At the time Franchisee requests Franchisor's consent to relocate, Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof.

C.    Subsequent to Franchisee's selection of an approved location for the Center in accordance with the provisions of Section 6, Franchisee shall be assigned a specific geographic area (the "Territory") by Franchisor.  A description of Franchisee's Territory shall be set forth on Attachment "A".  During the term of this Agreement, so long as Franchisee is in full compliance with the terms and conditions of this Agreement, Franchisor shall not establish or grant others the right to establish a Center in the Territory (subject to Subsection D. below).  Franchisee shall use its best efforts to advertise and promote the Center in its Territory in accordance with Section 4 below.

D.    If at any time during the term of this Agreement, Franchisor desires to establish or authorize any other person to establish one or more FASTSIGNS centers in the Territory as a result of an increase in the Business Count in the Territory, and if Franchisee is then in full compliance with the terms and conditions of this Agreement and meets the then-current criteria established by Franchisor to develop an additional Center, then Franchisee shall have the option to obtain the right to develop and operate the additional center(s) by entering into a development agreement or franchise agreement, as the case may be.  Franchisor shall provide Franchisee with notice thereof and the then-current form of franchise agreement or development agreement; provided, that the initial franchise fee shall be the same as the initial franchise fee described in Section 3 below.  Franchisee shall have a period of thirty (30) days following notice from Franchisor to execute and return to Franchisor the applicable agreement and pay the initial fees thereunder.  If Franchisee fails to timely exercise its rights under this Section 1.D, Franchisor may thereafter establish such center itself or authorize others to do so.  The "Business Count" shall mean the number of businesses which Franchisor determines in its business judgment constitute potential customers for Franchisee's products and services.

E.    Franchisee acknowledges and agrees that Franchisor and its affiliates have the right to establish, operate, franchise or license others to operate businesses at any location, including within the Territory by: (i) selling products and services other than those sold at the Center under the Proprietary Marks; or (ii) selling products and services similar to those sold at the Center under different trade names, trademarks or service marks in the Territory through similar outlets or alternative channels of distribution.

2.    <u>Term and Renewal</u>

A.    Except as otherwise provided herein, the term of this Agreement shall expire twenty (20) years from the date of execution.

B.    Franchisee may, at its option, renew this Agreement for an additional term of ten (10) years, subject to the following conditions, which must, in Franchisor's sole discretion, be met prior to renewal:

(1)    Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than eight (8) nor more than twelve (12) months prior to the expiration of the initial term;

(2)    Franchisee shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for FASTSIGNS centers under the System;

(3)    Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof;

(4)    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and shall have timely met those obligations throughout the term of this Agreement;

(5)      Franchisee shall execute Franchisor's then-current form of franchise agreement for the renewal term prescribed herein, which agreement shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement and may include, without limitation, a higher service fee and advertising fee; provided that Franchisee shall pay in lieu of an initial franchise fee a renewal fee equal to no more than four percent (4%) of the initial franchise fee then being charged to new franchisees under the System. Any franchise agreement signed for the renewal term shall contain substantially the terms and provisions set forth in Attachment H to this Agreement, except as Franchisor may otherwise consent to in writing;

(6)      Franchisee shall comply with Franchisor's then-current qualification and training requirements;

(7)      Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the approved location for the duration of the renewal term of this Agreement; and

(8)      Franchisee and each Controlling Principal (as defined in Section 27.E) shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, and representatives, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or under federal, state or local laws, regulations, rules or orders.

3.      **Fees**

A.      <u>Initial Franchise Fee.</u>      Upon execution of this Agreement, Franchisee shall pay to Franchisor a franchise fee of Twenty Thousand dollars ($20,000.00) which shall be deemed fully earned and nonrefundable upon execution of this Agreement (subject to the provisions of Section 16.B(2)) in consideration of the administrative and other expenses incurred by Franchisor in granting the franchise hereunder and for Franchisor's lost or deferred opportunity to franchise at the specified location to any other party.

B.      <u>Service Fee.</u>      During the term of this Agreement, Franchisee shall pay to Franchisor a continuous nonrefundable fee (the "Service Fee") equal to six percent ███████████████████████ (as defined below) of the Center. The obligation to pay the Service Fee commences immediately upon opening of the Center for business. Payment of the Service Fee will be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the Service Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day. Franchisor reserves the right to change the method of payment of the Service Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. A business day for purposes of this Section 3.B means any day other than Saturday, Sunday, or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

C.      <u>Gross Sales.</u>      As used in this Agreement, "Gross Sales" shall include all revenues from ████████████████████████████████ whether for cash, credit or in exchange for other goods and services and regardless of collection in the case of credit) at or from the Center ████ █████████████████████████████████████████ provided, however, Gross Sales shall not include any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

D.   NAC Fee.     During the term of this Agreement, Franchisor and Franchisee agree as follows:

(1)     Franchisee shall be required to deposit Six Thousand Three Hundred Ninety Nine Dollars ($6,399) into an account during new owner training to be administered by the National Advertising Council, Inc. ("NAC") to purchase mailings and other marketing materials during the initial twelve (12) months the Center is open for business (See Attachment I to this Agreement regarding a Center that has been acquired by Franchisee from an existing Franchisee). In addition, if the Center is opening without a Yellow Pages display ad for three (3) months or more, an additional deposit will be required based on the monthly amount that would be spent on a Yellow Pages display ad.

(2)     During the term of this Agreement, Franchisee shall pay to the NAC a continuous nonrefundable advertising fee (the "NAC Fee") equal to two percent (2%) of the monthly Gross Sales of the Center. The obligation to pay the NAC Fee shall commence immediately upon the opening of the Center for business. Payment of the NAC Fee will be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the NAC Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day). Franchisor reserves the right to change the method of payment of the NAC Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. The term "business day" in this Section 3.D. shall have the same meaning as set forth in Section 3.B. above. All NAC Fees collected by Franchisor on behalf of the NAC shall be deposited in a separate account (the "NAC Fund") administered by Franchisor and the NAC.

E.     Past Due Amounts.     Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder. Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue. Time is of the essence with respect to all payments to be made by Franchisee to Franchisor. Any payment not actually received by Franchisor on the due date and any payment for invoices made by a check that is returned by the bank upon which it is drawn for insufficient funds or for any other reason shall be deemed overdue. If any payment is overdue, Franchisee shall pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of eighteen percent (18%) per annum, or the maximum rate of interest permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Franchisor may have at law or in equity, arising under this Agreement or otherwise.

F.     Electronic Funds Transfer.     Upon execution of this Agreement and at any time thereafter at Franchisor's request, Franchisee shall execute Attachment K to this Agreement and all other documents necessary to permit Franchisor to withdraw funds from Franchisee's designated bank account by electronic funds transfer ("EFT") in the amount of the service fee described in Section 3.B. above and the NAC fee described in Section 3.D.(2) above, and all other fees or amounts described in this Agreement, at the time or times that such fees or amounts become due and payable under the terms of this Agreement, provided such days is a business day (and if not a business day, on the next succeeding business day). Any fee calculated by reference to Gross Sales shall be based on the information in the applicable Gross Sales Report or, if the Gross Sales Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the subject month based on one and half (1 ½) times the most recent Gross Sales Report provided to Franchisor by Franchisee; provided that if a Report for the subject month is subsequently received and reflects (i) that the actual amount of the fee due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the EFT by Franchisor, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations. Should any EFT not be honored by Franchisee's bank for any reason, Franchisee agrees that it shall responsible for that payment plus a service charge applied by Franchisor and the bank, if any. If any payments are not received when due, interest may be charged by Franchisee in accordance with Section 3.E. above. Upon written notice to Franchisee, Franchisor may designate another method of payment, at Franchisor's sole discretion.

4.    <u>Advertising</u>

During the term of this Agreement, in order to promote the goodwill and public image of the system, Franchisor and Franchisee agree as follows:

A.    Franchisee, by virtue of its being a franchisee of Franchisor, shall be a member of the NAC. The board of directors of the NAC is comprised of Franchisor and franchisees elected by the members pursuant to the bylaws of the NAC. Monies from the NAC Fund are to be used to pay for advertising and promotional programs for the benefit of the System. Franchisee agrees that the NAC Fund shall be maintained and administered by Franchisor and the NAC or their designee as follows:

(1)    Subject to Section 4.F below, the board of directors of the NAC shall direct all advertising programs and shall approve or disapprove the creative concepts, materials, and media used in such programs and the production thereof. All decisions of the NAC are subject to the approval of Franchisor. Franchisee agrees and acknowledges that the NAC Fund is intended to maximize general public recognition and acceptance of the Proprietary Marks and the System. In administering the NAC Fund, neither Franchisor nor the NAC undertake any obligation to make expenditures for Franchisee which are equivalent or proportionate to its contribution or to ensure that any particular franchisee benefits directly or pro rata from the production of such advertising;

(2)    Franchisee agrees that the NAC Fund may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising consistent with the objectives of the NAC, as set forth in its bylaws (including, without limitation, the cost of preparing television, radio, magazine, business journals and newspaper advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other advertising materials to the businesses operating under the System). Franchisor and the NAC reserve the right to use the NAC Fund in connection with the placement and allocation of such advertising. In addition, disbursements may be made to compensate Franchisor's employees who devote time and render services in the formulation, development and production of programs to satisfy such objectives and purposes, or who perform services in connection with the administration of the NAC Fund. The NAC Fund and its earnings shall not otherwise inure to the benefit of Franchisor or the NAC; and

(3)    An unaudited statement of contributions to and disbursements of the NAC Fund shall be prepared quarterly by Franchisor and made available to Franchisee upon request.

B.    In addition to the NAC Fund described in Section 3.D(2), Franchisor shall have the right, in its sole discretion, to designate any geographic area in which two (2) or more FASTSIGNS centers are located as a region for establishing an advertising cooperative ("Advertising Cooperative"). At any time after a second FASTSIGNS Center located within a designated geographic area has opened for business, Franchisor can designate and Franchisee shall be required to form an Advertising Cooperative to operate within that geographic area. Each Advertising Cooperative shall be organized and governed in a form and manner, and must commence operations on a date determined by Franchisor in its sole discretion. Each Advertising Cooperative shall be administered and maintained in a accordance with the terms of its governing documents. The Advertising Cooperative, all contributions thereto and any earnings thereon shall be used exclusively to meet any and all costs of developing, creating, producing, maintaining, administering, directing and preparing advertising and promotional materials and programs, subject to Franchisor's approval pursuant to Section 4.F, for Centers participating in the Advertising Cooperative. If at the time of the execution of this Agreement, an Advertising Cooperative has been established for a geographic area that includes Franchisee's Territory, Franchisee shall become a member of the Advertising Cooperative upon execution. If an Advertising Cooperative is established at any time during the term of this Agreement, Franchisee shall become a member of the Advertising Cooperative immediately after the Advertising Cooperative commences operation. In either case, Franchisee shall participate as follows:

(1)    Franchisee shall contribute to the Advertising Cooperative such amounts as are required by the Advertising Cooperative; provided, however, Franchisee will not be required to contribute more than two percent (2%) of Franchisee's Gross Sales during any calendar month to the Advertising Cooperative unless, subject to Franchisor's approval, the members of the Advertising Cooperative agree in writing to contribute a specific amount each month.  This contribution does not include the Franchisee's cost for their Yellow Pages display ad;

(2)    Franchisee shall submit to the Advertising Cooperative and to Franchisor such statements and reports as may be required by Franchisor or by the Advertising Cooperative.  All contributions to the Advertising Cooperative shall be maintained and administered in accordance with procedures adopted by the Advertising Cooperative and approved by Franchisor; and

(3)    No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without the prior approval of Franchisor.

C.    Franchisee shall place and pay to the local directory or the Advertising Cooperative, as determined by Franchisor, the cost of a quarter page or larger Yellow Pages display ad in Franchisee's local market area or, to the extent other FASTSIGNS centers are located in such area, Franchisee's pro rata share of the cost of the display ad or listing.  This area will usually include Franchisee's Territory.  To the extent more than one telephone company or directory service publishes display ads for Franchisee's local market area, Franchisor shall designate the directory in which Franchisee's display ad shall be published.  If Franchisor determines that Franchisee's participation in a display ad in another directory serving a related market area would be beneficial to Franchisee and the System and other FASTSIGNS centers are located in such related market area, Franchisee shall also pay its pro rata share of the cost of such additional ad.  Franchisee shall list the Yellow Pages display ad under the Signs heading and any other heading deemed appropriate by Franchisor in any and all directories Franchisee advertises in.  If more than one franchisee is advertising in a directory, Franchisee shall place a joint display ad with each franchisee paying their pro rata share of the cost of the joint display ad.  Franchisee shall not obtain in any directory, advertise or otherwise solicit business through the use of a national long distance toll free telephone number.  By obtaining Franchisor's prior written approval, Franchisee may advertise or otherwise solicit business through use of a regional long distance toll free number, remote call forwarding number or a listing for a future Center (the "number").  If permission is granted for Franchisee to obtain a number, Franchisee must use it as determined by Franchisor and relinquish the number at Franchisor's request.

D.    Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment E to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to the telephone numbers of the Center and any related and other business listings upon material default of Section 4.C. of this Agreement, or termination or expiration of this Agreement as required under Section 4.

E.    Franchisor may from time to time develop and administer other advertising programs designed to promote the entire System.  Franchisee shall have the right to participate in such programs, but only in full compliance with the terms established by Franchisor for each such program.

F.    All advertising and promotion by Franchisee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals (as defined in Section 14.A) or otherwise.  Franchisee shall obtain Franchisor's approval of all advertising and promotional plans and materials prior to use if such plans and materials have not been prepared by Franchisor or previously approved by Franchisor within the immediately preceding one (1) year period.  Franchisee shall submit such unapproved plans and materials to Franchisor, and Franchisor shall approve or disapprove such plans and materials within five (5) business days from the date of receipt thereof by Franchisor.  Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor.  Franchisee shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.

G.     From time to time during the term of the Agreement, the NAC may, on behalf of all franchisees in the System, obtain accounts from national companies that fulfill their needs for signs on a local basis and from a centrally coordinated service ("National Accounts"). Under the national accounts program ("NAP"), the NAC will negotiate and execute agreements with National Accounts customers (the "Customers") and will organize and administer the NAP. The NAP acts as a central access point through which the Franchisee can effectively meet the needs of the Customers. The NAP conforms to the individual needs of each customer by designing a customer tailored system for the Customer's ordering, production, distribution, and invoicing. Franchisee will be permitted to participate in the NAP; provided, Franchisee meets and complies with the NAC's criteria and standards for participating in such a program (which includes being in compliance with the terms of this Agreement), executes such form of participation agreement and other documents required by the NAC, and agrees to provide the services under the terms and conditions negotiated by the NAC. The Franchisor does not represent that the Franchisor or the NAC will obtain any national accounts in the Franchisee's Territory (as defined in Section 1.C). If, however, the NAC does obtain such accounts, the NAC will advise Franchisee of the terms of such participation and offer Franchisee the option to participate. Participation in the NAP is voluntary on the part of Franchisee and may be terminated by Franchisee or by the NAC in accordance with the terms of the participation agreement. Franchisee is not obligated to accept any Customer order from the NAP.

H.     Franchisee shall have the right to sell its products and offer services at any prices Franchisee may determine.

I.     Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment F to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to any web sites, web pages, listings, banners, URLs, advertisements or other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos, on or with the Internet, World Wide Web, Internet service providers, electronic mail services, electronic communication providers, search engines or other similar services upon the termination or expiration of this Agreement as required under Section 4. Franchisee shall execute such other documents required by Franchisor to effect this provision. Franchisee agrees that it has no authority to and shall not establish any web sites or listings on the Internet or World-Wide-Web without the express written consent of Franchisor.

5.    Franchisee Organization

A.     In the event Franchisee is a corporation, a partnership or a limited liability company, Franchisee and the Controlling Principals represent, warrant, and covenant that:

(1)     Franchisee is duly organized and validly existing under the state law of its formation;

(2)     Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(3)     Franchisee's corporate charter or written partnership agreement shall at all times provide that the activities of Franchisee are confined exclusively to the development and operation of FASTSIGNS centers under the System unless otherwise consented to by Franchisor in writing;

(4)     The execution of this Agreement and the transactions contemplated hereby are within Franchisee's corporate power if Franchisee is a corporation or limited liability company, or if Franchisee is a partnership, are authorized under Franchisee's written partnership agreement and have been duly authorized by Franchisee;

(5)    If Franchisee is a corporation or a limited liability company, copies of Franchisee's articles of incorporation, bylaws, stock certificates, other governing documents, any amendments to the foregoing, and resolutions of the Board of Directors authorizing entry into and performance of this Agreement shall be furnished to Franchisor prior to the execution of this Agreement; or, if Franchisee is a partnership, copies of the written partnership agreement, other governing documents, and any amendments to the foregoing, shall be furnished to Franchisor prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by Franchisee's written partnership agreement;

(6)    If Franchisee is a corporation, partnership or limited liability company, the ownership interests in Franchisee are accurately and completely described in Attachment "B". Further, if Franchisee is a corporation, Franchisee shall maintain at all times a current list of all owners of record and all beneficial owners of any class of voting securities in Franchisee or, if Franchisee is a partnership, all current owners of an interest in the partnership. In the event there is a change in the information contained in Attachment "B", Franchisee agrees to provide such information to Franchisor within five (5) days subsequent to any such change and to execute any documents deemed necessary by Franchisor to amend Attachment "B" in order to reflect such changes. Franchisee shall make its listings available to Franchisor upon request; and

(7)    If Franchisee is a corporation or a limited liability company, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate of the corporation shall have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to and that the further assignment or transfer thereof is subject to all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section 5.A(7) shall not apply to the transfer of equity securities of a publicly-held corporation. If Franchisee is a partnership, its written partnership agreement shall provide that ownership of an interest in the partnership is held subject to and that further assignment or transfer is subject to all restrictions imposed upon assignments by this Agreement.

(8)    If, after the execution of this Agreement, any person ceases to qualify as one of Franchisee's Principals (defined in Section 27.E) or if any individual succeeds to or otherwise comes to occupy a position which would, upon designation by Franchisor, qualify him as one of Controlling Principals, Franchisee shall notify Franchisor within five (5) days after any such change and, upon designation of such person by Franchisor as one of Franchisee's Principals or as a Controlling Principal, as the case may be, such person shall execute such documents and instruments (including, as applicable, this Agreement) as may be required by Franchisor to be executed by others in such positions; and

(9)    Franchisee's Principals (as defined in Section 27.E) shall each execute and bind themselves to the confidentiality and noncompetition covenants set forth in the Confidentiality Agreement and Ancillary Covenants Not to Compete which forms Attachment D to this Agreement (see Sections 15.B and 19.I). The Controlling Principals shall, jointly and severally, guarantee Franchisee's performance of all of Franchisee's obligations, covenants and agreements hereunder pursuant to the terms and conditions of the guaranty contained herein, and shall otherwise bind themselves to the terms of this Agreement as stated herein.

B.    Franchisee and the Controlling Principals acknowledge and agree that the representations, warranties and covenants set forth above in Section 5.A(1)-(9) are continuing obligations of Franchisee and the Controlling Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. Franchisee and the Controlling Principals will cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

6.    Site Selection; Lease___ ans and Construction

A.    Franchisee assumes all cost, liability, expense, and responsibility for locating, obtaining, and developing a site for any Center to be established under this Agreement and for constructing and equipping the Center at such site. Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for a Center unless the site is approved in accordance with the procedure herein set forth. Franchisee acknowledges that Franchisor's approval of a prospective site or the rendering of assistance in the selection of a site does not constitute a representation, promise, warranty or guarantee by Franchisor that a Center operated at that site will be profitable or otherwise successful.

B.    Within sixty (60) days after execution of this Agreement or any extended time period approved by Franchisor in writing, Franchisee shall acquire, at Franchisee's expense, a location for the Center at a site approved by Franchisor as hereinafter provided.

C.    (1)    Prior to acquisition of a site for the Center and within thirty (30) days after execution of this Agreement, Franchisee shall locate three (3) potential sites for the Center which satisfies Franchisor's site selection criteria and shall submit to Franchisor in the form specified by Franchisor a description of the three sites, together with such other information and materials as Franchisor may reasonably require. Franchisor shall review Franchisee's proposed sites based upon an analysis of local competitors, demographics, visibility, accessibility and suitability of the premises and other relevant factors. A representative of Franchisor shall travel, subject to availability, to Franchisee's proposed sites for an on-site evaluation of the sites for the Center developed pursuant to this Agreement. Franchisor may withhold approval of a site for any <u>bona</u> <u>fide</u> reason that Franchisor, in the exercise of its reasonable business judgment, deems necessary. All costs incurred by Franchisor's representative for such on-site evaluation for the Center premises developed hereunder shall be paid by Franchisor; provided, if Franchisee must relocate the Center for any reason, all such costs incurred by Franchisor's representative for site selection activities associated with such relocation shall be paid by Franchisee. Franchisee shall also pay all costs incurred for any additional on-site evaluations, if deemed necessary by Franchisor or requested by Franchisee.

(2)    If Franchisee is to occupy the premises of the Center under a lease, Franchisee shall submit to Franchisor the lease prior to its execution for Franchisor's approval and shall furnish to Franchisor a copy of the executed lease within ten (10) days after execution thereof. Any lease for the Center premises shall contain substantially the terms and provisions set forth in Attachment "C" to this Agreement, except as Franchisor may otherwise consent to in writing. If Franchisee is to purchase the premises for the Center, Franchisee shall submit the contract of sale to Franchisor for approval prior to its execution and shall furnish to Franchisor a copy of the executed contract of sale within ten (10) days after execution thereof.

(3)    Failure by Franchisee to acquire the site for the Center within the time period prescribed above (including any extensions approved by Franchisor) and in accordance with the terms of this Agreement shall constitute a material default hereunder.

(4)    Following the approval by Franchisor and the acquisition by Franchisee of a location for the Center pursuant to this Section 6, the location shall be described in Attachment "A" to this Agreement.

D.    Franchisee shall be responsible for obtaining and maintaining all zoning classifications and clearances which may be required by state, provincial, or local laws, ordinances, or regulations or which may be necessary or advisable as a result of any restrictive covenants relating to the Center premises. Franchisee shall obtain all permits, licenses, and certifications required for the lawful construction and operation of the Center. In addition, prior to the commencement of the construction or finish-out of the Center, Franchisee shall certify in writing to Franchisor that the insurance coverage specified in Section 10 is in full force and effect and that all required approvals, clearances, permits, and certifications have been obtained. Upon request, Franchisee shall provide to Franchisor additional copies

of Franchisee's insurance policies or certificates of insurance and copies of all such approvals, clearances, permits, and certifications.

E.     Franchisor provides the FASTSIGNS standard floor plan, reflective ceiling plan, and specifications for contractor bids and construction for the Center. These drawings will be supplied in a reproducible sepia format to allow Franchisee to make blueline prints. Franchisor will supply additional drawings, revisions and required forms. Franchisor will not charge Franchisee for the cost of the first revision to the drawings. Franchisor will charge Franchisee for the costs of additional revisions to the drawings. Franchisor will obtain any architectural seals required by local city ordinances and charge Franchisee for those and/or any out-of-pocket costs. Any engineering drawings required by local ordinances are Franchisee's responsibility.

F.     Franchisee shall independently secure the services of a qualified, licensed general contractor to construct the Center and complete all improvements thereto. If Franchisee must relocate the Center for any reason and Franchisor determines that the plans produced by the architectural firm selected by Franchisee for construction of the Center are not consistent with Franchisor's standards and specifications, Franchisor may prohibit the implementation of such plans or any part thereof. Franchisor shall notify Franchisee within thirty (30) days of receiving the architectural design plans for review that it objects to such plans. In the event Franchisor objects to any such plans, it shall provide Franchisee with a reasonably detailed list of changes necessary to make the plans acceptable. Franchisor shall, upon a resubmission of the plans with such changes, notify Franchisee within fifteen (15) days of receiving the resubmitted plans whether the plans are acceptable. Except as provided in Section 6.E above, preparation of such architectural plans and any revisions thereto shall be at Franchisee's expense. Construction of the Center shall be at Franchisee's expense. Franchisee shall diligently pursue construction of the Center. During the time of construction and completion of improvements, Franchisee shall provide Franchisor with weekly reports regarding the progress of such work as may be reasonably requested by Franchisor and in such form as required by Franchisor. In addition, Franchisor shall have the right to make such on-site inspections during the time of construction as it may deem reasonably necessary to evaluate Franchisee's progress. Franchisee shall notify Franchisor of the scheduled date for completion of construction and all improvements no later than thirty (30) days prior to such date. Within a reasonable time after the date of completion of construction, Franchisor shall, at its option, conduct an inspection of the completed Center and its premises. Franchisee acknowledges and agrees that Franchisee will not open the Center for business without the written authorization of Franchisor.

G.     Franchisee acknowledges that time is of the essence. Subject to Franchisee's compliance with the pre-opening obligations described in Sections 6 and 8, Franchisee shall open the Center and commence business within one hundred twenty (120) days following the date of execution of this Agreement unless Franchisee obtains an extension of such time period from Franchisor. Franchisor shall have the right to prohibit Franchisee from commencing operation of the Center in the event Franchisee fails to comply with such pre-opening obligations. The foregoing will not apply in the event this Agreement is entered into pursuant to the Development Agreement in which case Franchisee shall open the Center in accordance with the schedule provided therein.

7.     Duties of Franchisor

A.     Franchisor shall provide site selection assistance as set forth in Section 6.

B.     Franchisor shall provide Franchisee specifications and standards for the construction and design of a Center as provided in Section 6.

C.     Prior to the opening of the Center, Franchisor shall provide an initial training program for Franchisee, if Franchisee is an individual, or if Franchisee is a corporation or partnership, for one of the Controlling Principals (as defined in Section 27.E) and the General Manager (or designated personnel) in accordance with Section 8 and shall make available such other training programs as it deems appropriate.

D.     In connecti   with the opening of the Center, Franchiso   ranchise business consultant ("FBC") shall provide on-site pre-opening and opening training, supervision and assistance to Franchisee during the first week and a Sales Development Specialist during the second week the Center is open for business.   Except as set forth below, the FBC shall be provided at no expense to Franchisee.   If construction of the Center is not completed at the time the FBC arrives for the opening of the Center, Franchisee shall pay the expenses incurred by the FBC including, without limitation, the costs of travel, lodging, meals and wages.   Franchisee shall schedule another trip at a time when construction of the Center is complete, which trip shall be at no expense to Franchisee.   Additionally, for any replacement Center established by Franchisee in connection with any Development Agreement pursuant to which this Agreement is executed, or in accordance with Section 16.B(5) hereof as a result of an event of Force Majeure, Franchisor may, in its sole discretion, charge a reasonable fee for such opening assistance.

E.     In addition to the assistance rendered Franchisee prior to opening, Franchisor shall provide advisory assistance in the management and operation of the Center as Franchisor deems advisable.   Franchisor shall provide such assistance by means of toll free telephone service and, at the request of Franchisee or, if Franchisor deems necessary, through on-site visits by Franchisor's FBC.   Franchisor shall, at its expense, provide on-site assistance not less than two (2) times every twelve (12) months during the term of this Agreement with the first such time period commencing immediately following the initial week the Center is open for business.   If additional visits are requested by Franchisee, all costs and expenses incurred by Franchisor's representatives for such on-site assistance including, without limitation, the costs of travel, lodging, meals and wages, shall be paid by Franchisee unless Franchisor, in its sole discretion, agrees to pay such costs and expenses.

F.     Franchisor shall administer the NAC Fund and any Advertising Cooperative in accordance with Sections 3.D and 4.B.

G.     Franchisor shall provide Franchisee, on loan, one copy of the Manuals (as defined in Section 14.A).

H.     Franchisor shall, from time to time, conduct meetings, seminars and other related activities regarding the System for franchisees generally, which Franchisee is highly encouraged to attend.   Except as approved by Franchisor, any costs incurred by Franchisee, Franchisee's Principals or Center personnel in attending such events shall be the responsibility of Franchisee.

I.     Franchisor shall provide Franchisee with the terms and conditions applicable to the purchase of its store graphics package and menu graphics and for other fixtures, panel saw, equipment, computers, supplies and merchandise that Franchisee shall purchase from Franchisor and other approved or designated suppliers for use at the Center.

J.     Franchisor shall submit, on behalf of Franchisee, the opening inventory order.   In conjunction with the NAC, Franchisor shall make available printing and mailing services for the Center at a reasonable cost, as provided in Section 3.D(1).

K.     Franchisor shall seek to maintain the high standards of quality and service of the System, and, accordingly, shall conduct, as it deems advisable, inspections of the Center and evaluations of the products sold and services rendered therein.

L.     In the event a General Manager employed by Franchisee terminates employment with Franchisee to open a Center and has an ownership interest in said Center, Franchisee will be entitled to compensation at an amount equal to 1% of the new Center's gross sales during its first year of operation, payable quarterly, which amount will be paid by Franchisor.   Such amount represents compensation for the reasonable costs and expenses incurred by the Franchisee in connection with the training of such employee and shall not constitute payment for any broker or salesperson fees, nor shall Franchisor and Franchisee be deemed to create such a relationship by the payment of such fee.

8.    Training

Franchisee acknowledges that it is necessary to the continued operation of the System and the Center that Franchisee and Center personnel receive such training as specified in the Manuals or as Franchisor may require, and, accordingly, agrees as follows:

A.    Prior to the opening of the Center, Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest if less than twenty-five percent (25%)) and the General Manager (as defined in Section 9.B) (or such other designated personnel that Franchisor approves) shall attend and complete, to Franchisor's satisfaction, Franchisor's initial training program. Franchisee may, upon Franchisor's approval, permit other Center personnel to attend the initial training program. The initial training program shall include inspection of one or more existing FASTSIGNS centers, discussion and implementation of a grand-opening advertising program and training of Center personnel in the sales, administrative and financial aspects of the operation of the Center and in the use of sign-making and digital imaging equipment. Training shall be for such period of time as Franchisor deems reasonably necessary and shall be conducted at Franchisor's corporate offices or such other location determined by Franchisor. If the training program is not satisfactorily completed by Franchisee, the Controlling Principal attending training or the General Manager (or such other designated personnel), Franchisee shall designate a replacement to satisfactorily complete such training. Franchisor shall have the right to prevent Franchisee from opening the Center for business until the persons designated herein successfully complete the initial training program. During the remaining term of this Agreement, any successor General Manager shall, and any other personnel employed by Franchisee may be required by Franchisor to, attend and complete to Franchisor's satisfaction, Franchisor's initial training program. Any successor General Manager shall complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisor reserves the right to impose a training fee for such additional training, including training for any replacement General Manager. Notwithstanding the foregoing, if the Center is opened pursuant to a Development Agreement, the General Manager shall not be required to attend and complete Franchisor's initial training program if such General Manager has been employed by Franchisee or its affiliate in a management position at another FASTSIGNS center for four (4) or more months prior to the opening of such Center.

B.    Franchisee, Franchisee's Principals and the General Manager may attend such additional training programs and seminars as Franchisor may offer from time to time. At Franchisor's discretion, such additional training shall be mandatory. For all such programs and seminars, Franchisor will provide the instructors and training materials; however, Franchisor reserves the right to impose a reasonable fee for such additional training programs and seminars.

C.    Franchisee, a Controlling Principal or the General Manager shall attend the annual franchisee convention once within every three (3) year period from the date of this Agreement.

D.    Franchisee shall be solely responsible for all costs and expenses incurred by Franchisee, Franchisee's Principals or personnel attending any training programs, the annual franchisee conventions, and any other meetings and seminars including, without limitation, costs of travel, lodging, meals and wages.

9.    Center Operations

A.    Franchisee shall use the Center premises solely for the operation of the Center, shall maintain business hours as provided in the Manuals (as defined in Section 14.A) or as Franchisor shall specify from time to time in writing, and shall refrain from using or permitting the use of the Center premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor.

B.    Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest, if less than twenty-five (25%))

and who is acceptable to F   hisor, shall supervise the Center and dev   iis full time, best efforts and constant personal attention to the day-to-day operations of the Center for not less than the first six months the Center is open for business. In addition, Franchisee shall designate, in writing, an individual (the "General Manager") who will assist Franchisee or the Controlling Principal, as the case may be, in the management of the Center (and/or who will devote his full time, best efforts and constant personal attention to the day-to-day operations of the Center in the event Franchisee or Controlling Principal does not participate in the full-time operation of the Center after the initial six-month period the Center is open). Also, Franchisee shall designate in writing, an individual who will be Franchisee's production employee. The General Manager may be any of Franchisee's Principals or an employee of Franchisee. The General Manager shall satisfactorily complete Franchisor's initial training program; shall satisfy Franchisor's educational or business experience criteria in effect for General Managers in the System as of the time the General Manager is designated; and shall otherwise be an individual acceptable to Franchisor. If at any time during the term of this Agreement the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section 9.B, Franchisee shall promptly notify Franchisor and shall designate a replacement General Manager within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above. The replacement General Manager shall attend and complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisee shall provide for interim management of the Center until the replacement is designated, such interim management to be conducted in accordance with the terms of this Agreement.

C.      Franchisee shall maintain competent, conscientious and trained personnel to operate the Center in accordance with this Agreement and the Manuals and shall take such steps as are necessary to ensure that its employees maintain good customer relations.

D.      Franchisee and the Controlling Principals understand that compliance by all franchisees operating under the System with Franchisor's training and operational requirements is an essential and material element of the System and that Franchisor and franchisees operating under the System consequently expend substantial time, effort, and expense in training its personnel. Accordingly, Franchisee and the Controlling Principals agree that if during the term of this Agreement, Franchisee or any Controlling Principal shall designate as General Manager, Customer Service Representative, Inside Sales Representative, Computer Graphic Designer, Outside Sales Representative or FBC who is at the time or was at any time during the prior six (6) months employed in a similar position by Franchisor or any of its subsidiaries or affiliates, or by any other franchisee, such former employer shall be entitled to be compensated for the reasonable costs and expenses incurred by such employer in connection with the training of such individual. The parties agree that such expenditures may be uncertain and difficult to ascertain and therefore agree that the compensation specified herein reasonably represents such expenditures and is not a penalty. An amount equal to two months of the person's monthly salary, including monthly commissions and/or bonus at the time of the termination of his employment with such former employer shall be paid by Franchisee prior to such individual assuming the position. In seeking an individual to serve in the capacities described above, Franchisee and the Controlling Principals shall not discriminate in any manner whatsoever against any individual, the employment of whom by Franchisee is subject to the provisions of this Section 9.D, on the basis of the compensation required to be paid by Franchisee hereunder in the event of the employment by Franchisee or any Controlling Principal of such individual. The parties hereto expressly acknowledge and agree that no current or former employee of Franchisor, its subsidiaries and affiliates, or of any franchisee under the System shall be a third party beneficiary of this Agreement or any provision hereof, excluding only the covenant of Franchisee set forth in the preceding sentence. Franchisor hereby expressly disclaims any representations and warranties regarding the performance of any employee or former employee of Franchisor or its subsidiaries and affiliates, or any franchisee operating under the System, who is designated as General Manager or employed by Franchisee or any of the Controlling Principals in any other capacity, and Franchisor shall not be liable for any losses, of whatever nature or kind, incurred by Franchisee or such Controlling Principal in connection therewith.

E.      To ensure that the highest degree of quality and service is maintained, Franchisee shall operate the Center in strict conformity with such methods, standards and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing. Franchisee further agrees:

(1)      To offer for sale and sell at the Center all products and services required by Franchisor and to provide such products and services in the manner and style prescribed by Franchisor;

(2)      To offer for sale and sell only products and services expressly approved for sale in writing by Franchisor; to refrain from deviating from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue offering for sale and selling any product or service which Franchisor disapproves in writing at any time;

(3)      To purchase the store graphics package from Franchisor or its designated supplier and install such equipment and items, at Franchisee's expense, at the Center; and to purchase or lease and install, at Franchisee's expense, the panel saw, the signmaking computer, point-of-sale computer system and all other fixtures, furnishings, equipment, decor items, and signs which conform to Franchisor's standards and specifications as Franchisor may reasonably direct from time to time in the Manuals or otherwise in writing and refrain from installing or permitting to be installed on or about the Center premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved by Franchisor. If any of the property described above is leased by Franchisee from a third party, such lease must be approved by Franchisor, in writing, prior to execution. Franchisor's approval shall be conditioned upon such lease containing a provision which permits any interest of Franchisee in the lease to be assigned to Franchisor upon the termination or expiration of this Agreement and which prohibits the lessor from imposing an assignment or related fee upon Franchisor in connection with such assignment;

(4)      To purchase the opening inventory order and to obtain store fixtures from Franchisor's designated suppliers and to obtain all products, equipment, signs, interior and exterior decor items, furnishings, supplies and other materials required for operation of the Center solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then-current standards and specifications for such items and who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved in writing by Franchisor and not thereafter disapproved.

(5)      If Franchisee desires to purchase, lease or use products from a supplier who has not been previously approved by Franchisor, Franchisee shall submit to Franchisor a written request for such approval or may request the supplier to do so. Franchisee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor. Franchisor's representatives shall be permitted to inspect the supplier's facilities, and to require that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent firm designated by Franchisor for testing. Franchisor may impose a charge on Franchisee or the supplier for the costs of any such tests. Franchisor reserves the right, at its option, to reinspect the facilities and products from time to time and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Notwithstanding the foregoing, Franchisor shall not be required to approve any particular supplier.

F.      Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including forms, stationery and business cards) and other items which may be designated by Franchisor to bear the Proprietary Marks in the form, color, location and manner prescribed by Franchisor.

G.      Franchisee shall, at Franchisee's sole cost and expense, maintain the Center in the highest degree of repair and condition and in conformity with the standards, specifications, and requirements of the System, as the same may be designated by Franchisor from time to time. Franchisee specifically agrees to repair or replace, at Franchisee's cost, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Center

as necessary or desirable, : to obtain, at Franchisee's cost, any new o. : ditional equipment, fixtures, supplies, and other products and materials which may be reasonably required by Franchisor in order for Franchisee to offer and sell products or services from the Center. Except as may be expressly provided in the Manuals, no alterations or improvements, or changes of any kind in design, equipment, signs, interior, or exterior decor items, fixtures or furnishings shall be made in or about the Center or Center premises without the prior written approval of Franchisor in each instance.

H.    In order to assure the continued success of the Center, Franchisee shall, upon the request of Franchisor, modernize the Center premises, equipment, signs, interior, and exterior decor items, fixtures and furnishings required for the operation of the Center, to Franchisor's then-current standards and specifications; however, Franchisee shall not be required to undertake a material modernization of the Center that exceeds twenty thousand dollars ($20,000) within any three (3) year period during the term of this Agreement, except, however, the twenty thousand dollar ($20,000) limitation shall not apply to the purchase of equipment necessary to offer new and additional services provided in Section 9.G. above. Franchisee's obligations under this Section 9.H are in addition to, and shall not relieve Franchisee from, any of its other obligations under this Agreement, including those contained in the Manuals.

I.    Franchisee shall grant Franchisor and its representatives and agents the right to enter upon the Center premises at any time for the purpose of conducting inspections of the Center and its operations, and Franchisee shall cooperate with Franchisor's representatives and agents in such inspections by rendering such assistance as they may reasonably request and, upon notice from Franchisor or its representatives and agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, any obligation to do so), to correct such deficiencies and to charge Franchisee a reasonable fee for Franchisor's expenses in so acting, payable by Franchisee immediately upon demand.

J.    Franchisee shall comply with all other requirements set forth in this Agreement.

10.    **Insurance**

A.    Franchisee shall procure, prior to commencing construction of the Center, and shall maintain in full force and effect during the term of this Agreement, and any renewal hereof, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Franchisee's Principals and Franchisor and its subsidiaries, affiliates, successors and assigns, and their respective directors, officers, shareholders, partners, employees, agents and representatives, against any demand or claim relating to personal injury, death, property damage or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Center or by reason of the construction, operation or occupancy of the Center, as well as such other insurance applicable to such other special risks, if any, as Franchisor may reasonably require for its own and Franchisee's protection.

B.    Such policy or policies shall be written by an insurance company approved by Franchisor and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified for all franchisees, from time to time, by Franchisor in the Manuals or otherwise in writing), the following insurance coverage and policy limits:

(1)    Comprehensive general liability insurance, including personal injury coverage, property damage coverage, products liability coverage and fire and storm damage coverage, with primary and excess limits of not less than One Million Dollars ($1,000,000);

(2)    Motor vehicle liability insurance, including coverage of vehicles not owned by Franchisee but used by employees in connection with the Center, with a combination of primary and excess limits of not less than One Million Dollars ($1,000,000);

(3)    Employer's liability and workers' compensation insurance in amounts provided by applicable law or, if permissible under applicable law, and with respect to workers' compensation, any legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to Franchisor, provided that Franchisee (i) maintains an excess indemnity or "umbrella" policy covering employer's liability and/or a medical/disability policy covering medical expenses for on the job accidents, which policy or policies shall contain such coverage amounts as Franchisee and Franchisor shall mutually agree upon and (ii) conducts and maintains a risk management and safety program for its employees as the Franchisee and Franchisor shall mutually agree is appropriate. Such policies shall also include a waiver of subrogation in favor of Franchisor and its directors, officers, shareholders, partners, employees, representatives, independent contractors and agents; and

(5)    Other insurance which may be required by statute or rule of the state or locality in which the Center is located.

C.    Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified in Section 10.B shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, and each such insurance policy shall provide that the proceeds thereof shall not be reduced by any amount payable or paid to Franchisor under any policy procured and maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20. hereof.

D.    All public liability, property damage, and motor vehicle liability policies shall contain a provision that Franchisee's insurance coverage shall be primary to any coverage maintained by Franchisor and Franchisor shall be entitled to recover under Franchisee's policies for any loss occasioned to Franchisor, its subsidiaries, affiliates, successors and assigns, and their respective officers, directors, shareholders, employees, servants, agents, or representatives for whatever reason.

E.    Not later than fifteen (15) days prior to the date construction of the Center premises is to commence and, thereafter, at least thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor Certificates of Insurance and, if requested by Franchisor, copies of the applicable insurance policies evidencing the proper coverage with limits not less than those required hereunder. All insurance policies and Certificates required hereunder, with the exception of workers' compensation, shall name Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, servants, agents, and representatives as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions. Further, all insurance policies and Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Franchisor in the event of a material alteration to or cancellation of the policies. Nonsubscribers of Workers' Compensation (as permitted by law) shall provide Franchisor with proof of substitute coverage.

F.    Should Franchisee, for any reason, fail to procure and maintain the insurance coverage required by this Agreement or fail to provide proof of such insurance upon request by Franchisor, Franchisor shall have the right, at its option, to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing rights and remedies shall be in addition to any other remedies Franchisor may have.

G.    It is recommended by Franchisor that Franchisee procure garage keeper's comprehensive insurance, which provides coverage of theft or vandalism of vehicles that are owned by customers that Franchisee is providing service to with limits of not less than Twenty Five Thousand Dollars ($25,000) per vehicle. It is also recommended by Franchisor that Franchisee procure loss/interruption of business insurance.

11.    Taxes, Permits and Indebtedness

A.    Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all trade and other accounts and indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement.

B.    Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, excise tax or any license or tax similar thereto, directly or indirectly, imposed on Franchisor with respect to any payment to Franchisor required under this Agreement. The preceding sentence shall not apply to any franchise tax or income, war profits or excess profits tax (or any tax in lieu thereof) imposed on Franchisor with respect to the aforesaid payments.

C.    In the event of any *bona fide* dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Center, or any improvements thereon.

D.    Franchisee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Center, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits and fire clearances and shall promptly provide Franchisor with copies of the same in accordance with Section 6.D and promptly thereafter as new or modified permits, licenses or certificates are obtained.

E.    Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Center.

12.    Records and Reports

A.    Franchisee shall maintain during the term of this Agreement full, complete and accurate books, records and accounts including, without limitation, sales slips, purchase orders, invoices, payroll records, bank statements, and cash receipts and disbursements journals and ledgers in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing. Franchisee shall preserve such books, records and accounts for not less than seven (7) years following the date of their preparation. Franchisor may require Franchisee to use an approved source for accounting and financial services in connection with the maintenance of the books and records.

B.    Franchisee, at its expense, shall submit to Franchisor a monthly report of Gross Sales of the Center and such other data or information as Franchisor may reasonably require. Such report shall be delivered each month during the term of this Agreement. Such report shall be due even if no Service Fee is due.

C.    In addition to the sales report described in Section 12.B, Franchisee, at its expense, shall submit to Franchisor a monthly and year-to-date financial statement of Franchisee and the business franchised hereunder. Such statement shall be prepared based on a calendar year and shall be prepared using the accrual method. Such statement shall be delivered within th▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓during the term of this Agreement and shall be prepared in accordance with generally accepted accounting principles and certified as true, complete and accurate by Franchisee or Franchisee's treasurer or chief financial officer. In addition, upon the request of Franchisor, within sixty (60) days following the conclusion of Franchisee's fiscal year, Franchisee shall, at Franchisee's

expense, deliver year-end financial statements of Franchisee and the Center that have been prepared in accordance with generally accepted accounting principles and reviewed for completeness and lack of material misstatements or omissions by an independent certified public accountant or bookkeeping service approved by Franchisor.

D.    Franchisee shall file all federal, state and local reports and returns as may be required by law in connection with the operation of the Center.

E.    Franchisee shall also submit to Franchisor, for review or audit, such other forms, reports, tax returns, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing. Franchisee shall submit to Franchisor, a copy of Franchisee's federal tax return within sixty ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

F.    Franchisor or its designated agents shall have the right at all reasonable times to examine, copy or electronically poll all of Franchisee's books, records, tax returns and correspondence. Franchisor shall also have the right at any time to have an independent audit performed on the books and records of Franchisee and the Center. If any such examination discloses a deficiency in any payment to Franchisor, Franchisor shall give notice of the deficiency to Franchisee, and Franchisee shall pay the amount of the deficiency within ten (10) days after receipt of the notice, together with interest from the date such amount was due until paid at the rate of eighteen percent (18%) per annum, or at the maximum rate of interest permitted by applicable law, whichever is less. If any inspection discloses an understatement of Gross Sales for any period of more than two percent (2%), Franchisee shall, in addition, reimburse Franchisor for all costs in connection with the examination or audit. The foregoing remedies shall be in addition to any other remedies Franchisor may have under this Agreement.

G.    Upon execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment G to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by Franchisee with any state and/or federal taxing authority. This power of attorney shall survive the expiration or termination of this Agreement. Franchisee shall execute such additional documents as Franchisor shall require in connection with such appointment.

H.    Franchisee shall grant Franchisor or its agents, upon request of Franchisor, the right to contact and obtain information from third parties doing business with Franchisee regarding Franchisee's financial condition or business practices or policies. Franchisee agrees that any third party, including, without limitation, clients, vendors, suppliers, financial institutions, lessors and financiers, may release any and all information requested by Franchisor without obtaining any further permission from Franchisee.

13.    Proprietary Marks

A.    Franchisor hereby grants to Franchisee a license to use the Proprietary Marks during the term of this Agreement in accordance with the System and the standards and specifications attendant thereto, as prescribed by Franchisor from time to time which underlie the goodwill associated with and symbolized by the Proprietary Marks.

B.    With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

(1)    Franchisee shall use only the Proprietary Mark designated by Franchisor and shall use them only in the manner authorized and permitted by Franchisor. Any unauthorized use of the Proprietary Marks shall constitute an infringement of Franchisor's rights and a material event of default under this Agreement. Franchisee shall not use the name FASTSIGNS or any other Proprietary Mark in the corporate or other legal name of any corporation or other entity formed by or affiliated with Franchisee;

(2)    Franchisee shall use the Proprietary Marks only for the operation of the Center or in advertising for the Center. Franchisee shall permanently cease all use of the Proprietary Marks immediately upon termination or expiration of this Agreement and take appropriate action to remove the Proprietary Marks from the premises upon which the Center is located and to cancel any advertising relating to Franchisee's use of the Proprietary Marks, including Yellow Pages listings;

(3)    Franchisor shall have the right to approve any materials containing any of the Proprietary Marks, including, without limitation, signs, stationery, business cards, forms and other materials and supplies used by Franchisee;

(4)    During the term of this Agreement, Franchisee shall identify itself as the owner of the Center (i) in conjunction with any use of the Proprietary Marks, including without limitation, uses on invoices, order forms, receipts and contracts, and (ii) in a notice of such content and form and at such conspicuous locations at the Center premises as Franchisor may require;

(5)    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or any of its affiliates;

(6)    Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Center only under the mark FASTSIGNS without prefix or suffix;

(7)    Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability, and upon request of Franchisor, Franchisee shall provide it with a copy of such document(s); and

(8)    Franchisee and the Controlling Principals shall immediately notify Franchisor of any infringement of the Proprietary Marks or challenge to its use of any of the Proprietary Marks or claim by any person of any rights in any of the Proprietary Marks. Franchisee and the Controlling Principals agree that they will not communicate with any person other than Franchisor and Franchisor's counsel in connection with any such infringement, challenge, or claim. Franchisor shall have sole discretion to take such action as it deems appropriate and the right to exclusively control and conduct any litigation, or Patent and Trademark Office or other proceeding arising out of any infringement, challenge, or claim relating to any of the Proprietary Marks. Franchisee and each of the Controlling Principals agree to execute any and all instruments and documents, render such assistance, and perform such acts as may, in the opinion of Franchisor's counsel, be necessary or advisable to protect and maintain Franchisor's interests in any such litigation or Patent and Trademark Office or other proceeding or to otherwise protect and maintain Franchisor's interest in the Proprietary Marks.

C.    Franchisee and the Controlling Principals expressly acknowledge and agree that:

(1)    Franchisor is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them;

(2)    The Proprietary Marks are valid and serve to identify Franchisor as the source of origin of goods and services provided under them;

(3)     Neither Franchisee nor any Controlling Principal shall directly or indirectly contest the ownership or validity of the Proprietary Marks;

(4)     Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership or other interest in or to the Proprietary Marks, except the limited license granted pursuant to this Agreement;

(5)     Any and all goodwill and improvements to the System arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks; and

(6)     Franchisor reserves the right to substitute different Proprietary Marks for use in identifying the System and the businesses operating thereunder if the Proprietary Marks no longer can be used or such use is restricted, or if Franchisor, in its sole business judgment, determines that substitution of different marks will be beneficial to the System. Any costs incurred by Franchisee to comply with any change or modification of the Proprietary Marks shall be paid solely by Franchisee; provided that Franchisor shall reimburse Franchisee for reasonable expenses incurred which are directly related to such change or modification upon receipt of documentation satisfactory to Franchisor, such reimbursement to be limited to fifty percent (50%) of Franchisee's total expenses or $2,000.00, whichever is less.

14.    **Confidential Manuals**

A.     Franchisee shall receive on loan from Franchisor several manuals including, without limitation, the Site Selection Notebook, Romancing the Shopping Center Kit, Pre-Opening Manual, FASTSIGNS Operations Manual, Target Marketing Manual, Marketing Resource Manual, Customer Service Kit Audio/Video, Computer Manual, Typestyles & Symbols Manual, Employee Manual, Personnel Manual, Price List Manual, Presentation Manual, and any other materials designated by Franchisor from time to time (collectively, the "Manuals") concerning the operation, merchandise, equipment, supplies, sales, service, advertising, marketing and other aspects of the System. Franchisee and the Controlling Principals and all other employees shall at all times treat the Manuals, any other manuals created for or approved for use in operation of the Center, and the information contained therein as confidential and shall maintain such information as secret and confidential. One set of the Manuals shall be loaned at no expense to Franchisee. Franchisor also reserves the right to impose a reasonable fee for the replacement of any Manual loaned to Franchisee. Additional copies of the Manuals may be loaned to Franchisee by Franchisor at a reasonable cost. Neither Franchisee nor any of the Controlling Principals shall at any time copy, duplicate, record or otherwise reproduce the foregoing materials in whole or in part, nor otherwise disclose or make the same available to an unauthorized person.

B.     In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Proprietary Marks, Franchisee shall conduct its business in accordance with the Manuals, other written directives which Franchisor may issue to Franchisee from time to time whether or not such directives are made part of the Manuals, and any other manuals and materials created or approved for use in the operation of the Center.

C.     Franchisee and each of the Controlling Principals acknowledge and agree that it will abide by the specifications, standards and procedures contained in each of the Manuals.

D.     The Manuals, written directives, other manuals and materials, and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor, shall at all times be kept in a secure place on the Center premises and shall be returned to Franchisor immediately upon request or upon termination or expiration of this Agreement.

E.     Franchisor may from time to time revise the contents of the Manuals and the contents of any other manuals and materials created or approved for use in the operation of the Center. Franchisee

expressly agrees to insert a    changes and additions into the correct Man    upon receipt of the same and agrees to comply with each new or changed standard.

F.    Franchisee shall at all times ensure that the Manuals are kept current and up to date. In the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's corporate office shall be controlling.

## 15.    Confidential Information

A.    Franchisee and each of the Controlling Principals shall not, during the term of this Agreement or any time thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation or other entity any confidential information, trade secrets, knowledge, know-how, or techniques concerning the methods of operation of the Center which, in addition to the Manuals described above, may be communicated or provided to Franchisee or Controlling Principals or of which they may be apprised by virtue of Franchisee's operation of the Center under the terms of this Agreement. Franchisee and Controlling Principals shall divulge such confidential information only to the General Manager and such of Franchisee's employees as must have access to such confidential information in connection with the operation of the Center. Any and all information, trade secrets, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor any of the Controlling Principals shall, at any time, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, or otherwise make the same available to any unauthorized person, without the prior written consent of Franchisor.

B.    Franchisee shall require and obtain execution of covenants similar to those set forth in Sections 14 and 15.A from its General Manager and all other personnel of Franchisee who have received or will have access to confidential information. Such covenants shall be substantially in the form set forth in Attachment D. All of Franchisee's Principals also must execute such covenants. Franchisor may, in its sole discretion, modify Attachment "D" with respect to any Center personnel to remove the covenant-not-to-compete provisions if, pursuant to Section 19., Franchisor does not require execution of such covenants by Franchisee's personnel.

C.    If Franchisee or any of the Controlling Principals develops any new concepts, processes, or improvements in the operation or promotion of the Center, Franchisee agrees to promptly notify Franchisor and provide Franchisor with all necessary information concerning the same, without compensation. Franchisee and Franchisee's Principals acknowledge that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to its developers, franchisees and other parties as it deems appropriate.

D.    Franchisee and each of the Controlling Principals acknowledge that any failure to comply with the requirements of this Section 15 shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 15 without the necessity of posting bond. Franchisee and the Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 15.

## 16.    Default and Termination

A.    Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee if Franchisee shall become insolvent or shall have made a general assignment for the benefit of creditors; or a petition under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state thereof shall have been filed by Franchisee or such a petition shall have been filed against and not opposed by Franchisee; or Franchisee admits in writing its inability to pay its debts when due; or

Franchisee shall have been adjudicated bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy law or any similar law or statute of the United States or any state thereof; or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets shall have been filed and not opposed by Franchisee; or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, shall have been appointed by any court of competent jurisdiction; or proceedings for a composition with creditors under any state or federal law shall have been instituted by or against Franchisee; or a final judgment against Franchisee shall have remained unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond shall have been filed); or if Franchisee is dissolved; or execution shall have been levied against Franchisee, Franchisee's Center or property; or suit to foreclose any lien or mortgage against the premises or equipment shall have been instituted against the premises or equipment of any business operated hereunder and not dismissed within thirty (30) days; or the real or personal property of any business operated hereunder shall be sold after levy thereupon by any sheriff, marshal or constable.

B.     Franchisee shall be in default and Franchisor may, in its sole discretion, immediately terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default (except as otherwise required by law) effective upon notice to Franchisee, upon the occurrence of any of the following events, each of which shall be deemed to be a material event of default:

(1)     If Franchisee operates the Center or sells any products or services authorized by Franchisor for sale at the Center at a location which has not been approved by Franchisor;

(2)     If Franchisee fails to acquire a site for the Center within sixty (60) days following the date of this Agreement, or if after the acquisition of an approved site, Franchisee is unable to obtain the required permits, licenses, and certifications required to commence construction within sixty (60) days after the location is approved or if Franchisee fails to acquire, within sixty (60) days following the date of this Agreement, sufficient financing to complete construction of the Center and to open the Center for business (unless any extension of such time periods is approved by Franchisor in writing); provided, however, under such circumstances, Franchisor shall, subject to Franchisee's compliance with the post-termination obligations under Section 17, refund the initial franchise fee actually paid by Franchisee pursuant to Section 3.A., without interest, less Four Thousand Dollars ($4,000.00) of such franchise fee. This refund is only applicable when Franchisee pays the full Twenty Thousand Dollar ($20,000.00) franchise fee. Such payment shall be made within thirty (30) days after the effective date of the termination. Franchisor shall not be obligated to return any fees paid by Franchisee in the event this Agreement is terminated by Franchisor pursuant to any other term of this Agreement or by Franchisee for any reason other than the reasons expressly set forth above;



(4)     Franchisee or any of the Controlling Principals shall have been convicted of or shall have entered a plea of nolo contendere to a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor shall believe reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interest therein;

(5)     If Franchisee shall have ceased to do business at the Center for seven (7) consecutive days, or shall have lost the right to possession of the premises, or otherwise shall have forfeited the right to do or transact business in the jurisdiction where the Center is located; provided, however, this provision shall not apply in cases of Force Majeure (as defined in Section 28.A) if, through no fault of Franchisee, the premises shall have been damaged or destroyed and Franchisee, within thirty (30) days after such damage or destruction has occurred, applies for Franchisor's approval to relocate or reconstruct the Center premises, which approval shall not be unreasonably withheld, but may be conditioned upon the payment of an agreed minimum Service Fee to Franchisor during the period in which the Center is not in operation;

(6)    If Franchisee fails to designate a qualified replacement General Manager thereto within thirty (30) days after such General Manager ceases to serve as such, as provided in Section 9.B above;

(7)    If Franchisee breaches or is in default under any of the representations, warranties and covenants contained in Section 5;

(8)    If a transfer or attempt to transfer any rights or obligations under this Agreement or any interest in Franchisee or the Center to any third party is made by Franchisee or the Controlling Principals without Franchisor's prior written consent, or without offering Franchisor a right of first refusal with respect to such transfer, contrary to the terms of Section 18 of this Agreement;

(9)    If Franchisee or any of the Controlling Principals fails to comply with the covenants in Section 15.A or 19.B hereof or if Franchisee fails to obtain the execution of the covenants required under Section 15.B or 19.I hereof within thirty (30) days following Franchisor's request that Franchisee obtain the execution of such covenants;

(10)    If an approved transfer upon death or permanent disability is not effected within the time period prescribed by Section 18.E hereof;

(11)    If Franchisee fails to open and operate the Center within one hundred twenty (120) days after the date of execution of this Agreement, or within any additional time period approved by Franchisor pursuant to Section 6.G of this Agreement;

(12)    If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or with the System, or Franchisor's rights therein and does not cure such default within twenty-four (24) hours following notice thereof from Franchisor;

(13)    If Franchisee fails to procure and maintain such insurance policies as required by Section 10 and Franchisee fails to cure such default within seven (7) days following notice thereof from Franchisor;



(15)    If Franchisee is in default with respect to the payment of any monetary obligation due to Franchisor hereunder more than two (2) times during any immediately preceding twelve (12) month period of time, whether or not cured by Franchisee after notice by Franchisor; or

(16)    Except as provided in Section 16.B(15), if Franchisee or and Controlling Principal repeatedly is in default under Section 16.C hereof for failure to comply with any of the requirements imposed by this Agreement, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by Franchisee after notice by Franchisor.

(17)    Any default by Franchisee under the terms and conditions of any other agreement between Franchisor and Franchisee, or a default by Franchisee of his obligations to any Advertising Cooperative of which Franchisee is a member, shall be deemed to be a default of this Agreement. Furthermore, in the event of termination, for any cause, of any other agreement between the parties hereto, Franchisor may, at its option, terminate this Agreement.

(18)    If Franchisee fails to attend an annual franchisee convention once within every three (3) year period as provided in Section 8.C of this Agreement.

FAREV3.01                                      -23-

C.     Except as provided in Section 16.B above, upon any default by Franchisee which is susceptible of being cured, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirt▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the thirty (30) day period, and by promptly providing proof thereof to Franchisor. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.  Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(1)     If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by the Manuals, or fails to carry out the terms of this Agreement in good faith;

(2)     If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing;

(3)     If Franchisee fails, refuses or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

(4)     If Franchisee or any Controlling Principal engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

(5)     If Franchisee receives three (3) or more material customer complaints within a twelve (12) month period that are reported to Franchisor and are not resolved to Franchisor's complete satisfaction.

17.     <u>Obligations Upon Termination or Expiration</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and each of the following provisions apply:

A.     Franchisee shall immediately and permanently cease to use in any manner whatsoever any equipment, methods, procedures and techniques associated with the System, the name FASTSIGNS and all Proprietary Marks and distinctive trade dress and devices associated with the System, and Franchisee shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

B.     Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark FASTSIGNS or any other trademark or service mark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

C.     Franchisee and the Controlling Principals shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates.  Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the termination or expiration of this Agreement (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief for the enforcement of any provision of this Section 17), which obligation shall, until paid in full, give rise to and remain a lien in favor of Franchisor against any and all of the personal property, furnishings, fixtures, equipment, signs and inventory owned by Franchisee and on the premises at the time of the termination or expiration.  Franchisor shall have the right to file this Agreement as a financing statement with the proper offices to perfect its lien hereunder.

D.     Franchisee shall immediately deliver to Franchisor all materials, including the Manuals, records, files (including electronic files), customer lists, point-of-sale databases, instructions, correspondence, and any and all other materials relating to the System and the operation of the business franchised hereunder in Franchisee's possession, and all copies thereof (all of which are acknowledged to be Franchisor's property), and Franchisee shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

E.     Franchisee, at Franchisor's option, shall assign to Franchisor all rights to the telephone number for the Center and any related Yellow Pages or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time to transfer such service and numbers to Franchisor. Notwithstanding any forms and documents which may have been executed by Franchisee under Section 4.C., Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. Franchisee shall thereafter use different telephone numbers at or in connection with any subsequent business conducted by Franchisee.

F.     Franchisee shall, at Franchisor's option, assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises or with respect to any equipment used in the operation of the Center. Franchisor may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement. In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Center, Franchisee shall make such modifications or alterations to the premises operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of such premises from that of other FASTSIGNS centers under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with the requirements of this Section 17, Franchisor shall have the right to enter upon the premises where Franchisee's Center was operated, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

G.     Franchisor shall also have the option, but not the obligation, which it may exercise by providing written notice thereof within thirty (30) days after termination or expiration of this Agreement, to purchase any or all inventory, fixtures, equipment, furnishings and any and all other items bearing the Proprietary Marks, at Franchisee's cost or fair market value, whichever is less. If the parties cannot agree on a fair market value within thirty (30) days from Franchisor's notice, a qualified independent appraiser shall be designated by Franchisor, the determination of such appraiser to be binding on the parties. No value will be given to goodwill. If Franchisor elects to exercise any option to purchase items as herein provided, it shall have the right to set off all amounts due from Franchisee and the cost of the appraisal, if any, against any payment therefor. In the event Franchisor exercises this option, Franchisee shall deliver to Franchisor, in a form satisfactory to Franchisor, such bills of sale, assignments, releases of liens and other such documents which Franchisor deems reasonably necessary. The closing for such purchase shall be within thirty (30) days following the date the purchase price for such goods and items is determined, or such other date as the parties may mutually agree upon.

H.     Franchisee and each of the Controlling Principals agree, in the event any such party continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agree not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

FAREV3.01                                    -25-

I.    Franchisee and the Controlling Principals shall comply with the restrictions on confidential information contained in Sections 14 and 15.A and the covenants contained in Section 19.B of this Agreement. Any other person required to execute similar covenants pursuant to Section 15.B or 19.I shall also comply with such covenants.

18.    Transfer of Interest

A.    Transfer by Franchisor

Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations hereunder to any person or legal entity and all rights hereunder shall inure to the benefit of Franchisor and its successors and assigns.

B.    Transfer by Franchisee

(1)    Franchisee and Controlling Principals acknowledge and agree that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted the franchise rights hereunder in reliance on the business skill, financial capacity and personal character of Franchisee and the Controlling Principals. Accordingly, neither Franchisee nor any initial or subsequent successor or assign to any part of Franchisee's interest in this Agreement or the Center, nor any individual, partnership, corporation, or other entity which directly or indirectly has or owns any interest in this Agreement, the Center or Franchisee shall sell, assign, transfer, convey, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement, the Center or Franchisee without the prior written consent of Franchisor; provided, however, that Franchisor's prior written consent shall not be required for a transfer of less than a one percent (1%) interest in any entity that is required to register its securities under Section 12 of the Securities Exchange Act of 1934, as amended. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section 18, shall be null and void and shall constitute a material event of default under Section 16.B(8) of this Agreement.

(2)    Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee, the Center or this Agreement; however, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

(a)    All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its subsidiaries and affiliates shall have been satisfied in a timely manner;

(b)    Franchisee or the Controlling Principals shall not be in default under any provision of this Agreement, any amendment or supplement hereto, or any other agreement between Franchisee or any of the Controlling Principals and Franchisor or any of its subsidiaries and affiliates;

(c)    The transferor and its principals (if applicable) shall have executed a general release, in a form prescribed by Franchisor, of any and all claims of the transferor, of whatever kind or nature, against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, employees, agents and representatives, including, without limitation, claims arising under this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries or affiliates and federal, state and local laws, regulations, rules or orders;

(d)    The transferee and its principals shall have demonstrated to Franchisor's satisfaction the following: transferee's meeting the criteria considered by Franchisor when reviewing a prospective franchisee's application for a franchise, including Franchisor's educational, managerial and business standards; transferee's character, business reputation, credit rating and financial capability; transferee's aptitude and ability to conduct the business contemplated hereunder (as may be evidenced by prior related business experience or otherwise); and transferee's completion of Franchisor's Confidential Questionnaire;

(e)    The transferee shall have entered into a written agreement, in a form prescribed by Franchisor, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements contained in this Agreement, and, if transferee is a corporation or a partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreement as transferee's principals;

(f)    At Franchisor's option, the transferee shall have executed for a term ending on the expiration date of this Agreement and with such renewal term as may be provided herein, the standard form franchise agreement then being offered to new System franchisees or a revised form of this Agreement, as Franchisor deems appropriate, and all other ancillary documents as Franchisor may require, which agreements shall supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement and may include, without limitation, higher service fees and advertising fees, and a revised Territory; provided, however, that the transferee shall not be required to pay any initial franchise fee; and if the transferee is a corporation, a limited liability company, or a partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreements as transferee's principals, and guarantee the performance of all such obligations, covenants and agreements. Any franchise agreement signed by the transferee shall contain substantially the terms and provisions set forth in Attachment I to this Agreement, except as Franchisor may otherwise consent to in writing;

(g)    Transferor shall have executed any documents reasonably required by Franchisor to evidence transferor's obligation to remain liable, except for those obligations surviving any termination of transferor's interest in Franchisee, the Center or this Agreement, for all of the obligations to Franchisor prior to the effective date of the transfer;

(h)    Transferee (or, if transferee is a corporation, limited liability company or a partnership, one of transferee's shareholders, partners or investors, as designated by Franchisor) and transferee's manager shall have completed any training programs then in effect for System franchisees upon such terms and conditions as Franchisor may reasonably require;

(i)    If transferee is a corporation, limited liability company or a partnership, transferee shall make and will be bound by any or all of the representations, warranties, and covenants set forth in Section 5 as Franchisor requests. Transferee shall provide to Franchisor evidence satisfactory to Franchisor that the terms of Section 5 have been satisfied and are true and correct on the date of transfer;

(j)    Transferee, at its expense, shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for Centers under the System, as Franchisor may require; and

(k)    If transferor proposes to transfer an interest in any Agreement, the Center or in Franchisee, as applicable, transferor must pay to Franchisor a transfer fee equal to a pro rata portion of $10,000.00 based upon the percentage of interest that is being transferred (e.g., if Franchisee wishes to transfer fifty-five percent (55%) of an interest or shares of Franchisee, transferor shall pay a transfer fee equal to fifty-five percent (55%) of $10,000.00 or $5,500.00). If the proposed transfer is to or among Franchisee's Principals, or to or among the immediate family members of Franchisee or any of its Principals (defined as the spouse of transferor and transferor's children (including half-blood or adopted children)), transferor shall pay a transfer fee of $300.00, or such greater amount as is necessary to compensate Franchisor for its costs in reviewing such transfer (including attorneys' fees). The fees referenced herein are to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the transfer and training costs for the transferee.

(3)    Franchisee shall not grant a security interest in this Agreement or the rights hereunder without Franchisor's prior written consent, which consent shall not be unreasonably withheld. In connection therewith, the secured party shall be required by Franchisor to agree that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right

and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee.

(4)    Franchisee and Franchisee's Principals acknowledge and agree that each condition which must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

C.    Transfer for Convenience of Ownership

In the event that the proposed transfer is to a corporation, a proprietorship, a partnership or limited liability company formed by Franchisee solely for the convenience of ownership, Franchisor's consent to such transfer shall be conditioned upon the requirements set forth in this Section 18 except for the requirements of Sections 18.B(2)(c), (d), (f) and (h); and provided that Franchisee shall pay a transfer fee of ($300.00), or such greater amount as is reasonably necessary to reimburse Franchisor for its expenses in connection with the approval of the transfer and shall deliver to Franchisor the documents described in Section 5.A above with respect to such corporation. Notwithstanding the foregoing, if such transfer by Franchisee is prior to commencement of the initial training program described in Section 8.A above, there shall be no transfer fee provided that Franchisee otherwise complies with the provisions of this Section 18.C. Franchisee shall be the owner of all the voting stock or interest of the corporation and if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

D.    Right of First Refusal

(1)    Any party holding a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), who desires to accept any bona fide offer from a third party to purchase such interest shall promptly notify Franchisor in writing of each such offer and shall provide such information and documentation relating to the offer as Franchisor may require including, without limitation, the name and address of the prospective purchaser, the terms of the offer and a copy of any letter of intent or proposed purchase contract. Franchisor shall have the right and option, exercisable for thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor or such later date as may be provided in the third party offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 18.D shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 18, with respect to a proposed transfer.

(2)    In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisor may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash part of the offer, an independent appraiser, qualified by training and experience to appraise such non-cash consideration, shall be designated by Franchisor to determine such amount, and his determination shall be binding on the parties. Franchisor shall have the right to set off the cost of such appraisal against the purchase price.

E.    Transfer Upon Death or Permanent Disability

(1)    Upon the death of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement, or any of the Controlling Principals or other persons with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%) (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall have six (6) months from the date of death to transfer such interest to a third party approved by Franchisor. If

no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor. If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within six (6) months after the death of the Deceased.

(2)     Upon the permanent disability of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement; or any Controlling Principal or other person with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), Franchisor may, in its sole discretion, require such interest to be transferred to a third party approved by Franchisor within six (6) months after notice to Franchisee. "Permanent disability" shall mean any physical, emotional, or mental injury, illness, or incapacity which would prevent a person from performing the obligations set forth in this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely. Permanent disability shall be determined upon examination of the person by a licensed practicing physician selected by Franchisor; or if the person refuses to submit to an examination, then such person shall be automatically deemed permanently disabled as of the date of such refusal for the purpose of this Section 18. The costs of any examination required by this Section 18.E(2) shall be paid by Franchisor.

(3)     Upon the death or claim of permanent disability of any person described in Sections 18.E(1) and 18.E(2), Franchisee or a representative of Franchisee must promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in Section 18 for any *inter vivos* transfer. If an interest is not transferred upon death or permanent disability as required in this Section 18.E, and in accordance with the terms and conditions of Section 18, such failure shall constitute a material event of default under Section 16.B(10).

F.     Non-Waiver of Claims

Franchisor's consent to a transfer of any interest in Franchisee or this Agreement shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

G.     Offerings by Franchisee

Securities or partnership interests in Franchisee may be offered to the public, by private offering or otherwise after the date hereof only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for such offering by federal or state law shall be submitted to Franchisor for a limited review as described below prior to their being filed with any government agency, and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor or any of its subsidiaries or affiliates is participating in an underwriting, issuance or offering of Franchisor's or Franchisee's or their subsidiaries, or affiliates' securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship among Franchisee, Franchisor and any subsidiaries or affiliates, if applicable. Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitation described in the preceding sentence. Franchisee, Controlling Principals and any other participants in the offering shall fully indemnify Franchisor, its subsidiaries, affiliates, successors and assigns and their respective directors, officers, shareholders, partners, employees, agents and representatives in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of $2,500.00 or such greater amount as is necessary to reimburse

Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section 18.G.

19.    Covenants

A.    Franchisee and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Franchisee and the Controlling Principals will receive valuable specialized training, trade secrets, and confidential information, including, without limitation, information regarding the management, operational and marketing methods and techniques of Franchisor and the System which are beyond the present skills and experience of Franchisee and the Controlling Principals and Franchisee's managers and employees. Franchisee and Controlling Principals acknowledge that such specialized training, trade secrets, and confidential information provide a competitive advantage and will be valuable to them in the operation of the Center, and that gaining access to such specialized training, trade secrets, and confidential information is, therefore, a primary reason why they are entering into this Agreement.

B.    In consideration for such specialized training, trade secrets, confidential information and exclusive rights described in Section 19.A above, Franchisee and the Controlling Principals covenant as follows:

(1)    With respect to Franchisee, during the term of this Agreement, or with respect to each of the Controlling Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of "Controlling Principal" (as described in Section 27.E), except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership, corporation or limited liability company:

(a)    divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System;

(b)    except as permitted by Section 9.D, employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Proprietary Marks or operates or licenses others to operate a business under the same or similar Proprietary Marks, that produces and offers for sale graphics, banners and signs.

(2)    With respect to Franchisee, and for a continuous uninterrupted period commencing upon the expiration or termination (regardless of the cause of termination) or transfer of this Agreement (or, with respect to each of the Controlling Principals, for a continuous uninterrupted period commencing upon the earlier of: (i) the expiration or termination of or transfer of all of Franchisee's interest in this Agreement or (ii) the time such individual or entity ceases to satisfy the definition of "Controlling Principal") and for two (2) years thereafter, except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company:

(a)    divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any

(b)     except as permitted by Section 9.D, employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)     own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business that produces and offers for sale graphics, banners and signs, which business is, or is intended to be, located within the Territory, or within a ten (10) mile radius of any Center or sign making facility that is owned or operated by Franchisor or its affiliates, or any franchisee of Franchisor, in existence or under construction at any given time during such period; and

C.     The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor. The parties agree that each of the covenants herein shall be construed as independent of any other covenant or provision of this Agreement. It is the express intention of the parties to this Agreement to comply with all laws applicable to the covenants contained in this Agreement. If any of the covenants contained in this Section 19 are found to exceed in duration, geographical area or scope those permitted by applicable law, it is expressly agreed that such restrictive covenant may be reformed or modified by the final judgment of a court of competent jurisdiction or other lawful constituted authority to reflect a lawful and enforceable duration, geographical area or scope, and such covenant automatically shall be deemed to be amended and modified so as to comply with the judgment or order of such court or authority. If any one or more of the provisions contained in this Section 19 shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein.

D.     Franchisee and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Section 19.B in this Agreement, or any portion thereof, without their consent, effective immediately upon notice to Franchisee; and Franchisee and Controlling Principals agree that they shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 21 hereof.

E.     Franchisee and Controlling Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 19.

F.     Franchisee and Controlling Principals understand and agree that the restrictions contained in Section 19.B are reasonable and necessarily protect the legitimate interests of Franchisor.

G.     Nothing contained in this Agreement shall prevent Franchisee or Controlling Principals from owning less than a one percent (1%) interest in any publicly traded equity or stock listed on a recognized national stock exchange.

H.     Franchisee and each of Controlling Principals acknowledge that any failure to comply with the requirements of this Section 19 shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 19 without the necessity of posting bond. Franchisee and Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 19.

I.       Franchisee shall require and obtain execution of covenants similar to those set forth in this Section 19 (including covenants applicable upon the termination of a person's relationship with Franchisee) from Franchisee's General Manager and any other personnel employed by Franchisee who have received or will receive training from Franchisor and all of Franchisee's Principals that are not designated as Controlling Principals. Such covenants shall be substantially in the form set forth in Attachment "D". Failure by Franchisee to obtain execution of a covenant required by this Section 19.I shall constitute a material event of default under Section 16.B(8) hereof.

20.    Independent Contractor and Indemnification

A.       It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, affiliate, joint venturer, partner, employee, employer, joint employer, or servant of the other for any purpose whatsoever.

B.       During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor. Franchisee agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place in the franchised premises, the content and form of which Franchisor reserves the right to specify in the Manuals or otherwise in writing.

C.       Franchisee and Controlling Principals understand and agree that nothing in this Agreement authorizes Franchisee or Controlling Principals to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be deemed liable by reason of any act or omission of Franchisee or Controlling Principals in the conduct of business at the Center or for any claim or judgment arising therefrom.

D.       (1)      Franchisee and each of Controlling Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor, its subsidiaries, affiliates, successors, and assigns and their respective directors, officers, shareholders, partners, servants, employees, agents, and representatives from all "losses and expenses" (as defined in Section 20.D(4)(b)) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(a)      The infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Controlling Principals of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any rights in the Proprietary Marks or copyrights granted hereunder);

(b)      The violation, breach or asserted violation or breach by Franchisee or any of Controlling Principals of any contract, federal, state or local law, regulation, ruling, standard or directive or any industry standard;

(c)      Libel, slander or any other form of defamation of Franchisor or the System, by Franchisee or by any of Controlling Principals;

(d)      The violation or breach by Franchisee or by any of Controlling Principals of any warranty, representation, agreement or obligation in this Agreement or other agreement between Franchisee and Franchisor or its subsidiaries or affiliates; and

acts, errors or omissions of Franchisee or any of Controlling Principals, or any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees, or representatives of Franchisee, its subsidiaries or affiliates in connection with the performance of the operation of the Center.

(2)     Franchisee and each of Controlling Principals agree to give Franchisor notice of any such action, suit, proceeding, claim, demand, inquiry or investigation. At the expense and risk of Franchisee and each of Controlling Principals, Franchisor may elect to assume (but under no circumstance is obligated to undertake), the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Franchisee and each of Controlling Principals to indemnify Franchisor and to hold it harmless.

(3)     In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, Franchisor may, at any time and without notice, as it, in its judgment deems appropriate, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in Franchisor's sole judgment, there are reasonable grounds to believe that:

(a)     any of the acts or circumstances enumerated in Section 20.D(1) above have occurred; or

(b)     any act, error, or omission of Franchisee or any of Controlling Principals or Controlling subsidiaries or affiliates may result directly or indirectly in damage, injury or harm to any person or any property.

(4)     (a)     All losses and expenses incurred under this Section 20.D shall be chargeable to and paid by Franchisee or any of Controlling Principals pursuant to its obligations of indemnity under this Section 20.D, regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

(b)     As used in this Section 20.D, the phrase "losses and expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorney's fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

(5)     The persons indemnified pursuant to Section 20.D do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee, any of Controlling Principals or Franchisee's subsidiaries and affiliates may contract, regardless of the purpose. Franchisee and each of Controlling Principals shall hold harmless and indemnify the persons indemnified pursuant to this Section 20.D for all losses and expenses which may arise out of any acts, errors or omissions of Franchisee, Franchisee's Principals, any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees or representatives of Franchisee, its subsidiaries or affiliates and any such third parties without limit and without regard to the cause or causes thereof or the negligence of Franchisor or any other party or parties arising in connection therewith, and whether such negligence be sole, joint or concurrent, active or passive.

(6)     Under no circumstances shall the persons indemnified pursuant to this Section 20.D be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee or any of Franchisee's Principals. Franchisee and each of Controlling Principals agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from Franchisee or any of Controlling Principals by the persons indemnified pursuant to this Section 20.D.

21.    **Entire Agreement and Modification**

    This Agreement, the documents referred to herein and the Attachments hereto, set forth all of the promises, covenants, agreements and conditions between the Franchisor, Franchisee and the Controlling Principals and supersedes all prior and contemporaneous agreements and understandings, express or implied, oral or written.   Except as otherwise provided herein, this Agreement may be amended, modified or canceled and any of the terms, covenants or conditions hereof may be waived only in writing and signed by both Franchisor and Franchisee.

22.    **Approvals**

    A.    Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent granted shall be in writing.

    B.    Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

23.    **Non-Waiver and Remedies**

    A.    No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or Controlling Principals under any of the terms hereof, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power with respect to any other breach or default by Franchisee or Controlling Principals or of any other rights hereunder.   Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee or Controlling Principals of any terms of this Agreement.

    B.    All rights and remedies of the parties hereto shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any actual or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries and affiliates.   The rights and remedies of the parties hereto shall be continuing and may be exercised at any time or from time to time.   The expiration, earlier termination, or exercise of Franchisor's rights pursuant to Section 16 of this Agreement shall not discharge or release Franchisee or any of Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination, or the exercise of such rights under this Agreement.

    C.    Franchisee shall, during the term of this Agreement and thereafter, promptly pay all sums owing to Franchisor and its subsidiaries and affiliates.   Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of Franchisee's failure to perform its obligation hereunder (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief in connection with the enforcement of any provision of this Agreement).

24.    **Dispute Resolution**

    ▨▨▨▨▨▨▨▨▨▨ Franchisor and Franchisee agree that, subject to Paragraph B below, any claim, controversy or dispute between Franchisor (and its affiliates and their respective shareholders, officers, directors, agents, employees, successors and assigns) and Franchisee (and its Controlling Principals, Principals, guarantors, officers, directors, agents, employees, successors and assigns) arising out of or or relating to:  (1) Franchisee's operation of the Center under this Agreement; (2) this Agreement

or any other agreement between Franchisee and Franchisor; (3) the relationship created by this Agreement; (4) the validity of this Agreement or any other agreement between Franchisee and Franchisor; or (5) any System standard relating to the establishment or operation of the Center, will be submitted for binding arbitration before one arbitrator in accordance with the then-current commercial arbitration rules of the American Arbitration Association. If such rules are in any way contrary to or in conflict with this Agreement, the terms of this Agreement shall control.

Arbitration shall take place at a location specified by the arbitrator within ten miles of Franchisor's principal place of business in Dallas County, Texas. The award of the arbitrator shall be final and judgment upon the award rendered in arbitration may be entered in any court having jurisdiction thereof. The costs and expenses of arbitration, including compensation and expenses of the arbitrator, shall be borne by the parties as the arbitrator determines. Franchisor and Franchisee further agree that, in any arbitration proceeding, each must submit or file any claim which would consitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either Franchisor or Franchisee.

Franchisor and Franchisee agree that arbitration will be conducted on an individual, not a class wide basis, and that an arbitration proceeding between Franchisor and Franchisee may not be consolidated with any other arbitration proceeding between Franchisor and any other person.

Franchisor and Franchisee waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statule.

B.      Injunctive Relief. Notwithstanding any provision contained in Paragraph A above, either party may institute in a court of competent jurisdiction an action or actions for temporary or preliminary injunctive relief; provided, however, that such party must contemporaneously submit the dispute for arbitration on the merits as provided in Paragraph A above.

C.      Jurisdiction and Venue. With respect to actions described in Paragraph B above and any other actions not subject to arbitration under Paragraph A above, Franchisee and Controlling Principals hereby agree that Franchisor may institute any action against either or both of them in the state courts of Dallas County, Texas and the federal district court for the Northern District of Texas, Dallas Division, and Franchisee and Controlling Principals irrevocably submit themselves to the jurisdiction of such courts. Franchisee and Controlling Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision. Franchisee and Controlling Principals hereby irrevocably agree that service of process may be made upon them in any legal proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Texas or federal law.

D.      Governing Law.  All matters relating to arbitration will be governed by the Federal Arbitration Act.  This Agreement and the relationship of the parties shall be interpreted and construed under Texas law (except for Texas choice of law rules), and except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et. seq.), the Federal Arbitration Act, or other federal law.

E.      Waiver of Certain Damages and Jury Trial. Franchisor and Franchisee hereby waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statute.  Franchisor and Franchisee hereby irrevocably waive trial by jury on any action, proceeding or counterclaim, whether at law or in equity, brought by either of them.

25.     Notices

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or sent by prepaid telex, or facsimile (provided that the sender

confirms the telex or facsimile. , sending an original confirmation copy thereof by certified or registered mail or expedited delivery service within three (3) business days after transmission thereof) to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

If to Franchisor:      FASTSIGNS International, Inc.:
                        2550 Midway Road, Suite 150
                        Carrollton, Texas 75006
                        Attn: Law Department
                        Facsimile No. (214) 346-5793

If to Franchisee or
Controlling Principals: To the mailing address of the Center unless
                        otherwise provided in writing to Franchisor.

Any notice given hereunder by certified or registered mail shall be deemed to have been given five (5) business days after the date of mailing, and any notice given hereunder by telex or facsimile shall be deemed to have been given upon receipt thereof, provided that the telex or facsimile is confirmed as provided in this Section. Business days for the purpose of this Section excludes Saturday, Sunday, and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

26.    <u>Limitations of Claims</u>

Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes Franchisor, any and all claims arising out of or relating to this Agreement or Franchisor's relationship with Franchisee will barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

27.    <u>Severability and Construction</u>

A.     Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term, or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, or provisions of this Agreement as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, or provisions shall be deemed not to be part of this Agreement.

B.     Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and employees, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by Section 18 hereof, any rights or remedies under or by reason of this Agreement.

C.     All captions in this Agreement are intended solely for the convenience of the parties, and shall not affect the meaning or construction of any provision hereof.

D.     All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable; and, without limiting the obligations individually undertaken by Controlling Principals hereunder, all acknowledgments, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all of Controlling Principals.

E.    The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any general partner of Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee. The initial Franchisee's Principals shall be listed on Attachment C. The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder. For purposes of this Agreement, a publicly-held corporation is a corporation registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15(d) of such Act.

F.    Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

G.    This Agreement may be executed in counterparts, and each copy so executed shall be deemed an original.

H.    This Agreement shall not become effective until signed by an authorized officer of Franchisor.

28.    **Force Majeure**

A.    As used in this Agreement, the term "Force Majeure" shall mean any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire or other catastrophe, act of any government and any other similar cause not within the control of the party affected thereby.

B.    Except as provided in Section 16.B(5), if the performance of any obligation by any party under this Agreement is prevented, hindered or delayed by reason of Force Majeure, which cannot be overcome by use of normal commercial measures, the parties shall be relieved of their respective obligations to the extent the parties are respectively necessarily prevented, hindered or delayed in such performance during the period of such Force Majeure; provided, however, that a party shall not be released of its obligation to pay amounts then owing hereunder. The party whose performance is affected by an event of Force Majeure shall give prompt notice of such Force Majeure event to the other party by telephone or telegram (in each case to be confirmed in writing), setting forth the nature thereof and an estimate as to its duration, and shall be liable for failure to give such timely notice only to the extent of damage actually caused.

29.    **Acknowledgments**

Franchisee and Controlling Principals hereby represent, warrant, covenant and acknowledge to Franchisor that:

A.    Neither Franchisee nor any of Controlling Principals had any part in the creation or development of the System or the Proprietary Marks provided by Franchisor;

B.    Franchisor has made no representations or promises to or with Franchisee or a Franchisee's Principal which are not contained in this Agreement;

C.    Franchisee has conducted an independent investigation of the business venture contemplated by this Agreement and understands that the business venture involves substantial financial risks and largely depends upon the abilities of Franchisee;

D.      Franchisee has not relied upon, nor has Franchisor made, any representations, warranties or guarantees, expressed or implied, as to the potential volume, profits or success of the business venture contemplated herein;

E.      Franchisee has the full right and authority to enter into this Agreement without joinder of any other person;

F.      All information and materials provided to Franchisor by Franchisee and Controlling Principals, individually or collectively, are true and correct and complete to the best of their knowledge, information and belief;

G.      Franchisee has received a completed copy of this Agreement, the Addenda hereto and all agreements relating hereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges that it has received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed;

H.      Franchisee has received, read and understood this Agreement, the Addenda hereto, and all agreements relating hereto, if any, and Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement; and

I.      Franchisor's obligations and Franchisee's rights pursuant to this Agreement are expressly conditioned upon the continued truth of the representations and warranties set forth above at the time of execution hereof and throughout the term hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

FASTSIGNS INTERNATIONAL, INC.

By:_____
Name:_____
Title:_____

ATTEST:

_____

FRANCHISEE:

By:_____
Name: Norman Gilbert
Title:_____
Date Signed: 10 - 26 - 01

ATTEST:

_____

FRANCHISEE:

By:_____
Name:_____
Title:_____
Date Signed:_____

CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 27.E of the Franchise Agreement;

(3) Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed. Upon default by Franchisee or upon notice from Franchisor, each will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee. Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased will be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

ATTEST:

CONTROLLING PRINCIPALS

_____

_____

Witness

Name: Norman Gilbert

_____

_____

Witness

Name: Susan Gilbert

## AMENDMENT TO FASTSIGNS INTERNATIONAL, INC
## FRANCHISE AGREEMENT
## FOR THE STATE OF CALIFORNIA

    The FASTSIGNS International, Inc. Franchise Agreement between Norman Gilbert ("Franchisee" or "You") and FASTSIGNS International, Inc. ("Franchisor") dated _November XX_ (the "Agreement") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### CALIFORNIA LAW MODIFICATIONS

    1.    The California Department of Corporations requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. BUS. & PROF. CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq. To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

        a.    California Business and Professions Code Sections 20000 through 20043 provide rights to You concerning nonrenewal and termination of the Agreement. The Federal Bankruptcy Code also provides rights to You concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws will control.

        b.    If the Franchisee is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the California Franchise Investment Law and the California Franchise Relations Act.

        c.    If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

        d.    If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

        e.    If the Agreement requires litigation, arbitration, or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

        f.    If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

### [REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

2.     Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of the California law applicable to the provision are met independent of this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the Franchisee acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby.  The parties have duly executed and delivered this Amendment to the Agreement on _November 12, 2001_.

FASTSIGNS INTERNATIONAL, INC.

By: _____
Name: _Gary Salomon_
Title: _CEO_

ATTEST:                                    FRANCHISEE:

By: _Norman Gilbert_
_____          Name: Norman Gilbert
Witness                                   Title: _____
                                          Date Signed: _10-26-01_

ATTEST:                                    FRANCHISEE:

By: _____
_____          Name: _____
Witness                                   Title: _____
                                          Date Signed: _____

ATTEST:                                    FRANCHISEE:

By: _____
_____          Name: _____
Witness                                   Title: _____
                                          Date Signed: _____

ATTEST:                                    FRANCHISEE:

By: _____
_____          Name: _____
Witness                                   Title: _____
                                          Date Signed: _____

CAFRAM3-01                                -2-

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the Franchise Agreement, as hereby amended, and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 27.E. of the Franchise Agreement;

(3) Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed. Upon default by Franchisee or upon notice from Franchisor, each will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee. Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased will be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

ATTEST:

CONTROLLING PRINCIPALS

_____
Witness

Name: Norman Gilbert

_____
Witness

Name: Susan Gilbert

_____
Witness

Name:_____

_____
Witness

Name:_____

Attachment "A"
to Franchise Agreement
Approved Location and Territory

1.        Approved Location

Pursuant to Section 1.A. of the Franchise Agreement, the Center shall be located at the following approved location:

TO BE DETERMINED UPON SITE SELECTION _____

_____
_____
_____
_____
_____
_____
_____

2.        Territory

Pursuant to Section 1.C of the Franchise Agreement, the Territory shall be as shown on the map attached hereto as Attachment A.1.

Attachment "B" to Franchise Agreement
Statement of Ownership Interest

A.    The following is a list of all shareholders, partners or other investors in Franchisee, including all investors who own or hold a direct or indirect interest in Franchisee, and a description of the nature of their interest:

| Name | Percentage of Ownership/Nature of Interest |
|------|--------------------------------------------|
| Norman Gilbert | 100% |

B.    In addition to the persons listed in paragraph A, the following is a list of all of Franchisee's Principals described in and designated pursuant to Section 27.E of the Franchise Agreement. Unless designated as a Controlling Principal, each of Franchisee's Principals shall execute the Confidentiality Agreement and Ancillary Covenants Not to Compete substantially in the form set forth in Attachment D (see Sections 15.B and 19.I of the Franchise Agreement):

Susan Gilbert

Attachment "C"
to Franchise Agreement
Lease Addendum

1.       Use of Premises.

        During the term of the Franchise Agreement, the premises may be used only for the operation of a retail sign business under the FASTSIGNS System which specializes in the production and marketing of signs, graphics, banners, ready-to-apply lettering, trade show displays, digital imaging and other complementary products and services, and which emphasize convenience and one-day service. Tenant shall be permitted to use all equipment and machines typical of other FASTSIGNS centers including photocopiers.

2.       Construction of Premises.

A.       Landlord shall provide Tenant with finish out of demising walls, glass walls and paint sheetrock.

B.       Landlord shall put carpet in front sales area and tile in back as per the specifications provided by Tenant as well as four (4) ceiling fans, all at Landlord's expense.

C.       Landlord shall provide to Tenant one dedicated circuit for computer room, one dedicated circuit for front counter, and eight (8) outlets at various locations throughout the premises, as designated by Tenant.

D        Landlord shall provide sufficient lighting typical of other FASTSIGNS centers.

E.       Landlord shall warrant that the leased premises, buildings and common areas meet current Americans With Disabilities Act requirements.

3.       Signs and Graphics Package.

A.       Tenant shall be permitted to install on the outside of the premises a red, white and/or blue FASTSIGNS facia sign or awning.

B.       Tenant shall be permitted from time to time to place a banner in the front, side or facia of the premises.

C.       Tenant shall be permitted to install the typical FASTSIGNS graphics package which includes a horizontal logo stripe across the front of the premises.

4.       Assignment and Notices.

A.       Notwithstanding anything to the contrary in this Lease, Tenant shall have the right to assign this Lease and all rights hereunder to FASTSIGNS International, Inc. ("FII") or its affiliates, subsidiaries or lenders upon the expiration or earlier termination of that certain Franchise Agreement dated _____, 20__ (the "Franchise Agreement"), by and between FII and Tenant. Landlord will consent to such assignment without the imposition of any assignment fee or similar charge and Landlord shall not accelerate the rent owed hereunder in connection with such assignment.

B.       Landlord agrees that Tenant shall not otherwise assign the Lease or renew or extend the term of the Lease without the prior written consent of FII.

C.       Landlord agrees to furnish FII with copies of any and all letters and notices sent to Franchisee pertaining to the Lease and the Premises, at the same time that such letters and notices are sent to Franchisee. Landlord further agrees that, if it intends to terminate the Lease, the Landlord will give FII thirty (30) days advance written notice of such intent, specifying in such notice all defaults that are the cause of the proposed termination. FII shall have after the expiration of the period during which Tenant may cure such default, an additional fifteen (15) days (or if there is no cure period, at least fifteen (15) days) to cure, at its sole option, any such default.     If neither Franchisee nor FII

cures all such defaults with. .aid time periods (or such longer cure pe..od as may be specifically permitted by the Lease), then the Landlord may terminate the Lease, re-enter the Premises and exercise all of its other post-termination rights as set forth in the Lease.

D.    FII shall have the right to enter the premises to make any reasonable modification or reasonable alteration necessary to protect FII's interest in the FASTSIGNS business and Proprietary Marks or to cure any default under the Franchise Agreement or any development agreement entered into by FII and Tenant or under the Lease, and Landlord agrees that FII shall not be liable for trespass or any other crime or tort.

5.    Waiver of Landlord's Lien.

A.    Notwithstanding anything to the contrary in this Lease, Landlord expressly waives any and all liens it may have or acquire pursuant to the Lease or by law with respect to Tenant's fixtures, equipment and other personal property. Landlord acknowledges and agrees that _____ owns/holds a security interest senior to that of Landlord in all such fixtures, equipment and personal property.

B.    Landlord shall permit _____ to enter the premises to remove such fixtures, equipment and personal property in the event Tenant defaults under the Lease, vacates, abandons or otherwise surrenders the premises, or upon mutual cancellation of the Lease, or otherwise jeopardizes _____ security interest in the fixtures, equipment and personal property.

6.    Financing.

This Lease shall be expressly conditioned upon Tenant securing adequate financing. Tenant shall give Landlord notice upon obtaining such financing.

7.    Parking and Common Areas.

Landlord shall provide Tenant with not less than five (5) spaces in the parking lot adjoining the premises for exclusive use by Tenant, its employees, customers and invitees.

8.    Notices.

All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to Tenant, the notice shall be addressed to:

_____
_____
_____
Attention:_____
Facsimile:_____

If directed to Landlord, the notice shall be addressed to:

_____
_____
_____
Attention:_____
Facsimile:_____

If directed to FII,    , notice shall be addressed to:

> FASTSIGNS International, Inc.
> 2550 Midway Road, Ste. 150
> Carrollton, Texas 75006
> Attention: Legal Department
> Facsimile: (214) 346-5793

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by telex or facsimile shall be deemed given upon transmission, provided confirmation is made as provided above. Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving fifteen (15) days written notice of such change to the other parties. Business day for the purpose of this Agreement excludes Saturday, Sunday and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

9.        Amendments.

Landlord and Tenant will not amend or otherwise modify this Lease in any manner which would materially affect any of the foregoing provisions without FII's prior written consent.

The terms of this Lease Addendum will supersede any conflicting terms of the Lease.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year set forth in the Lease Agreement.

LANDLORD

_____

TENANT

_____

FAREV3.01                                        -3-

Attachment "D"

## CONFIDENTIALITY AND ANCILLARY NON-COMPETE AGREEMENT

This Agreement is made and entered into _____, 20__, between FASTSIGNS International, Inc., a Texas corporation ("FII"), _____ ("Franchisee") and _____ ("Covenantor").

### RECITALS

WHEREAS, FII has developed, is using and is the owner of all rights in a unique system (the "System") for the development and operation of centers under the name and mark FASTSIGNS ("Centers"); and

WHEREAS, the System includes but is not limited to certain trade names, service marks, trademarks, symbols, logos, emblems, and indicia of origin, including, but not limited to, the mark FASTSIGNS, "FASTSIGNS, The One Day Sign & Lettering Experts", "FASTSIGNS, For A Quality Sign That's Right. On Time", "Quality Signs. Done Right. On Time.", "Sign & Graphic Solutions Made Simple" and such other trade names, service marks, and trademarks as FII may develop in the future for the purposes of identifying the System, and such other distinguishing characteristics of the System including, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; uniform standards, technology, know-how and procedures for production of signs, graphics, digital imaging and banners; quality and consistency of products and services; inventory, management and financial control methods; training and assistance; and advertising and promotional programs; all of which may be changed, improved and further developed by Franchisor from time to time ("FII's Trade Secrets"); and

WHEREAS, FII's Trade Secrets provide economic advantages to FII and are not generally known to nor readily ascertainable by proper means by, FII's competitors who could obtain economic value from knowledge and use of FII's Trade Secrets; and

WHEREAS, FII has taken, and intends to take all reasonable steps to maintain the confidentiality and secrecy of FII's Trade Secrets; and

WHEREAS, FII has granted Franchisee a limited right to operate the Centers using the System and FII' Trade Secrets for the period defined in the franchise agreement made and entered into _____, 20__ ("Franchise Agreement") between FII and Franchisee; and

WHEREAS, FII and Franchisee have agreed in the Franchise Agreement on the importance to FII and to the Franchisee and other licensed users of the System of restricting use, access and dissemination of FII's Trade Secrets; and

WHEREAS, it will be necessary for certain employees, agents, independent contractors, officers, directors and interest holders of Franchisee, or any entity having an interest in Franchisee ("Covenantors") to have access to and to use some or all of FII's Trade Secrets in the development and operation of Franchisee's Centers using the System; and

WHEREAS, Franchisee has agreed to obtain from those Covenantors written agreements protecting FII's Trade Secrets and the System against unfair competition; and

WHEREAS, Covenantor wishes to remain, or wishes to become associated with or employed by Franchisee; and

WHEREAS, Covenantor wishes and needs to receive and use FII's Trade Secrets in the course of his employment or association in order to effectively perform his services for Franchisee; and

WHEREAS, Covenantor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

FAREV3.01                                           -1-

Confidentiality Agreement

1.    FII and/or Franchisee shall disclose to Covenantor some or all of FII's Trade Secrets relating to the System.   All information and materials, including, without limitation, any manuals, drawings, specifications, techniques and compilations of data which FII provides to Franchisee and/or Covenantor shall be deemed confidential Trade Secrets for the purposes of this Agreement.

2.    Covenantor shall receive FII's Trade Secrets in confidence, maintain them in confidence, and use them only in the course of his employment by or association with Franchisee and then only in connection with the development and/or operation by Franchisee of Centers using the System for so long as Franchisee is licensed by FII to use the System.

3.    Covenantor shall not at any time make copies of any documents or compilations containing some or all of FII's Trade Secrets without the express written permission of FII.

4.    Covenantor shall not disclose or permit the disclosure of FII's Trade Secrets except to other employees or persons associated with Franchisee and only to the limited extent necessary to train or assist other employees of Franchisee in the operation or development of a Center using the System.

5.    Covenantor shall surrender the Operations Manuals and any other material containing some or all of FII's Trade Secrets to Franchisee or to FII, upon request, or upon termination of employment by or association with Franchisee, or upon conclusion of the use for which Manuals or other information or material may have been furnished to Covenantor.

6.    Covenantor shall not, directly or indirectly, do any act or omit to do any act, which would or would be likely to be injurious or prejudicial to the goodwill associated with the System.

7.    All manuals are loaned by FII to Franchisee for limited purposes only and remain the property of FII and may not be reproduced, in whole or in part, without FII's written consent.

Covenants Not to Compete

1.    In order to protect the goodwill and unique qualities of the System and the confidentiality and value of FII's Trade Secrets, and in consideration for the disclosure to Covenantor of FII's Trade Secrets, Covenantor further undertakes and covenants that, during the time he is employed by or associated with Franchisee, he will not:

a.    Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, engage in or acquire any financial or beneficial interest in (including interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, help or make loans to any entity involved in business which is the same as or similar to that conducted at the Center including, but not limited to, any business located, within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Proprietary Marks or operates or licenses others to operate a business under the same or similar Proprietary Marks, that produces and offers for sale graphics, banners and signs.

b.    Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of Franchisee's Center(s) to any competitor, including, but not limited to, other FASTSIGNS Centers operated by licensed uses of the System, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System.

---

May be deleted if FII does not require the Franchisee to obtain the execution of these covenants by the Employee. See Section 20.1 of the Franchise Agreement.

c.    Employ or seek to employ any person who is at the time employed by FII or any franchisee or developer. FII, or otherwise directly or indirectly induce such persons to leave his or her employment.

2.      In further consideration for the disclosure to Covenantor of FII's Trade Secrets and to protect the uniqueness of the System, Covenantor agrees that for two (2) years following the earlier of the expiration, termination or transfer of all of Franchisee's interest in the Franchise Agreement or the termination of his employment by or association with Franchisee, Covenantor will not without the prior written consent of FII:

*a.      Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, engage in or acquire any financial or beneficial interest in (including interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, help or make loans to any entity involved in business which is the same as or similar to that conducted at the Center including, but not limited to, any business which produces and offers for sale graphics, banners and signs which business is, or is intended to be located, within the Territory as defined in Section 1.C of the Franchisee's Franchise Agreement, and/or within a ten (10) mile radius of any Center or sign making facility that is owned or operated by Franchisor or its affiliates, or any franchisee of Franchisor, in existence or under construction at any given time during such period.

b.      Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of Franchisee's Center(s) to any competitor, including, but not limited to, other FASTSIGNS Centers operated by other licensed users of the System, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System.

c.      Employ or seek to employ any person who is at the time employed by FII or any franchisee or developer of FII, or otherwise directly or indirectly induce such persons to leave his or her employment.

d.      Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, solicit, recruit, or otherwise contact customers of Franchisee's Center.

Miscellaneous

1.      Franchisee undertakes to use its best efforts to ensure that Covenantor acts as required by this Agreement.

2.      Covenantor agrees that in the event of a breach of this Agreement, FII and Franchisee would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions thereof, FII and/or Franchisee shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies which are made available to it at law or in equity, including the right to terminate the Franchise Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm, and without being required to furnish a bond or other security.

3.      Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by FII and Franchisee in enforcing this Agreement.

4.      Any failure by FII or the Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

5.      THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT FOR TEXAS CHOICE OF LAW RULES. COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF DALLAS COUNTY, TEXAS AND THE FEDERAL DISTRICT COURTS FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS, DIVISION. COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES

THAT SERVICE OF PROCL   MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW.  COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE DALLAS COUNTY, TEXAS; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION WHICH INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE WHICH HAS JURISDICTION.

6.    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which FII is a party, Covenantor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.    This Agreement contains the entire agreement of the parties regarding the subject matter hereof.  This Agreement may be modified only by a duly authorized writing executed by all parties.

8.    All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to FII, the notice shall be addressed to:

FASTSIGNS International, Inc.
2550 Midway Road, Suite 150
Carrollton, Texas 75006
Attention: Law Department
Facsimile No.: (214) 346-5793

If directed to Franchisee, the notice shall be addressed to:

_____
_____
_____
Attention:_____
Facsimile:_____

If directed to Covenantor, the notice shall be addressed to:

_____
_____
_____
Attention:_____
Facsimile:_____

Any notices sent by personal delivery shall be deemed given upon receipt.  Any notices given by telex or facsimile shall be deemed given upon transmission, provided confirmation is made as provided above.  Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing.  Any change in the foregoing addresses shall be effected by giving fifteen (15) days written notice of such change to the other parties.  Business day for the purpose of this Agreement excludes Saturday, Sunday and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

9.    The rig.    and remedies of FII under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective subsidiaries, affiliates, successors and assigns. The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of FII.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

FRANCHISEE

By:_____
Title:_____

FASTSIGNS INTERNATIONAL, INC.

By:_____
Title:_____

COVENANTOR

By:_____
Title:_____

Attachment "E"
to Franchise Agreement

| | | |
|---|---|---|
| STATE OF CALIFORNIA | § | IRREVOCABLE POWER OF ATTORNEY |
| | § | |
| COUNTY OF _____ | § | KNOW ALL MEN BY THESE PRESENTS |

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of assigning to Franchisor all of Franchisee's right, title and interest in and to any and all telephone numbers of Franchisee's franchise and all related Yellow Pages, White Pages and other business listings, including but not limited to, the execution and delivery of any Transfer of Service Agreement and any other transfer documentation required by the applicable telephone service company providing telephone services to Franchisee, hereby granting unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no person, firm or corporation dealing with Franchisor shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of funds or property paid or delivered to Franchisor. Any person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm or corporation acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of _November 12, 2001_ by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas and shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the ____ day of ____ _____, 20____.

FRANCHISEE:

By: _Norman Gilbert_

Name: Norman Gilbert
Title: _____

Attachment "F"
to Franchise Agreement

| | | |
|---|---|---|
| STATE OF CALIFORNIA | § | IRREVOCABLE POWER OF ATTORNEY |
| | § | |
| COUNTY OF _____ | § | |

KNOW ALL MEN BY THESE PRESENTS

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of assigning to Franchisor all of Franchisee's right, title and interest in and to any and all web sites, web pages, listings, banners, URLs, advertisements or other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos ("Trademarks"), on or with the Internet, World Wide Web, Internet service providers, electronic mail services, communication providers, search engines or other similar services. Franchisor shall have the authority to execute and deliver on Franchisee's behalf any and all documentation required by the applicable company, the Internet, and regulatory agency, or other provider of services to Franchisee to transfer, modify or cancel such services, listings, or links and Franchisee hereby grants unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no person, firm or corporation dealing with Franchisor shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of funds or property paid or delivered to Franchisor. Any person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm or corporation acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of November 12, 2001 by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the ____ day of ____
_____, 20____.

FRANCHISEE:

By: _Norman Gilbert_

Name: Norman Gilbert _____
Title: _____

Attachment "G"
to Franchise Agreement

STATE OF CALIFORNIA        §
                          §
COUNTY OF _____    §    **IRREVOCABLE POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of obtaining any and all returns, records, reports and other documentation relating to the payment of taxes filed by Franchisee with any state and/or federal taxing authority, including but not limited to the execution and delivery of any and all formal requests and other documentation as may be required by the applicable state and/or federal taxing authority, hereby granting unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no governmental agency, person, firm or corporation dealing with Franchisor, if acting in good faith, shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of documents delivered or funds or property paid or delivered to Franchisor. Any governmental agency, person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm, corporation or agency acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of November 12, 2001 by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the ____ day of ____ _____, 20_____.

FRANCHISEE:

By: _Norman Gilbert_____

Name: Norman Gilbert_____
Title:_____

Attachment K to Franchise Agreement
ELECTRONIC FUNDS TRANSFER
AUTHORIZATION TO HONOR CHARGES DRAWN BY AND PAYABLE TO FASTSIGNS
INTERNATIONAL, INC./NATIONAL ADVERTISING COUNCIL, INC.

FASTSIGNS INTERNATIONAL, INC./NATIONAL ADVERTISING COUNCIL, INC./PAYEE

| BANK NAME | ACCOUNT # | ABA | FEIN |
| --- | --- | --- | --- |
| _____ | _____ | _____ | _____ |

The undersigned Depositor hereby authorizes and requests the Depository designated below to honor and to charge to the following designated account, checks, and electronic debits (collectively, "debits") drawn on such account which are payable to the above named Payee. It is agreed that Depository's rights with respect to each such debit shall be the same as if it were a check drawn and signed by Depositor. It is further agreed that if any such debit is not honored, whether with or without cause and whether intentionally or inadvertently, Depository shall be under no liability whatsoever. This authorization shall continue in force until Depository and Payee have received at least thirty (30) days written notification from Depositor of its termination.

The Depositor agree with respect to any action taken pursuant to the above authorization:

(1)     To indemnify the Depository and hold it harmless from any loss it may suffer resulting from or in connection with any debit, including, without limitation, execution and issuance of any check, draft or order, whether or not genuine, purporting to be authorized or executed by the Payee and received by the Depository in the regular course of business for the purpose of payment, including any costs or expenses reasonably incurred in connection therewith.

(2)     To indemnify Payee and the Depository for any loss arising in the event that any such debit shall be dishonored, whether with or without cause and whether intentionally or inadvertently.

(3)     To defend at Depositor's own cost and expense any action which might be brought by a depositor or any other persons because of any actions taken by the Depository or Payee pursuant to the foregoing request and authorization, or in any manner arising by reason of the Depository's or Payee's participation therein.

Name of Depository: _____

Name of Depositor: _____

Designated Bank Acct.: _____
(Please attach one voided check for the above account)

Center Location: _____

Center #: _____

For information call: _____

Address: _____

Phone #: _____

Fax #: _____

Name of Franchisee/Depositor (please print)

By: _____

Signature and Title of Authorized Representative

Date: _____ 10-26-01

**EXHIBIT B**

1  DOUGLAS W. DAL CIELO (SBN 157109)
   GREGORY M. GENTILE (SBN 142424)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, CA 95113
   Telephone:  (408) 287-6262
4  Facsimile:  (408) 918-4501
   ddalcielo@rmkb.com
5  ggentile@rmkb.com

6  Attorneys for Plaintiff
   NORMAN GILBERT

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN MATEO

10

11  NORMAN GILBERT,                      CASE NO. CIV 473600

12              Plaintiff,
                                         **NOTICE OF ENTRY OF TEMPORARY
13      v.                               RESTRAINING ORDER**

14  FASTSIGNS INTERNATIONAL INC.
    and DOES 1-20, inclusive,
15
                Defendants.
16

17  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

18      PLEASE TAKE NOTICE that on June 11, 2008, the Court entered a Temporary

19  Restraining Order in the form attached hereto.

20  Dated:  June 12, 2008          ROPERS, MAJESKI, KOHN & BENTLEY

21

22
                                   By _____
23                                    DOUGLAS W. DAL CIELO
                                      GREGORY M. GENTILE
24                                    Attorneys for Plaintiff
                                      NORMAN GILBERT
25

26

27

28
    RC1/5135053.1/BL1                                        CIV 473600

*Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose*

ENDORSED FILED
SAN MATEO COUNTY

JUN 1 2 2008

Clerk of the Superior Court
By ___F. MORREAU___
       DEPUTY CLERK

BY FAX

1  DOUGLAS W. DAL CIELO (SBN 157109)
   GREGORY M. GENTILE (SBN 142424)
2  ROPERS, MAJESKI, KOHN & BENTLEY
   50 West San Fernando Street, Suite 1400
3  San Jose, CA  95113
   Telephone:    (408) 287-6262
4  Facsimile:    (408) 918-4501
   ddalcielo@rmkb.com
5  ggentile@rmkb.com

6  Attorneys for Plaintiff
   NORMAN GILBERT

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN MATEO

10

11 NORMAN GILBERT,                    CASE NO.

12              Plaintiff,            [PROPOSED]
                                      TEMPORARY RESTRAINING ORDER
13      v.

14 FASTSIGNS INTERNATIONAL, INC.
   and DOES 1-20, inclusive,
15
                Defendants.
16
   proposed
17

18         Good cause appearing for this Court to issue a Temporary Restraining Order in favor of

19 Plaintiff NORMAN GILBERT and against Defendant, FASTSIGNS INTERNATIONAL, INC,
                                                                             at 9:00 AM
20         IT IS HEREBY ORDERED that pending the hearing of this matter on June __11__ 2008 or

21 as soon as the OSC may be heard by this Court, the above named Defendant, its agents, servants,

22 employees, and representatives and all persons acting in concert or participating with it, shall,

23 within twenty-four (24) hours of facsimile service of this Order:

24         1.      Restore in full the following e-mail and website communications of the company

25 known as Mid-Peninsula Marquee Inc.:

26         a.      The e-mail accounts: 395@fastsigns.com; norm.gilbert@fastsigns.com;

27 64201@fastsigns.com;

28         2.      Restore access to FSOL (FASTSIGNS Online) via a program called First Class

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

JUN 11 2008

1  Client including full access to all discussion and support folders, as they existed prior to June 9,

2  2008;

3       3.    Restore access to support.fastsigns.com and all services contained therein,

4  including but not limited to Send A File, FASTMAIL, Web Proofs, Search, Archives, Logo

5  Library, Spam Filtering, On Demand Zone and Marketing Resources as they existed prior to

6  June 9, 2008;

7       4.    Restore public access to the full web site http://www.fastsign,com/395 (and

8  derivatives of that website and name) including pending updates in progress from the

9  FASTSIGNS designated contractor, Netsam, Inc.;

10      5.    Restore access to all other electronic communications systems, web sites landing

11  pages, on-line maps, advertising, search engines, optimizations, Pay Per Click programs, Find a

12  Center, e-commerce or other electronic services, without limitation as they previously existed

13  prior to June 9, 2008;

14      6.    Restore any and all other franchise services, such as technical support,

15  consultation, advice, marketing, training, conventions, meetings or other services of any nature

16  whatsoever, delivered by phone, fax, e-mail, postal mail, or in person which would normally be

17  provided by FASTSIGNS INTERNATIONAL, INC., or normally made available to franchisees in

18  good standing of the FASTSIGNS INTERNATIONAL, INC. system and which were provided to

19  FASTSIGNS of Redwood City prior to June 9, 2008.

20      IT IS FURTHER ORDERED that Defendant, its agents, servants, employees, and

21  representatives and all persons acting in concert or participating with it refrain from any further

22  actions that may be inimical to the franchise business commonly known as Mid-Peninsula

23  Marquee Inc., a California corporation, pending arbitration of this matter.

24      The Court retains jurisdiction to modify this Order as the ends of justice may require.

    This order shall expire on July 11, 2008 at 9:00 AM

25  Dated: June 11 , 2008

26

27                                              JUDGE OF THE SUPERIOR COURT

28

**(PROPOSED) TEMPORARY RESTRAINING ORDER**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1 | DOUGLAS W. DAL CIELO (SBN 157109)
GREGORY M. GENTILE (SBN 142424)
2 | ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
3 | San Jose, CA 95113
Telephone:    (408) 287-6262
4 | Facsimile:    (408) 918-4501
ddalcielo@rmkb.com
5 | ggentile@rmkb.com

6 | Attorneys for Plaintiff
NORMAN GILBERT

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN MATEO

10

11 | NORMAN GILBERT,                    CASE NO.  CIV 473600

12 |           Plaintiff,              **NOTICE OF ENTRY OF ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION**
13 |      v.

14 | FASTSIGNS INTERNATIONAL INC.
and DOES 1-20, inclusive,

15 |           Defendants.

16

17 | **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

18 |      PLEASE TAKE NOTICE that on June 11, 2008, the Court entered an Order to Show

19 | Cause re Preliminary Injunction.

20 | Dated:  June 12, 2008                ROPERS, MAJESKI, KOHN & BENTLEY

21

22 |                                       By
23 |                                          DOUGLAS W. DAL CIELO
                                              GREGORY M. GENTILE
24 |                                          Attorneys for Plaintiff
                                              NORMAN GILBERT
25

26

27

28

RC1/5135063.1/BL1                                              CIV 473600

NOTICE OF ENTRY OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*(left margin)* Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

ENDORSED FILED
SAN MATEO COUNTY

JUN 1 2 2008

Clerk of the Superior Court
By ___ F. MORNEAU
DEPUTY CLERK

BY FAX

DOUGLAS W. DAL CIELO (SBN 157109)
GREGORY M. GENTILE (SBN 142424)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA  95113
Telephone:    (408) 287-6262
Facsimile:     (408) 918-4501
ddalcielo@rmkb.com
ggentile@rmkb.com

JUN 1 2 2008

Attorneys for Plaintiff
NORMAN GILBERT

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| NORMAN GILBERT,<br><br>        Plaintiff,<br><br>v.<br><br>FASTSIGNS INTERNATIONAL INC. and<br>DOES 1-20, inclusive,<br><br>        Defendants. | CASE NO.<br><br>~~(PROPOSED)~~) ORDER TO SHOW CAUSE<br>RE PRELIMINARY INJUNCTION |

Good cause appearing,

IT IS ORDERED that the above named Defendant, appear in Department 21 of this Court located at the Hall of Justice, 400 County Center, Redwood City, California, on June 11, 2008 at 9:00 a.m., or as soon thereafter as the matter may be heard, then and there to show cause, if any it has, why it, its agents, servants, employees, and representatives and all persons acting in concert or participating with it, should not:

    1.    Restore in full the following e-mail and website communications of the company known as Mid-Peninsula Marquee Inc.:

    a.    The e-mail accounts: 395@fastsigns.com; norm.gilbert@fastsigns.com; 64201@fastsigns.com;

    2.    Restore access to FSOL (FASTSIGNS Online) via a program called First Class Client including full access to all discussion and support folders, as they existed prior to June 9,

Ropers Majeski Kohn & Bentley<br>A Professional Corporation<br>San Jose

1  2008;

2        3.     Restore access to support.fastsigns.com and all services contained therein,

3  including but not limited to Send A File, FASTMAIL, Web Proofs, Search, Archives, Logo

4  Library, Spam Filtering, On Demand Zone and Marketing Resources as they existed prior to

5  June 9, 2008;

6        4.     Restore public access to the full web site http://www.fastsign,com/395 (and

7  derivatives of that website and name) including pending updates in progress from the

8  FASTSIGNS designated contractor, Netsam, Inc.;

9        5.     Restore access to all other electronic communications systems, web sites landing

10  pages, on-line maps, advertising, search engines, optimizations, Pay Per Click programs, Find a

11  Center, e-commerce or other electronic services, without limitation as they previously existed

12  prior to June 9, 2008;

13        6.     Restore any and all other franchise services, such as technical support,

14  consultation, advice, marketing, training, conventions, meetings or other services of any nature

15  whatsoever, delivered by phone, fax, e-mail, postal mail, or in person which would normally be

16  provided by FASTSIGNS INTERNATIONAL, INC., or normally made available to franchisees in

17  good standing of the FASTSIGNS INTERNATIONAL, INC., system and which were provided to

18  FASTSIGNS of Redwood City prior to June 9, 2008.

19      IT IS FURTHER ORDERED that the above-named Defendant, its agents, servants,

20  employees, and representatives and all persons acting in concert or participating with it, shall

21  refrain from any further actions that may be inimical to the franchise business commonly known

22  as Mid-Peninsula Marquee Inc., a California corporation, pending arbitration of this matter.

23      The Court hereby orders the following briefing schedule: ~~Any further papers in support of~~ *Defendant's counsel agrees*

24  *to accept service of moving papers.* ~~the OSC are to be served and filed by Plaintiff no later than seven (7) days before the date of the~~

25  ~~hearing set by this Court. Service may be made by fax.~~  Any Opposition to Plaintiff's papers is to

26  be served and filed ~~within five (5) days of the date of the hearing~~ *by July 2, 2008.* Service may be made by fax.

27  Any Reply shall be served and filed no later than ~~two (2) days before the date of the hearing.~~ *July 8, 2008.*

28  Service may be made by fax.

RC1/5133747.1/BL1                 - 2 -

**(PROPOSED) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1       Service of this Order on Defendant is to be made no later than June 12, 2008 by facsimile

2 transmission. Proof of Service of this Order is to be filed with the Court no later than June 16,

3 2008. The Temporary Restraining Order is to remain in effect until ~~June 26, 2008~~ July 11, 2008 unless

4 extended by the Court or the request of a party. The Court retains jurisdiction to modify this

5 Order as the ends of justice may require.

6 Dated: _June 11_, 2008

7

8                                        JUDGE OF THE SUPERIOR COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

**EXHIBIT C**

DOUGLAS W. DAL CIELO (SBN 157109)
GREGORY M. GENTILE (SBN 142424)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA 95113
Telephone:    (408) 287-6262
Facsimile:    (408) 918-4501
ddalcielo@rmkb.com
ggentile@rmkb.com

Attorneys for Plaintiff
NORMAN GILBERT

**ENDORSED FILED**
**SAN MATEO COUNTY**

JUN 1 1 2008

Clerk of the Superior Court
By    R. Montgomery
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| NORMAN GILBERT,<br><br>        Plaintiff,<br><br>    v.<br><br>FASTSIGNS INTERNATIONAL INC.<br>and DOES 1-20, inclusive,<br><br>        Defendants. | CASE NO.  **CIV 4 7 3 6 0 0**<br><br>**COMPLAINT FOR INJUNCTIVE AND<br>DECLARATORY RELIEF** |

Plaintiff NORMAN GILBERT for his Complaint for Injunctive and Declaratory Relief, alleges as follows:

**GENERAL ALLEGATIONS**

1.    Plaintiff NORMAN GILBERT (hereinafter "GILBERT" or "Plaintiff") is an individual residing in the State of California and is the owner/franchisee, operator and President of a licensed corporation known as Mid-Peninsula Marquee, Inc. dba FastSigns, with its principal place of business located at 2504 El Camino Real, Redwood City, California 94061.

2.    Defendant FASTSIGNS INTERNATIONAL INC. (hereinafter "FASTSIGNS" or "Defendant") is upon information and belief, a Texas corporation licensed to do business in the State of California and is a franchisor under that certain Franchise Agreement entered into with Plaintiff GILBERT and dated November 12, 2001.

3.    The true names and capacities, whether individual, corporate, associate, or

RCI/5133174.1/BL1                                    - 1 -

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1   otherwise of Defendants DOES 1 through 20, inclusive, are unknown to GILBERT, who

2   therefore sues such Defendants by such fictitious names. GILBERT is informed and believes

3   and, on that basis alleges, that each of the Defendants sued herein as Does 1 through 20,

4   inclusive, are responsible in some way for the events herein alleged. GILBERT will pray leave to

5   amend this Complaint to state the true names and capacities of said Defendants when the same

6   have been ascertained.

7   　　　　4.　　GILBERT is informed and believes and, on that basis, alleges that at all relevant

8   times herein, the Defendants, and each of them, were the agents, servants, and employees of each

9   of the remaining Defendants and acted within the course and scope of such agency, servitude, and

10  employment.

**RELEVANT ALLEGATIONS**

12  　　　　5.　　On or about November 12, 2001, GILBERT and Defendant entered into a

13  Franchise Agreement wherein GILBERT commenced the operation of a business incorporated as

14  Mid-Peninsula Marquee Inc. specializing in the production and marketing of signs, graphics,

15  banners, ready-to-apply lettering, etc. On the aforementioned date, GILBERT was granted by

16  Defendant the right and franchise of said business to develop and operate a "Fast Signs Center".

17  　　　　6.　　Thereafter, GILBERT commenced operation of the franchise under the name of

18  Mid-Peninsula Marquee Inc., and has spent the last five years building the FASTSIGNS brand

19  with both large and small customers.

20  　　　　7.　　GILBERT has operated such franchise and was considered a valued franchisee by

21  Defendant since November 12, 2001, achieving more than satisfactory gross sales and paying

22  royalties to Defendant.

23  　　　　8.　　In or about April, 2008, a dispute arose between GILBERT and Defendant

24  following an audit of April 14, 2008 wherein Defendant deemed GILBERT to be in violation of

25  certain sections of the aforementioned Franchise Agreement. Thereafter, Defendant deemed

26  GILBERT to be in non-compliance with the terms and conditions of the Franchise Agreement

27  and as a consequence seeks to terminate the Franchise Agreement. As a consequence, a dispute

28  arose between the parties which is specifically governed by Section 24A of the Franchise

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1    Agreement mandating binding arbitration which has been demanded in writing by GILBERT.

2        9.    Notwithstanding the dispute presently existing between GILBERT and Defendant,

3    Defendant has sought to take action inimical to GILBERT's business operation of the franchise,

4    including, but not limited to, the following: The termination of Plaintiff's vital e-mail

5    communication system and website, thereby negating and frustrating Plaintiff from operating said

6    business, communicating with present and prospective customers, patrons and others in the

7    furtherance of maintaining the business of the franchise, to the detriment of GILBERT.

8    GILBERT's sales revenue and goodwill are totally dependent upon the electronic services

9    provided by FASTSIGNS.

10        10.    Although Paragraph 24A of the aforementioned Franchise Agreement mandates

11    binding arbitration with the American Arbitration Association, Paragraph 24B of the Agreement

12    sets forth that "notwithstanding any provision contained in Paragraph A above, either party may

13    institute in a court of competent jurisdiction an action or actions for temporary or preliminary

14    injunctive relief; provided, however, that such party must contemporaneously submit the dispute

15    for arbitration on the merits as provided in Paragraph A".

16        11.    At all relevant times GILBERT has satisfied the condition and has demanded

17    arbitration in writing with Defendant and in good faith wishes to submit the pending dispute to

18    binding arbitration pursuant to Paragraph 24A. Despite GILBERT's good faith request to

19    arbitrate the dispute, Defendant has refused to restore the e-mail and website communications,

20    thereby crippling GILBERT's business. GILBERT requires and hereby seeks injunctive relief

21    seeking an order that Defendant restore all vital communications and restrain from taking any

22    further steps inimical to the operation of GILBERT's operation of the franchise and to preserve

23    the status quo pending the arbitration hearing.

24        12.    Despite GILBERT's request to Defendant to cease and desist its unlawful conduct

25    in removing and otherwise cutting off his communication system, Defendant has failed and

26    refused to desist and unless the Court imposes its equity powers and issues an injunction to

27    preserve the status quo pending arbitration, Plaintiff will be irreparably harmed.

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

·26

27

28

## FIRST CAUSE OF ACTION

### (Injunctive Relief)

13.    GILBERT realleges and incorporates herein by reference each and every allegation contained in Paragraph 1 through 12, inclusive.

14.    Unless and until enjoined and restrained by the Court, GILBERT will suffer great and irreparable injury in that Defendant's actions are restricting GILBERT from performing any business activities and is economically injuring him and his customer base to his detriment. Plaintiff has no speedy or adequate remedy at law for the on-going injuries being suffered as a result of Defendant's interference with its business communication and GILBERT is suffering the loss of its present business and future business and enjoyment of its business property as a result of Defendant's actions.

15.    As a proximate result of Defendant's interference with GILBERT communications system, GILBERT has been and is unable to use and/or operate its business and is suffering damages associated with the loss of use of its business and its customer base in an amount according to proof.

16.    Plaintiff will pray leave to amend this Complaint to allege further actions and an exact amount of said damages if same becomes necessary, and upon same becoming known to it.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### (Declaratory Relief)

17.    GILBERT realleges and incorporates herein by reference each and every allegation contained in Paragraph 1 through 16, inclusive.

18.    Based upon the above allegations and unless and until enjoined or restrained by order of this Court, Defendant's obstruction and interference with GILBERT business operation will cause great and irreparable injury.

19.    GILBERT has no adequate remedy at law for the injuries being suffered as a result of Defendant's activities and therefore GILBERT has no other alternative but to seek a declaratory judgment or injunctive relief since Defendant's activities are forcing GILBERT to

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1  forfeit all of his attendant business property rights.

2      20.    An actual controversy has arisen and now exists between GILBERT and

3  Defendant concerning the respective rights and duties regarding the communications system and

4  therefore Plaintiff seeks a judicial determination of its respective rights and duties and a

5  declaration that Defendant not interfere with his communications system or take any other action

6  inimical to the business until this matter is heard by the arbitrator pursuant to the Franchise

7  Agreement.

8      WHEREFORE, GILBERT prays for judgment as set forth below:

9      a.    A Temporary Restraining Order that Defendant restore the communications

10 system as it existed prior to June 9, 2008;

11     b.    A preliminary injunction that Defendant refrain from any such activity that may

12 interfere with GILBERT's use and enjoyment of the business enterprise named above and that

13 GILBERT's business e-mail and website be restored and maintained to its full operation until

14 arbitration of this matter is heard and the issue of the dispute is resolved by the Arbitrator.

15     c.    That the status quo be preserved pending arbitration in this matter and that

16 Defendant take no such action or activities inimical to GILBERT that interferes with Plaintiff's

17 operation of its business.

18     d.    For such other relief as this Court may deem proper.

19 Dated: June 11, 2008

                                    ROPERS, MAJESKI, KOHN & BENTLEY

20

21

                                    By:
22                                      DOUGLAS W. DAL CIELO
                                        GREGORY M. GENTILE
23                                      Attorneys for Plaintiff
                                        NORMAN GILBERT

24

25

26

27

28

RC1/5133174.1/BL1                   - 5 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

**EXHIBIT D**

1   JEFFREY M. HAMERLING (Bar No. 91532)
    ERIN FRAZOR (Bar No. 251324)
2   DLA PIPER US LLP
    153 Townsend Street, Suite 800
3   San Francisco, CA  94107-1957
    Tel:  415.836.2500
4   Fax:  415.836.2501

5   Attorneys for Defendant
    FASTSIGNS INTERNATIONAL, INC.

6

7                   IN THE UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO DIVISION

10

11  NORMAN GILBERT,

12              Plaintiff,                CV 08    3043

13      v.                                NOTICE OF REMOVAL OF ACTION
                                          PURSUANT TO 28 U.S.C. §§ 1332 AND
14  FASTSIGNS INTERNATIONAL, INC. and     1441
    DOES 1-20, inclusive,
15                                                        VRW
                Defendants.
16

17  TO THE CLERK AND THE PARTIES THROUGH THEIR COUNSEL OF RECORD:

18          PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332 & § 1441, defendant

19  FastSigns International, Inc. ("FII") hereby removes to this Court the case entitled *Norman*

20  *Gilbert v. FastSigns International, Inc. et al.*, filed on June 11, 2008, in the Superior Court of the

21  State of California for the County of San Mateo as Case No. CIV 473600 ("Gilbert Complaint").

22  This removal is based upon the following grounds:

23

24                              **JURISDICTION**

25          This Court has removal jurisdiction over this case pursuant to 28 U.S.C. §§ 1332 and 1441

26  as discussed in further detail in paragraphs 1 – 7 below.

27

28

WEST\21450695.2                    -1-

                                          NOTICE OF REMOVAL

**INTRA-DISTRICT ASSIGNMENT**

Assignment to the San Francisco Division of this Court is appropriate under Civil Local Rule 302(d) because the action being removed was originally filed in the Superior Court of the State of California in and for the County of San Mateo.

**BASIS FOR REMOVAL**

Removal is proper for the following reasons:

1.    On June 11, 2008, an action was commenced by the filing of the complaint in the Superior Court of the State of California for the County of San Mateo as Case No. CIV 473600, entitled *Norman Gilbert v. FastSigns International, Inc. et al.* Attached hereto as Exhibit A is a true and correct copy of said complaint. Also on June 11, 2008, Plaintiff Norman Gilbert ("Gilbert") sought an Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("TRO"). Attached hereto as Exhibit B are true and correct copies of the ex parte application. Attached hereto as Exhibit C is copy of the Court's order granting the TRO.

2.    The first date on which FII received a copy of the complaint was June 11, 2008 at the ex parte hearing. FII was served by mail a copy of the summons and complaint on June _, 2008 and returned the acknowledgment of service on June 20, 2008. Attached as Exhibit D are true and correct copies of the summons and acknowledgment of service.

3.    This Notice of Removal is filed prior to the expiration of thirty days after FII received Gilbert's Complaint, and is therefore timely under 28 U.S.C. § 1446(b).

4.    This Court has original jurisdiction of this action under 28 U.S.C. § 1332, which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441(b), because it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.    Complete diversity of citizenship exists in that: Plaintiff Gilbert is a citizen of the State of California; and Defendant FII was and is a corporation incorporated under the laws of the State of Texas and having its principal place of business in the State of Texas.

WEST\21450695.2                                         -2-

6.     The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, because Gilbert alleges, among other allegations that he will lose his business without the injunctive relief requested and Gilbert contends that his business is worth substantially more than $75,000. Specifically, Gilbert contends that: he is suffering "great and irreparable injury" (Gilbert Complaint ¶¶ 14, 18); he is being restricted from performing any business activities (Gilbert Complaint ¶ 14); he is suffering "on-going" injuries, and "suffering the loss of its present business and future business and enjoyment of its business property" (Gilbert Complaint ¶ 14); and he is unable to use and/or operate his business and is suffering damages associated with the loss of his business and customer base (Gilbert Complaint ¶ 15). Gilbert further alleges that he is being forced to "forfeit all of his attendant business property rights." Gilbert Complaint ¶ 19. Gilbert also states in his Declaration in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Gilbert Declaration") that: his "sales revenue and goodwill are totally dependent upon the electronic services provided by FASTSIGNS International" (Gilbert Declaration ¶ 6); his "business is being irreparably harmed by the denial of all electronic services and franchisee support" (Gilbert Declaration ¶ 15); his business has a valued reputation in the community and will "lose a significant amount of daily sales as well as the loss of customer goodwill" (Gilbert Declaration ¶ 16); his three employees are fearful of losing their jobs as a result of this dispute and are being caused "significant emotional stress" as well as affecting their job performance and productivity (Gilbert Declaration ¶ 17); and he has paid a pro-rata share for advertising his center (Gilbert Declaration ¶ 17).

7.     Pursuant to 28 U.S.C. § 1446(d), promptly after filing this Notice of Removal, FII will give written notice hereof to Gilbert and will file a copy of the Notice with the Clerk of the Superior Court of the State of California for the County of San Mateo.

//
//
//
//
//

WEST\21450695.2                                      -3-

1        WHEREFORE, FII prays that the above-captioned action now pending in the Superior

2   Court of the State of California for the County of San Mateo from be removed to this Court.

3

4   Dated: June __, 2008                        DLA Piper US LLP

5

6                                      By _____

7                                          Jeffrey M. Hamerling
                                           Erin Frazor
8                                          Attorneys for Defendant
                                           FASTSIGNS INTERNATIONAL, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEST\21450695.2

-4-

NOTICE OF REMOVAL

**EXHIBIT E**

SAN JOSE | 50 West San Fer... .do Street
Los Angeles | Suite 1400
New York | San Jose, CA 95113
San Francisco | Telephone (408) 287-6262
Redwood City | Facsimile (408) 918-4501
Boston | www.ropers.com



ddalcielo@ropers.com

Douglas W. Dal Cielo

June 2, 2008

Larry Lane
FastSigns International, Inc.
2542 Highlander Way
Carrollton, TX  75006

Dear Mr. Lane:

This correspondence is in response to your May 27, 2008 letter attempting to "terminate" the subject Franchise Agreement.  Please be advised that the franchisor has and continues to act in "bad faith" in violation of the Franchise Agreement dated November 12, 2001.  We invite you to reconsider your position; specifically, continuing to negotiate in "good faith" any outstanding royalties and fees that the franchisor deems owed.

It bears emphasis that we will not be forced to sell our franchise as a distressed commodity.  In the event that an economic settlement cannot be reached, we hereby demand binding arbitration in California pursuant to §24 of the Agreement and the addendum thereto. We thank you in advance for your prompt attention to this matter.

Very truly yours,

ROPERS, MAJESKI, KOHN & BENTLEY

/s/

DOUGLAS W. DAL CIELO

DWD/bjs
cc:   Norm Gilbert

RC1/5129265.1/BS

1   DOUGLAS W. DAL CIELO (SBN 157109)
    GREGORY M. GENTILE (SBN 142424)
2   ROPERS, MAJESKI, KOHN & BENTLEY
    50 West San Fernando Street, Suite 1400
3   San Jose, CA 95113
    Telephone:   (408) 287-6262
4   Facsimile:   (408) 918-4501
    ddalcielo@rmkb.com
5   ggentile@rmkb.com

6   Attorneys for Plaintiff
    NORMAN GILBERT

7

8                 UNITED STATES DISTRICT COURT

9           CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

10

11  NORMAN GILBERT,                    CASE NO.  3:08-CV-03043-VRW

12              Plaintiff,             **[PROPOSED] ORDER GRANTING
                                       PLAINTIFF NORMAN GILBERT'S
13        v.                           MOTION TO REMAND AND AWARDING
                                       ATTORNEY'S FEES AND COSTS**
14  FASTSIGNS INTERNATIONAL, INC.
    and DOES 1-20, inclusive,          **Date:     July 10, 2008**
15                                     **Time:     2:30 p.m.**
                Defendants.            **Judge:    Hon. Vaughn R. Walker**
16

17        Plaintiff NORMAN GILBERT's motion to remand came on for hearing upon shortened

18  time and pursuant to Court Order, on July 10, 2008 before the Honorable Vaughn R. Walker,

19  Chief Judge of the United States District Court of California, Northern District (San Francisco).

20  Plaintiff was represented by Gregory M. Gentile, Esq. of the law firm of Ropers, Majeski, Kohn

21  & Bentley.  Defendant was represented by Jeffrey M. Hamerling, Esq. of the law firm of DLA

22  Piper.  Upon considering the moving, opposing, and reply papers, and hearing oral argument, the

23  Court hereby grants Plaintiff's motion to remand pursuant to 28 U.S.C. §1447(c) and hereby

24  remands to the San Mateo County Superior Court Case No. CIV473600.

25        Furthermore, the Court finds that Plaintiff GILBERT is entitled to attorney's fees and

26  / / /

27  / / /

28  / / /

RC1/5143490.1/BL1                      -1-                    **Case No. 3:08-CV-03043-VRW**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

1  costs incurred as a result of the improper removal of the San Mateo County Superior Court action

2  and hereby awards GILBERT the total sum of $_____.

3  Dated: _____          _____

4                                  VAUGHN R. WALKER
                                   CHIEF JUDGE OF THE UNITED STATES
                                   DISTRICT COURT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Jose

RC1/5143490.1/BL1

-2-

Case No. 3:08-CV-03043-VRW

**[PROPOSED] ORDER GRANTING MOTION TO REMAND**