1  JEFFREY M. HAMERLING (Bar No. 91532)
   ERIN FRAZOR (Bar No. 251324)
2  DLA PIPER US LLP
   153 Townsend Street, Suite 800
3  San Francisco, CA 94107-1957
   Tel: 415.836.2500
4  Fax: 415.836.2501

5  Attorneys for Defendant
   FASTSIGNS INTERNATIONAL, INC.

6

7               IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                   SAN FRANCISCO DIVISION

10 NORMAN GILBERT                          Case No. CV 08-03043 VRW

11          Plaintiff,                     **DECLARATION OF STEPHANIE
                                           BROOKS IN SUPPORT OF
12     v.                                  DEFENDANT'S OPPOSITION TO
                                           PLAINTIFF'S MOTION FOR
13 FASTSIGNS INTERNATIONAL, INC.,          PRELIMINARY INJUNCTION**
   and DOES 1-20, inclusive,
14                                         Date:   August 7, 2008
            Defendants.                    Time:   2:30 p.m.
15                                         Judge:  Hon. Vaughn R. Walker

16

17     I, STEPHANIE BROOKS, declare as follows:

18     1.    I am the Director of Legal Administration for FASTSIGNS INTERNATIONAL,

19 INC. ("FII"), a Texas corporation that specializes in the production and marketing of signs,

20 graphics, banners, ready-to-apply lettering, trade show displays, and other complementary

21 products and services, with an emphasis on convenience and one-day service.

22     2.    I make this declaration in opposition to the motion for preliminary injunction filed

23 by Plaintiff Norman Gilbert ("Gilbert"). I make the declaration based on my review of my files

24 and documents, as well as my personal knowledge of the facts set forth in this declaration. If

25 called upon to do so, I could and would competently testify to these matters.

26     3.    On or about November 12, 2001, FII and Gilbert entered into a Franchise

27 Agreement providing Gilbert the right to operate a FASTSIGNS sign, graphics, and banner store

28

DLA PIPER US LLP
SAN FRANCISCO

-1-

WEST\21456924.1    DECLARATION OF STEPHANIE BROOKS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
                   PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    under the FII trademark, service mark, and trade name in Redwood City, California. Attached

2    hereto as Exhibit A is a true and correct copy of the Franchise Agreement.

3        4.    The Franchise Agreement does not grant a franchisee rights to email, website, and

4    E-Commerce communications services.

5        5.    Under Section 14A of the Franchise Agreement, the franchisee receives on loan

6    from FII several manuals (collectively "Manuals") including, among others, the FASTSIGNS

7    Operations Manual. Included in the Operations Manual are policies related to the electronic

8    services, including: (1) the FASTSIGNS Online Intranet Service Participation Policy ("FSOL");

9    (2) the File Transfer Protocol Site Policy ("FTP Site Policy"); (3) the E-Commerce Participation

10   Policy; (4) Attachment A to the FTP Site, FSOL Intranet Service & E-Commerce; and (5) the US

11   Limited Services Policy. Attached hereto as Exhibit B is a true and correct copy of the relevant

12   policy pages of the Operations Manual.

13       6.    Under "Attachment A," which applies to the electronic services, "FII may limit or

14   terminate [a franchisee's] access to any part or all of the FTP Site, the Service, E-Commerce

15   Participation and any related service(s) at any time, with or without cause, with or without notice,

16   effective immediately, for any reason whatsoever. . . . FII shall have no obligation to maintain

17   any content in [a franchisee's] account or to forward any unread or unsent messages to [a

18   franchisee] or any third party."

19       7.    In order to protect the reputation and goodwill of FII and its proprietary

20   trademarks and service marks, under Section 14B of the Franchise Agreement a franchisee is

21   required to conduct its business in accordance with (1) the Manuals, (2) other written directives

22   FII may issue from time to time, and (3) any other manuals and materials created or approved for

23   use in the operation of the Center.

24       8.    On or about November 19, 2001, Gilbert signed the above policies and agreed to

25   these terms in order to participate in the electronic services. Attached hereto as Exhibit C is a true

26   and correct copy of the policies Gilbert signed.

27       9.    The policies are provided to franchisees for their Operations Manual, and current

28   policies can be accessed online. Franchisees are notified of updates to all policies.

DLA PIPER US LLP
SAN FRANCISCO

WEST\21456924.1        DECLARATION OF STEPHANIE BROOKS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    I declare under penalty of perjury under the laws of the State of California and the United

2  States of America that the foregoing is true and correct to the best of my knowledge and belief

3  and that this declaration was executed by me on July 17, 2008 at Carrollton, Texas.

4

5                            Stephanie Brooks

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

WEST\21456924.1    DECLARATION OF STEPHANIE BROOKS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# Exhibit A



FASTSIGNS INTERNATIONAL, INC.

FRANCHISE AGREEMENT

Norman Gilbert

State of California

fm.6.26.01

FASTSIGNS International, Inc. • 2550 Midway Road, Ste. 150 • Carrollton, TX 75006 • 214/346-5600 • FAX 972/248-8201

FASTSIGNS INTERNATIONAL, INC.
FRANCHISE AGREEMENT

TABLE OF CONTENTS

| SECTION | | Page |
|---|---|---|
| 1. | Franchise Grant | 1 |
| 2. | Term and Renewal | 2 |
| 3. | Fees | 3 |
| 4. | Advertising | 5 |
| 5. | Franchisee Organization | 7 |
| 6. | Site Selection; Lease; Plans and Construction | 9 |
| 7. | Duties of Franchisor | 10 |
| 8. | Training | 12 |
| 9. | Center Operations | 12 |
| 10. | Insurance | 15 |
| 11. | Taxes, Permits and Indebtedness | 17 |
| 12. | Records and Reports | 17 |
| 13. | Proprietary Marks | 18 |
| 14. | Confidential Manuals | 20 |
| 15. | Confidential Information | 21 |
| 16. | Default and Termination | 21 |
| 17. | Obligations Upon Termination or Expiration | 24 |
| 18. | Transfer of Interest | 26 |
| 19. | Covenants | 30 |
| 20. | Independent Contractor and Indemnification | 32 |
| 21. | Entire Agreement and Modification | 34 |
| 22. | Approvals | 34 |
| 23. | Non-Waiver and Remedies | 34 |
| 24. | Dispute Resolution | 34 |

25.  Notices...................................................................................................................35

26.  Limitations of Claims..........................................................................................36

27.  Severability and Construction...............................................................................36

28.  Force Majeure....................................................................................................37

29.  Acknowledgments.............................................................................................37


Attachment "A" - Approved Location and Territory
Attachment "B" - Statement of Ownership Interests
Attachment "C" - Lease Addendum
Attachment "D" - Confidentiality and Ancillary Non-Compete Agreement
Attachment "E" - Telephone Irrevocable Power of Attorney
Attachment "F" - Internet Irrevocable Power of Attorney
Attachment "G" - Tax Irrevocable Power of Attorney
Attachment "H" – Franchise Agreement Renewal Amendment
Attachment "I" -- Franchise Agreement Transfer of Interest Amendment
Attachment "J" -- Franchise Agreement Conversion Franchise Amendment
Attachment "K" -- Electronic Funds Transfer

## FASTSIGNS INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is made and entered into this _____ day of _____, 200_ by and between FASTSIGNS INTERNATIONAL, INC., a Texas corporation ("Franchisor"), and Norman Gilbert (individually and collectively referred to as "Franchisee").

### W I T N E S S E T H :

WHEREAS, Franchisor, as the result of the expenditures of time, skill, effort and money, has developed a unique and comprehensive system for the promotion, development and operation of businesses which specialize in the production and marketing of signs, graphics, banners, ready-to-apply lettering, trade show displays, digital imaging and other complementary products and services, and which emphasize convenience and one-day service ("System"). Said System provides competitive and economic advantages to Franchisor and its Franchisees;

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; uniform standards, technology, know-how and procedures for production of signs, graphics, digital imaging and banners; quality and consistency of products and services; inventory, management and financial control methods; training and assistance; and advertising and promotional programs, all of which may be changed, improved and further developed by Franchisor from time to time;

WHEREAS, Franchisor identifies the System by means of certain trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin including, without limitation, the mark "FASTSIGNS", "FASTSIGNS", The One Day Sign & Lettering Experts", "FASTSIGNS, For A Quality Sign That's Right. On Time" and "Quality Signs. Done Right. On Time.", "Sign and Graphic Solutions Made Simple", and such other trade names, trademarks and service marks as Franchisor may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and the System and representing the System's high standards of quality, appearance and service (collectively, "Proprietary Marks");

WHEREAS, Franchisee desires to use the System in connection with the operation of a FASTSIGNS Center, at the location specified herein, upon the terms and subject to the conditions hereinafter set forth;

NOW THEREFORE, in consideration of the premises and of the mutual undertakings, obligations and commitments contained herein, it is agreed between the parties as follows:

1.    <u>Franchise Grant</u>

A.    Franchisor hereby grants to Franchisee the right, and Franchisee hereby undertakes the obligation, upon the terms and subject to the conditions hereinafter set forth, to develop and operate a FASTSIGNS Center (the "Center") and to use solely in connection therewith the Proprietary Marks and the System, as such may be changed, improved and further developed from time to time, only at the approved location described in Attachment "A" hereto.

B.    Franchisee shall not relocate the Center without the express prior written consent of Franchisor. This Agreement does not grant to Franchisee the right to franchise or operate the Center or to offer or sell any products or services described hereunder at or from any other location. At the time Franchisee requests Franchisor's consent to relocate, Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof.

C.    Subsequent to Franchisee's selection of an approved location for the Center in accordance with the provisions of Section 6, Franchisee shall be assigned a specific geographic area (the "Territory") by Franchisor. A description of Franchisee's Territory shall be set forth on Attachment "A". During the term of this Agreement, so long as Franchisee is in full compliance with the terms and conditions of this Agreement, Franchisor shall not establish or grant others the right to establish a Center in the Territory (subject to Subsection D. below). Franchisee shall use its best efforts to advertise and promote the Center in its Territory in accordance with Section 4 below.

D.    If at any time during the term of this Agreement, Franchisor desires to establish or authorize any other person to establish one or more FASTSIGNS centers in the Territory as a result of an increase in the Business Count in the Territory, and if Franchisee is then in full compliance with the terms and conditions of this Agreement and meets the then-current criteria established by Franchisor to develop an additional Center, then Franchisee shall have the option to obtain the right to develop and operate the additional center(s) by entering into a development agreement or franchise agreement, as the case may be. Franchisor shall provide Franchisee with notice thereof and the then-current form of franchise agreement or development agreement; provided, that the initial franchise fee shall be the same as the initial franchise fee described in Section 3 below. Franchisee shall have a period of thirty (30) days following notice from Franchisor to execute and return to Franchisor the applicable agreement and pay the initial fees thereunder. If Franchisee fails to timely exercise its rights under this Section 1.D, Franchisor may thereafter establish such center itself or authorize others to do so. The "Business Count" shall mean the number of businesses which Franchisor determines in its business judgment constitute potential customers for Franchisee's products and services.

E.    Franchisee acknowledges and agrees that Franchisor and its affiliates have the right to establish, operate, franchise or license others to operate businesses at any location, including within the Territory by: (i) selling products and services other than those sold at the Center under the Proprietary Marks; or (ii) selling products and services similar to those sold at the Center under different trade names, trademarks or service marks in the Territory through similar outlets or alternative channels of distribution.

2.    Term and Renewal

A.    Except as otherwise provided herein, the term of this Agreement shall expire twenty (20) years from the date of execution.

B.    Franchisee may, at its option, renew this Agreement for an additional term of ten (10) years, subject to the following conditions, which must, in Franchisor's sole discretion, be met prior to renewal:

(1)    Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than eight (8) nor more than twelve (12) months prior to the expiration of the initial term;

(2)    Franchisee shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for FASTSIGNS centers under the System;

(3)    Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof;

(4)    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and shall have timely met those obligations throughout the term of this Agreement;

(5)    Franchisee shall execute Franchisor's then-current form of franchise agreement for the renewal term prescribed herein, which agreement shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement and may include, without limitation, a higher service fee and advertising fee; provided that Franchisee shall pay in lieu of an initial franchise fee a renewal fee equal to no more than four percent (4%) of the initial franchise fee then being charged to new franchisees under the System. Any franchise agreement signed for the renewal term shall contain substantially the terms and provisions set forth in Attachment H to this Agreement, except as Franchisor may otherwise consent to in writing;

(6)    Franchisee shall comply with Franchisor's then-current qualification and training requirements;

(7)    Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the approved location for the duration of the renewal term of this Agreement; and

(8)    Franchisee and each Controlling Principal (as defined in Section 27.E) shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, and representatives, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or under federal, state or local laws, regulations, rules or orders.

3.    **Fees**

A.    <u>Initial Franchise Fee.</u>    Upon execution of this Agreement, Franchisee shall pay to Franchisor a franchise fee of Twenty Thousand dollars ($20,000.00) which shall be deemed fully earned and nonrefundable upon execution of this Agreement (subject to the provisions of Section 16.B(2)) in consideration of the administrative and other expenses incurred by Franchisor in granting the franchise hereunder and for Franchisor's lost or deferred opportunity to franchise at the specified location to any other party.

B.    <u>Service Fee.</u>    During the term of this Agreement, Franchisee shall pay to Franchisor a continuous nonrefundable fee (the "Service Fee") equal to six percent (6%) of the monthly Gross Sales (as defined below) of the Center. The obligation to pay the Service Fee commences immediately upon opening of the Center for business. Payment of the Service Fee will be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the Service Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day. Franchisor reserves the right to change the method of payment of the Service Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. A business day for purposes of this Section 3.B means any day other than Saturday, Sunday, or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

C.    <u>Gross Sales.</u>    As used in this Agreement, "Gross Sales" shall include all revenues from the sale of any and all services and products by Franchisee (whether for cash, credit or in exchange for other goods and services and regardless of collection in the case of credit) at or from the Center and all other revenues of every kind and nature related to the operation of the Center; provided, however, Gross Sales shall not include any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

D.    NAC Fee.    During the term of this Agreement, Franchisor and Franchisee agree as follows:

(1)    Franchisee shall be required to deposit Six Thousand Three Hundred Ninety Nine Dollars ($6,399) into an account during new owner training to be administered by the National Advertising Council, Inc. ("NAC") to purchase mailings and other marketing materials during the initial twelve (12) months the Center is open for business (See Attachment I to this Agreement regarding a Center that has been acquired by Franchisee from an existing Franchisee). In addition, if the Center is opening without a Yellow Pages display ad for three (3) months or more, an additional deposit will be required based on the monthly amount that would be spent on a Yellow Pages display ad.

(2)    During the term of this Agreement, Franchisee shall pay to the NAC a continuous nonrefundable advertising fee (the "NAC Fee") equal to two percent (2%) of the monthly Gross Sales of the Center. The obligation to pay the NAC Fee shall commence immediately upon the opening of the Center for business. Payment of the NAC Fee will be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the NAC Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day). Franchisor reserves the right to change the method of payment of the NAC Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. The term "business day" in this Section 3.D. shall have the same meaning as set forth in Section 3.B. above. All NAC Fees collected by Franchisor on behalf of the NAC shall be deposited in a separate account (the "NAC Fund") administered by Franchisor and the NAC.

E.    Past Due Amounts.    Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder. Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue. Time is of the essence with respect to all payments to be made by Franchisee to Franchisor. Any payment not actually received by Franchisor on the due date and any payment for invoices made by a check that is returned by the bank upon which it is drawn for insufficient funds or for any other reason shall be deemed overdue. If any payment is overdue, Franchisee shall pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of eighteen percent (18%) per annum, or the maximum rate of interest permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Franchisor may have at law or in equity, arising under this Agreement or otherwise.

F.    Electronic Funds Transfer.    Upon execution of this Agreement and at any time thereafter at Franchisor's request, Franchisee shall execute Attachment K to this Agreement and all other documents necessary to permit Franchisor to withdraw funds from Franchisee's designated bank account by electronic funds transfer ("EFT") in the amount of the service fee described in Section 3.B. above and the NAC fee described in Section 3.D.(2) above, and all other fees or amounts described in this Agreement, at the time or times that such fees or amounts become due and payable under the terms of this Agreement, provided such days is a business day (and if not a business day, on the next succeeding business day). Any fee calculated by reference to Gross Sales shall be based on the information in the applicable Gross Sales Report or, if the Gross Sales Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the subject month based on one and half (1 ½) times the most recent Gross Sales Report provided to Franchisor by Franchisee; provided that if a Report for the subject month is subsequently received and reflects (i) that the actual amount of the fee due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the EFT by Franchisor, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations. Should any EFT not be honored by Franchisee's bank for any reason, Franchisee agrees that it shall responsible for that payment plus a service charge applied by Franchisor and the bank, if any. If any payments are not received when due, interest may be charged by Franchisee in accordance with Section 3.E. above. Upon written notice to Franchisee, Franchisor may designate another method of payment, at Franchisor's sole discretion.

4.    Advertising

During the term of this Agreement, in order to promote the goodwill and public image of the system, Franchisor and Franchisee agree as follows:

A.    Franchisee, by virtue of its being a franchisee of Franchisor, shall be a member of the NAC. The board of directors of the NAC is comprised of Franchisor and franchisees elected by the members pursuant to the bylaws of the NAC. Monies from the NAC Fund are to be used to pay for advertising and promotional programs for the benefit of the System. Franchisee agrees that the NAC Fund shall be maintained and administered by Franchisor and the NAC or their designee as follows:

(1)    Subject to Section 4.F below, the board of directors of the NAC shall direct all advertising programs and shall approve or disapprove the creative concepts, materials, and media used in such programs and the production thereof. All decisions of the NAC are subject to the approval of Franchisor. Franchisee agrees and acknowledges that the NAC Fund is intended to maximize general public recognition and acceptance of the Proprietary Marks and the System. In administering the NAC Fund, neither Franchisor nor the NAC undertake any obligation to make expenditures for Franchisee which are equivalent or proportionate to its contribution or to ensure that any particular franchisee benefits directly or pro rata from the production of such advertising;

(2)    Franchisee agrees that the NAC Fund may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising consistent with the objectives of the NAC, as set forth in its bylaws (including, without limitation, the cost of preparing television, radio, magazine, business journals and newspaper advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other advertising materials to the businesses operating under the System). Franchisor and the NAC reserve the right to use the NAC Fund in connection with the placement and allocation of such advertising. In addition, disbursements may be made to compensate Franchisor's employees who devote time and render services in the formulation, development and production of programs to satisfy such objectives and purposes, or who perform services in connection with the administration of the NAC Fund. The NAC Fund and its earnings shall not otherwise inure to the benefit of Franchisor or the NAC; and

(3)    An unaudited statement of contributions to and disbursements of the NAC Fund shall be prepared quarterly by Franchisor and made available to Franchisee upon request.

B.    In addition to the NAC Fund described in Section 3.D(2), Franchisor shall have the right, in its sole discretion, to designate any geographic area in which two (2) or more FASTSIGNS centers are located as a region for establishing an advertising cooperative ("Advertising Cooperative"). At any time after a second FASTSIGNS Center located within a designated geographic area has opened for business, Franchisor can designate and Franchisee shall be required to form an Advertising Cooperative to operate within that geographic area. Each Advertising Cooperative shall be organized and governed in a form and manner, and must commence operations on a date determined by Franchisor in its sole discretion. Each Advertising Cooperative shall be administered and maintained in a accordance with the terms of its governing documents. The Advertising Cooperative, all contributions thereto and any earnings thereon shall be used exclusively to meet any and all costs of developing, creating, producing, maintaining, administering, directing and preparing advertising and promotional materials and programs, subject to Franchisor's approval pursuant to Section 4.F, for Centers participating in the Advertising Cooperative. If at the time of the execution of this Agreement, an Advertising Cooperative has been established for a geographic area that includes Franchisee's Territory, Franchisee shall become a member of the Advertising Cooperative upon execution. If an Advertising Cooperative is established at any time during the term of this Agreement, Franchisee shall become a member of the Advertising Cooperative immediately after the Advertising Cooperative commences operation. In either case, Franchisee shall participate as follows:

(1)    Franchisee shall contribute to the Advertising Cooperative such amounts as are required by the Advertising Cooperative; provided, however, Franchisee will not be required to contribute more than two percent (2%) of Franchisee's Gross Sales during any calendar month to the Advertising Cooperative unless, subject to Franchisor's approval, the members of the Advertising Cooperative agree in writing to contribute a specific amount each month. This contribution does not include the Franchisee's cost for their Yellow Pages display ad;

(2)    Franchisee shall submit to the Advertising Cooperative and to Franchisor such statements and reports as may be required by Franchisor or by the Advertising Cooperative. All contributions to the Advertising Cooperative shall be maintained and administered in accordance with procedures adopted by the Advertising Cooperative and approved by Franchisor; and

(3)    No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without the prior approval of Franchisor.

C.    Franchisee shall place and pay to the local directory or the Advertising Cooperative, as determined by Franchisor, the cost of a quarter page or larger Yellow Pages display ad in Franchisee's local market area or, to the extent other FASTSIGNS centers are located in such area, Franchisee's pro rata share of the cost of the display ad or listing. This area will usually include Franchisee's Territory. To the extent more than one telephone company or directory service publishes display ads for Franchisee's local market area, Franchisor shall designate the directory in which Franchisee's display ad shall be published. If Franchisor determines that Franchisee's participation in a display ad in another directory serving a related market area would be beneficial to Franchisee and the System and other FASTSIGNS centers are located in such related market area, Franchisee shall also pay its pro rata share of the cost of such additional ad. Franchisee shall list the Yellow Pages display ad under the Signs heading and any other heading deemed appropriate by Franchisor in any and all directories Franchisee advertises in. If more than one franchisee is advertising in a directory, Franchisee shall place a joint display ad with each franchisee paying their pro rata share of the cost of the joint display ad. Franchisee shall not obtain in any directory, advertise or otherwise solicit business through the use of a national long distance toll free telephone number. By obtaining Franchisor's prior written approval, Franchisee may advertise or otherwise solicit business through use of a regional long distance toll free number, remote call forwarding number or a listing for a future Center (the "number"). If permission is granted for Franchisee to obtain a number, Franchisee must use it as determined by Franchisor and relinquish the number at Franchisor's request.

D.    Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment E to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to the telephone numbers of the Center and any related and other business listings upon material default of Section 4.C. of this Agreement, or termination or expiration of this Agreement as required under Section 4.

E.    Franchisor may from time to time develop and administer other advertising programs designed to promote the entire System. Franchisee shall have the right to participate in such programs, but only in full compliance with the terms established by Franchisor for each such program.

F.    All advertising and promotion by Franchisee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals (as defined in Section 14.A) or otherwise. Franchisee shall obtain Franchisor's approval of all advertising and promotional plans and materials prior to use if such plans and materials have not been prepared by Franchisor or previously approved by Franchisor within the immediately preceding one (1) year period. Franchisee shall submit such unapproved plans and materials to Franchisor, and Franchisor shall approve or disapprove such plans and materials within five (5) business days from the date of receipt thereof by Franchisor. Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor. Franchisee shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.

G.    From time to time during the term of the Agreement, the NAC may, on behalf of all franchisees in the System, obtain accounts from national companies that fulfill their needs for signs on a local basis and from a centrally coordinated service ("National Accounts"). Under the national accounts program ("NAP"), the NAC will negotiate and execute agreements with National Accounts customers (the "Customers") and will organize and administer the NAP. The NAP acts as a central access point through which the Franchisee can effectively meet the needs of the Customers. The NAP conforms to the individual needs of each customer by designing a customer tailored system for the Customer's ordering, production, distribution, and invoicing. Franchisee will be permitted to participate in the NAP; provided, Franchisee meets and complies with the NAC's criteria and standards for participating in such a program (which includes being in compliance with the terms of this Agreement), executes such form of participation agreement and other documents required by the NAC, and agrees to provide the services under the terms and conditions negotiated by the NAC. The Franchisor does not represent that the Franchisor or the NAC will obtain any national accounts in the Franchisee's Territory (as defined in Section 1.C). If, however, the NAC does obtain such accounts, the NAC will advise Franchisee of the terms of such participation and offer Franchisee the option to participate. Participation in the NAP is voluntary on the part of Franchisee and may be terminated by Franchisee or by the NAC in accordance with the terms of the participation agreement. Franchisee is not obligated to accept any Customer order from the NAP.

H.    Franchisee shall have the right to sell its products and offer services at any prices Franchisee may determine.

I.    Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment F to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to any web sites, web pages, listings, banners, URLs, advertisements or other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos, on or with the Internet, World Wide Web, Internet service providers, electronic mail services, electronic communication providers, search engines or other similar services upon the termination or expiration of this Agreement as required under Section 4. Franchisee shall execute such other documents required by Franchisor to effect this provision. Franchisee agrees that it has no authority to and shall not establish any web sites or listings on the Internet or World-Wide-Web without the express written consent of Franchisor.

5.    <u>Franchisee Organization</u>

A.    In the event Franchisee is a corporation, a partnership or a limited liability company, Franchisee and the Controlling Principals represent, warrant, and covenant that:

(1)    Franchisee is duly organized and validly existing under the state law of its formation;

(2)    Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(3)    Franchisee's corporate charter or written partnership agreement shall at all times provide that the activities of Franchisee are confined exclusively to the development and operation of FASTSIGNS centers under the System unless otherwise consented to by Franchisor in writing;

(4)    The execution of this Agreement and the transactions contemplated hereby are within Franchisee's corporate power if Franchisee is a corporation or limited liability company, or if Franchisee is a partnership, are authorized under Franchisee's written partnership agreement and have been duly authorized by Franchisee;

(5)    If Franchisee is a corporation or a limited liability company, copies of Franchisee's articles of incorporation, bylaws, stock certificates, other governing documents, any amendments to the foregoing, and resolutions of the Board of Directors authorizing entry into and performance of this Agreement shall be furnished to Franchisor prior to the execution of this Agreement; or, if Franchisee is a partnership, copies of the written partnership agreement, other governing documents, and any amendments to the foregoing, shall be furnished to Franchisor prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by Franchisee's written partnership agreement;

(6)    If Franchisee is a corporation, partnership or limited liability company, the ownership interests in Franchisee are accurately and completely described in Attachment "B". Further, if Franchisee is a corporation, Franchisee shall maintain at all times a current list of all owners of record and all beneficial owners of any class of voting securities in Franchisee or, if Franchisee is a partnership, all current owners of an interest in the partnership. In the event there is a change in the information contained in Attachment "B", Franchisee agrees to provide such information to Franchisor within five (5) days subsequent to any such change and to execute any documents deemed necessary by Franchisor to amend Attachment "B" in order to reflect such changes. Franchisee shall make its listings available to Franchisor upon request; and

(7)    If Franchisee is a corporation or a limited liability company, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate of the corporation shall have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to and that the further assignment or transfer thereof is subject to all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section 5.A(7) shall not apply to the transfer of equity securities of a publicly-held corporation. If Franchisee is a partnership, its written partnership agreement shall provide that ownership of an interest in the partnership is held subject to and that further assignment or transfer is subject to all restrictions imposed upon assignments by this Agreement.

(8)    If, after the execution of this Agreement, any person ceases to qualify as one of Franchisee's Principals (defined in Section 27.E) or if any individual succeeds to or otherwise comes to occupy a position which would, upon designation by Franchisor, qualify him as one of Controlling Principals, Franchisee shall notify Franchisor within five (5) days after any such change and, upon designation of such person by Franchisor as one of Franchisee's Principals or as a Controlling Principal, as the case may be, such person shall execute such documents and instruments (including, as applicable, this Agreement) as may be required by Franchisor to be executed by others in such positions; and

(9)    Franchisee's Principals (as defined in Section 27.E) shall each execute and bind themselves to the confidentiality and noncompetition covenants set forth in the Confidentiality Agreement and Ancillary Covenants Not to Compete which forms Attachment D to this Agreement (see Sections 15.B and 19.I). The Controlling Principals shall, jointly and severally, guarantee Franchisee's performance of all of Franchisee's obligations, covenants and agreements hereunder pursuant to the terms and conditions of the guaranty contained herein, and shall otherwise bind themselves to the terms of this Agreement as stated herein.

B.    Franchisee and the Controlling Principals acknowledge and agree that the representations, warranties and covenants set forth above in Section 5.A(1)-(9) are continuing obligations of Franchisee and the Controlling Principals, as applicable; and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. Franchisee and the Controlling Principals will cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

6.     Site Selection; Lease; Plans and Construction

A.     Franchisee assumes all cost, liability, expense, and responsibility for locating, obtaining, and developing a site for any Center to be established under this Agreement and for constructing and equipping the Center at such site. Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for a Center unless the site is approved in accordance with the procedure herein set forth. Franchisee acknowledges that Franchisor's approval of a prospective site or the rendering of assistance in the selection of a site does not constitute a representation, promise, warranty or guarantee by Franchisor that a Center operated at that site will be profitable or otherwise successful.

B.     Within sixty (60) days after execution of this Agreement or any extended time period approved by Franchisor in writing, Franchisee shall acquire, at Franchisee's expense, a location for the Center at a site approved by Franchisor as hereinafter provided.

C.     (1)     Prior to acquisition of a site for the Center and within thirty (30) days after execution of this Agreement, Franchisee shall locate three (3) potential sites for the Center which satisfies Franchisor's site selection criteria and shall submit to Franchisor in the form specified by Franchisor a description of the three sites, together with such other information and materials as Franchisor may reasonably require. Franchisor shall review Franchisee's proposed sites based upon an analysis of local competitors, demographics, visibility, accessibility and suitability of the premises and other relevant factors. A representative of Franchisor shall travel, subject to availability, to Franchisee's proposed sites for an on-site evaluation of the sites for the Center developed pursuant to this Agreement. Franchisor may withhold approval of a site for any bona fide reason that Franchisor, in the exercise of its reasonable business judgment, deems necessary. All costs incurred by Franchisor's representative for such on-site evaluation for the Center premises developed hereunder shall be paid by Franchisor; provided, if Franchisee must relocate the Center for any reason, all such costs incurred by Franchisor's representative for site selection activities associated with such relocation shall be paid by Franchisee. Franchisee shall also pay all costs incurred for any additional on-site evaluations, if deemed necessary by Franchisor or requested by Franchisee.

(2)     If Franchisee is to occupy the premises of the Center under a lease, Franchisee shall submit to Franchisor the lease prior to its execution for Franchisor's approval and shall furnish to Franchisor a copy of the executed lease within ten (10) days after execution thereof. Any lease for the Center premises shall contain substantially the terms and provisions set forth in Attachment "C" to this Agreement, except as Franchisor may otherwise consent to in writing. If Franchisee is to purchase the premises for the Center, Franchisee shall submit the contract of sale to Franchisor for approval prior to its execution and shall furnish to Franchisor a copy of the executed contract of sale within ten (10) days after execution thereof.

(3)     Failure by Franchisee to acquire the site for the Center within the time period prescribed above (including any extensions approved by Franchisor) and in accordance with the terms of this Agreement shall constitute a material default hereunder.

(4)     Following the approval by Franchisor and the acquisition by Franchisee of a location for the Center pursuant to this Section 6, the location shall be described in Attachment "A" to this Agreement.

D.     Franchisee shall be responsible for obtaining and maintaining all zoning classifications and clearances which may be required by state, provincial, or local laws, ordinances, or regulations or which may be necessary or advisable as a result of any restrictive covenants relating to the Center premises. Franchisee shall obtain all permits, licenses, and certifications required for the lawful construction and operation of the Center. In addition, prior to the commencement of the construction or finish-out of the Center, Franchisee shall certify in writing to Franchisor that the insurance coverage specified in Section 10 is in full force and effect and that all required approvals, clearances, permits, and certifications have been obtained. Upon request, Franchisee shall provide to Franchisor additional copies

of Franchisee's insurance policies or certificates of insurance and copies of all such approvals, clearances, permits, and certifications.

E.     Franchisor provides the FASTSIGNS standard floor plan, reflective ceiling plan, and specifications for contractor bids and construction for the Center. These drawings will be supplied in a reproducible sepia format to allow Franchisee to make blueline prints. Franchisor will supply additional drawings, revisions and required forms. Franchisor will not charge Franchisee for the cost of the first revision to the drawings. Franchisor will charge Franchisee for the costs of additional revisions to the drawings. Franchisor will obtain any architectural seals required by local city ordinances and charge Franchisee for those and/or any out-of-pocket costs. Any engineering drawings required by local ordinances are Franchisee's responsibility.

F.     Franchisee shall independently secure the services of a qualified, licensed general contractor to construct the Center and complete all improvements thereto. If Franchisee must relocate the Center for any reason and Franchisor determines that the plans produced by the architectural firm selected by Franchisee for construction of the Center are not consistent with Franchisor's standards and specifications, Franchisor may prohibit the implementation of such plans or any part thereof. Franchisor shall notify Franchisee within thirty (30) days of receiving the architectural design plans for review that it objects to such plans. In the event Franchisor objects to any such plans, it shall provide Franchisee with a reasonably detailed list of changes necessary to make the plans acceptable. Franchisor shall, upon a resubmission of the plans with such changes, notify Franchisee within fifteen (15) days of receiving the resubmitted plans whether the plans are acceptable. Except as provided in Section 6.E above, preparation of such architectural plans and any revisions thereto shall be at Franchisee's expense. Construction of the Center shall be at Franchisee's expense. Franchisee shall diligently pursue construction of the Center. During the time of construction and completion of improvements, Franchisee shall provide Franchisor with weekly reports regarding the progress of such work as may be reasonably requested by Franchisor and in such form as required by Franchisor. In addition, Franchisor shall have the right to make such on-site inspections during the time of construction as it may deem reasonably necessary to evaluate Franchisee's progress.  Franchisee shall notify Franchisor of the scheduled date for completion of construction and all improvements no later than thirty (30) days prior to such date. Within a reasonable time after the date of completion of construction, Franchisor shall, at its option, conduct an inspection of the completed Center and its premises. Franchisee acknowledges and agrees that Franchisee will not open the Center for business without the written authorization of Franchisor.

G.     Franchisee acknowledges that time is of the essence. Subject to Franchisee's compliance with the pre-opening obligations described in Sections 6 and 8, Franchisee shall open the Center and commence business within one hundred twenty (120) days following the date of execution of this Agreement unless Franchisee obtains an extension of such time period from Franchisor. Franchisor shall have the right to prohibit Franchisee from commencing operation of the Center in the event Franchisee fails to comply with such pre-opening obligations. The foregoing will not apply in the event this Agreement is entered into pursuant to the Development Agreement in which case Franchisee shall open the Center in accordance with the schedule provided therein.

7.     Duties of Franchisor

A.     Franchisor shall provide site selection assistance as set forth in Section 6.

B.     Franchisor shall provide Franchisee specifications and standards for the construction and design of a Center as provided in Section 6.

C.     Prior to the opening of the Center, Franchisor shall provide an initial training program for Franchisee, if Franchisee is an individual, or if Franchisee is a corporation or partnership, for one of the Controlling Principals (as defined in Section 27.E) and the General Manager (or designated personnel) in accordance with Section 8 and shall make available such other training programs as it deems appropriate.

D.    In connection with the opening of the Center, Franchisor's franchise business consultant ("FBC") shall provide on-site pre-opening and opening training, supervision and assistance to Franchisee during the first week and a Sales Development Specialist during the second week the Center is open for business.  Except as set forth below, the FBC shall be provided at no expense to Franchisee.  If construction of the Center is not completed at the time the FBC arrives for the opening of the Center, Franchisee shall pay the expenses incurred by the FBC including, without limitation, the costs of travel, lodging, meals and wages.  Franchisee shall schedule another trip at a time when construction of the Center is complete, which trip shall be at no expense to Franchisee.  Additionally, for any replacement Center established by Franchisee in connection with any Development Agreement pursuant to which this Agreement is executed, or in accordance with Section 16.B(5) hereof as a result of an event of Force Majeure, Franchisor may, in its sole discretion, charge a reasonable fee for such opening assistance.

E.    In addition to the assistance rendered Franchisee prior to opening, Franchisor shall provide advisory assistance in the management and operation of the Center as Franchisor deems advisable.  Franchisor shall provide such assistance by means of toll free telephone service and, at the request of Franchisee or, if Franchisor deems necessary, through on-site visits by Franchisor's FBC.  Franchisor shall, at its expense, provide on-site assistance not less than two (2) times every twelve (12) months during the term of this Agreement with the first such time period commencing immediately following the initial week the Center is open for business.  If additional visits are requested by Franchisee, all costs and expenses incurred by Franchisor's representatives for such on-site assistance including, without limitation, the costs of travel, lodging, meals and wages, shall be paid by Franchisee unless Franchisor, in its sole discretion, agrees to pay such costs and expenses.

F.    Franchisor shall administer the NAC Fund and any Advertising Cooperative in accordance with Sections 3.D and 4.B.

G.    Franchisor shall provide Franchisee, on loan, one copy of the Manuals (as defined in Section 14.A).

H.    Franchisor shall, from time to time, conduct meetings, seminars and other related activities regarding the System for franchisees generally, which Franchisee is highly encouraged to attend.  Except as approved by Franchisor, any costs incurred by Franchisee, Franchisee's Principals or Center personnel in attending such events shall be the responsibility of Franchisee.

I.    Franchisor shall provide Franchisee with the terms and conditions applicable to the purchase of its store graphics package and menu graphics and for other fixtures, panel saw, equipment, computers, supplies and merchandise that Franchisee shall purchase from Franchisor and other approved or designated suppliers for use at the Center.

J.    Franchisor shall submit, on behalf of Franchisee, the opening inventory order.  In conjunction with the NAC, Franchisor shall make available printing and mailing services for the Center at a reasonable cost, as provided in Section 3.D(1).

K.    Franchisor shall seek to maintain the high standards of quality and service of the System, and, accordingly, shall conduct, as it deems advisable, inspections of the Center and evaluations of the products sold and services rendered therein.

L.    In the event a General Manager employed by Franchisee terminates employment with Franchisee to open a Center and has an ownership interest in said Center, Franchisee will be entitled to compensation at an amount equal to 1% of the new Center's gross sales during its first year of operation, payable quarterly, which amount will be paid by Franchisor.  Such amount represents compensation for the reasonable costs and expenses incurred by the Franchisee in connection with the training of such employee and shall not constitute payment for any broker or salesperson fees, nor shall Franchisor and Franchisee be deemed to create such a relationship by the payment of such fee.

8.    Training

Franchisee acknowledges that it is necessary to the continued operation of the System and the Center that Franchisee and Center personnel receive such training as specified in the Manuals or as Franchisor may require, and, accordingly, agrees as follows:

A.    Prior to the opening of the Center, Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest if less than twenty-five percent (25%)) and the General Manager (as defined in Section 9.B) (or such other designated personnel that Franchisor approves) shall attend and complete, to Franchisor's satisfaction, Franchisor's initial training program. Franchisee may, upon Franchisor's approval, permit other Center personnel to attend the initial training program. The initial training program shall include inspection of one or more existing FASTSIGNS centers, discussion and implementation of a grand-opening advertising program and training of Center personnel in the sales, administrative and financial aspects of the operation of the Center and in the use of sign-making and digital imaging equipment. Training shall be for such period of time as Franchisor deems reasonably necessary and shall be conducted at Franchisor's corporate offices or such other location determined by Franchisor. If the training program is not satisfactorily completed by Franchisee, the Controlling Principal attending training or the General Manager (or such other designated personnel), Franchisee shall designate a replacement to satisfactorily complete such training. Franchisor shall have the right to prevent Franchisee from opening the Center for business until the persons designated herein successfully complete the initial training program. During the remaining term of this Agreement, any successor General Manager shall, and any other personnel employed by Franchisee may be required by Franchisor to, attend and complete to Franchisor's satisfaction, Franchisor's initial training program. Any successor General Manager shall complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisor reserves the right to impose a training fee for such additional training, including training for any replacement General Manager. Notwithstanding the foregoing, if the Center is opened pursuant to a Development Agreement, the General Manager shall not be required to attend and complete Franchisor's initial training program if such General Manager has been employed by Franchisee or its affiliate in a management position at another FASTSIGNS center for four (4) or more months prior to the opening of such Center.

B.    Franchisee, Franchisee's Principals and the General Manager may attend such additional training programs and seminars as Franchisor may offer from time to time. At Franchisor's discretion, such additional training shall be mandatory. For all such programs and seminars, Franchisor will provide the instructors and training materials; however, Franchisor reserves the right to impose a reasonable fee for such additional training programs and seminars.

C.    Franchisee, a Controlling Principal or the General Manager shall attend the annual franchisee convention once within every three (3) year period from the date of this Agreement.

D.    Franchisee shall be solely responsible for all costs and expenses incurred by Franchisee, Franchisee's Principals or personnel attending any training programs, the annual franchisee conventions, and any other meetings and seminars including, without limitation, costs of travel, lodging, meals and wages.

9.    Center Operations

A.    Franchisee shall use the Center premises solely for the operation of the Center, shall maintain business hours as provided in the Manuals (as defined in Section 14.A) or as Franchisor shall specify from time to time in writing, and shall refrain from using or permitting the use of the Center premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor.

B.    Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest, if less than twenty-five (25%))

and who is acceptable to Franchisor, shall supervise the Center and devote his full time, best efforts and constant personal attention to the day-to-day operations of the Center for not less than the first six months the Center is open for business. In addition, Franchisee shall designate, in writing, an individual (the "General Manager") who will assist Franchisee or the Controlling Principal, as the case may be, in the management of the Center (and/or who will devote his full time, best efforts and constant personal attention to the day-to-day operations of the Center in the event Franchisee or Controlling Principal does not participate in the full-time operation of the Center after the initial six-month period the Center is open). Also, Franchisee shall designate in writing, an individual who will be Franchisee's production employee. The General Manager may be any of Franchisee's Principals or an employee of Franchisee. The General Manager shall satisfactorily complete Franchisor's initial training program; shall satisfy Franchisor's educational or business experience criteria in effect for General Managers in the System as of the time the General Manager is designated; and shall otherwise be an individual acceptable to Franchisor. If at any time during the term of this Agreement the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section 9.B, Franchisee shall promptly notify Franchisor and shall designate a replacement General Manager within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above. The replacement General Manager shall attend and complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisee shall provide for interim management of the Center until the replacement is designated, such interim management to be conducted in accordance with the terms of this Agreement.

      C.      Franchisee shall maintain competent, conscientious and trained personnel to operate the Center in accordance with this Agreement and the Manuals and shall take such steps as are necessary to ensure that its employees maintain good customer relations.

      D.      Franchisee and the Controlling Principals understand that compliance by all franchisees operating under the System with Franchisor's training and operational requirements is an essential and material element of the System and that Franchisor and franchisees operating under the System consequently expend substantial time, effort, and expense in training its personnel. Accordingly, Franchisee and the Controlling Principals agree that if during the term of this Agreement, Franchisee or any Controlling Principal shall designate as General Manager, Customer Service Representative, Inside Sales Representative, Computer Graphic Designer, Outside Sales Representative or FBC who is at the time or was at any time during the prior six (6) months employed in a similar position by Franchisor or any of its subsidiaries or affiliates, or by any other franchisee, such former employer shall be entitled to be compensated for the reasonable costs and expenses incurred by such employer in connection with the training of such individual. The parties agree that such expenditures may be uncertain and difficult to ascertain and therefore agree that the compensation specified herein reasonably represents such expenditures and is not a penalty. An amount equal to two months of the person's monthly salary, including monthly commissions and/or bonus at the time of the termination of his employment with such former employer shall be paid by Franchisee prior to such individual assuming the position. In seeking an individual to serve in the capacities described above, Franchisee and the Controlling Principals shall not discriminate in any manner whatsoever against any individual, the employment of whom by Franchisee is subject to the provisions of this Section 9.D, on the basis of the compensation required to be paid by Franchisee hereunder in the event of the employment by Franchisee or any Controlling Principal of such individual. The parties hereto expressly acknowledge and agree that no current or former employee of Franchisor, its subsidiaries and affiliates, or of any franchisee under the System shall be a third party beneficiary of this Agreement or any provision hereof, excluding only the covenant of Franchisee set forth in the preceding sentence. Franchisor hereby expressly disclaims any representations and warranties regarding the performance of any employee or former employee of Franchisor or its subsidiaries and affiliates, or any franchisee operating under the System, who is designated as General Manager or employed by Franchisee or any of the Controlling Principals in any other capacity, and Franchisor shall not be liable for any losses, of whatever nature or kind, incurred by Franchisee or such Controlling Principal in connection therewith.

E.    To ensure that the highest degree of quality and service is maintained, Franchisee shall operate the Center in strict conformity with such methods, standards and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing. Franchisee further agrees:

(1)    To offer for sale and sell at the Center all products and services required by Franchisor and to provide such products and services in the manner and style prescribed by Franchisor;

(2)    To offer for sale and sell only products and services expressly approved for sale in writing by Franchisor; to refrain from deviating from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue offering for sale and selling any product or service which Franchisor disapproves in writing at any time;

(3)    To purchase the store graphics package from Franchisor or its designated supplier and install such equipment and items, at Franchisee's expense, at the Center; and to purchase or lease and install, at Franchisee's expense, the panel saw, the signmaking computer, point-of-sale computer system and all other fixtures, furnishings, equipment, decor items, and signs which conform to Franchisor's standards and specifications as Franchisor may reasonably direct from time to time in the Manuals or otherwise in writing and refrain from installing or permitting to be installed on or about the Center premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved by Franchisor. If any of the property described above is leased by Franchisee from a third party, such lease must be approved by Franchisor, in writing, prior to execution. Franchisor's approval shall be conditioned upon such lease containing a provision which permits any interest of Franchisee in the lease to be assigned to Franchisor upon the termination or expiration of this Agreement and which prohibits the lessor from imposing an assignment or related fee upon Franchisor in connection with such assignment;

(4)    To purchase the opening inventory order and to obtain store fixtures from Franchisor's designated suppliers and to obtain all products, equipment, signs, interior and exterior decor items, furnishings, supplies and other materials required for operation of the Center solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then-current standards and specifications for such items and who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved in writing by Franchisor and not thereafter disapproved.

(5)    If Franchisee desires to purchase, lease or use products from a supplier who has not been previously approved by Franchisor, Franchisee shall submit to Franchisor a written request for such approval or may request the supplier to do so. Franchisee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor. Franchisor's representatives shall be permitted to inspect the supplier's facilities, and to require that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent firm designated by Franchisor for testing. Franchisor may impose a charge on Franchisee or the supplier for the costs of any such tests. Franchisor reserves the right, at its option, to reinspect the facilities and products from time to time and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Notwithstanding the foregoing, Franchisor shall not be required to approve any particular supplier.

F.    Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including forms, stationery and business cards) and other items which may be designated by Franchisor to bear the Proprietary Marks in the form, color, location and manner prescribed by Franchisor.

G.    Franchisee shall, at Franchisee's sole cost and expense, maintain the Center in the highest degree of repair and condition and in conformity with the standards, specifications, and requirements of the System, as the same may be designated by Franchisor from time to time. Franchisee specifically agrees to repair or replace, at Franchisee's cost, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Center

as necessary or desirable, and to obtain, at Franchisee's cost, any new or additional equipment, fixtures, supplies, and other products and materials which may be reasonably required by Franchisor in order for Franchisee to offer and sell products or services from the Center. Except as may be expressly provided in the Manuals, no alterations or improvements, or changes of any kind in design, equipment, signs, interior, or exterior decor items, fixtures or furnishings shall be made in or about the Center or Center premises without the prior written approval of Franchisor in each instance.

H.    In order to assure the continued success of the Center, Franchisee shall, upon the request of Franchisor, modernize the Center premises, equipment, signs, interior, and exterior decor items, fixtures and furnishings required for the operation of the Center, to Franchisor's then-current standards and specifications; however, Franchisee shall not be required to undertake a material modernization of the Center that exceeds twenty thousand dollars ($20,000) within any three (3) year period during the term of this Agreement, except, however, the twenty thousand dollar ($20,000) limitation shall not apply to the purchase of equipment necessary to offer new and additional services provided in Section 9.G. above. Franchisee's obligations under this Section 9.H are in addition to, and shall not relieve Franchisee from, any of its other obligations under this Agreement, including those contained in the Manuals.

I.    Franchisee shall grant Franchisor and its representatives and agents the right to enter upon the Center premises at any time for the purpose of conducting inspections of the Center and its operations, and Franchisee shall cooperate with Franchisor's representatives and agents in such inspections by rendering such assistance as they may reasonably request and, upon notice from Franchisor or its representatives and agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, any obligation to do so), to correct such deficiencies and to charge Franchisee a reasonable fee for Franchisor's expenses in so acting, payable by Franchisee immediately upon demand.

J.    Franchisee shall comply with all other requirements set forth in this Agreement.

10.    <u>Insurance</u>

A.    Franchisee shall procure, prior to commencing construction of the Center, and shall maintain in full force and effect during the term of this Agreement, and any renewal hereof, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Franchisee's Principals and Franchisor and its subsidiaries, affiliates, successors and assigns, and their respective directors, officers, shareholders, partners, employees, agents and representatives, against any demand or claim relating to personal injury, death, property damage or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Center or by reason of the construction, operation or occupancy of the Center, as well as such other insurance applicable to such other special risks, if any, as Franchisor may reasonably require for its own and Franchisee's protection.

B.    Such policy or policies shall be written by an insurance company approved by Franchisor and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified for all franchisees, from time to time, by Franchisor in the Manuals or otherwise in writing), the following insurance coverage and policy limits:

(1)    Comprehensive general liability insurance, including personal injury coverage, property damage coverage, products liability coverage and fire and storm damage coverage, with primary and excess limits of not less than One Million Dollars ($1,000,000);

(2)    Motor vehicle liability insurance, including coverage of vehicles not owned by Franchisee but used by employees in connection with the Center, with a combination of primary and excess limits of not less than One Million Dollars ($1,000,000);

(3)    Employer's liability and workers' compensation insurance in amounts provided by applicable law or, if permissible under applicable law, and with respect to workers' compensation, any legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to Franchisor, provided that Franchisee (i) maintains an excess indemnity or "umbrella" policy covering employer's liability and/or a medical/disability policy covering medical expenses for on the job accidents, which policy or policies shall contain such coverage amounts as Franchisee and Franchisor shall mutually agree upon and (ii) conducts and maintains a risk management and safety program for its employees as the Franchisee and Franchisor shall mutually agree is appropriate. Such policies shall also include a waiver of subrogation in favor of Franchisor and its directors, officers, shareholders, partners, employees, representatives, independent contractors and agents; and

(5)    Other insurance which may be required by statute or rule of the state or locality in which the Center is located.

C.    Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified in Section 10.B shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, and each such insurance policy shall provide that the proceeds thereof shall not be reduced by any amount payable or paid to Franchisor under any policy procured and maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20. hereof.

D.    All public liability, property damage, and motor vehicle liability policies shall contain a provision that Franchisee's insurance coverage shall be primary to any coverage maintained by Franchisor and Franchisor shall be entitled to recover under Franchisee's policies for any loss occasioned to Franchisor, its subsidiaries, affiliates, successors and assigns, and their respective officers, directors, shareholders, employees, servants, agents, or representatives for whatever reason.

E.    Not later than fifteen (15) days prior to the date construction of the Center premises is to commence and, thereafter, at least thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor Certificates of Insurance and, if requested by Franchisor, copies of the applicable insurance policies evidencing the proper coverage with limits not less than those required hereunder. All insurance policies and Certificates required hereunder, with the exception of workers' compensation, shall name Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, servants, agents, and representatives as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions. Further, all insurance policies and Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Franchisor in the event of a material alteration to or cancellation of the policies. Nonsubscribers of Workers' Compensation (as permitted by law) shall provide Franchisor with proof of substitute coverage.

F.    Should Franchisee, for any reason, fail to procure and maintain the insurance coverage required by this Agreement or fail to provide proof of such insurance upon request by Franchisor, Franchisor shall have the right, at its option, to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing rights and remedies shall be in addition to any other remedies Franchisor may have.

G.    It is recommended by Franchisor that Franchisee procure garage keeper's comprehensive insurance, which provides coverage of theft or vandalism of vehicles that are owned by customers that Franchisee is providing service to with limits of not less than Twenty Five Thousand Dollars ($25,000) per vehicle. It is also recommended by Franchisor that Franchisee procure loss/interruption of business insurance.

11.     Taxes, Permits and Indebtedness

A.     Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all trade and other accounts and indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement.

B.     Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, excise tax or any license or tax similar thereto, directly or indirectly, imposed on Franchisor with respect to any payment to Franchisor required under this Agreement. The preceding sentence shall not apply to any franchise tax or income, war profits or excess profits tax (or any tax in lieu thereof) imposed on Franchisor with respect to the aforesaid payments.

C.     In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Center, or any improvements thereon.

D.     Franchisee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Center, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits and fire clearances and shall promptly provide Franchisor with copies of the same in accordance with Section 6.D and promptly thereafter as new or modified permits, licenses or certificates are obtained.

E.     Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Center.

12.     Records and Reports

A.     Franchisee shall maintain during the term of this Agreement full, complete and accurate books, records and accounts including, without limitation, sales slips, purchase orders, invoices, payroll records, bank statements, and cash receipts and disbursements journals and ledgers in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing. Franchisee shall preserve such books, records and accounts for not less than seven (7) years following the date of their preparation. Franchisor may require Franchisee to use an approved source for accounting and financial services in connection with the maintenance of the books and records.

B.     Franchisee, at its expense, shall submit to Franchisor a monthly report of Gross Sales of the Center and such other data or information as Franchisor may reasonably require. Such report shall be delivered each month during the term of this Agreement. Such report shall be due even if no Service Fee is due.

C.     In addition to the sales report described in Section 12.B, Franchisee, at its expense, shall submit to Franchisor a monthly and year-to-date financial statement of Franchisee and the business franchised hereunder. Such statement shall be prepared based on a calendar year and shall be prepared using the accrual method. Such statement shall be delivered within thirty (30) days following the conclusion of each calendar month during the term of this Agreement and shall be prepared in accordance with generally accepted accounting principles and certified as true, complete and accurate by Franchisee or Franchisee's treasurer or chief financial officer. In addition, upon the request of Franchisor, within sixty (60) days following the conclusion of Franchisee's fiscal year, Franchisee shall, at Franchisee's

expense, deliver year-end financial statements of Franchisee and the Center that have been prepared in accordance with generally accepted accounting principles and reviewed for completeness and lack of material misstatements or omissions by an independent certified public accountant or bookkeeping service approved by Franchisor.

D.      Franchisee shall file all federal, state and local reports and returns as may be required by law in connection with the operation of the Center.

E.      Franchisee shall also submit to Franchisor, for review or audit, such other forms, reports, tax returns, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing. Franchisee shall submit to Franchisor, a copy of Franchisee's federal tax return within sixty (60) days of the date of filing.

F.      Franchisor or its designated agents shall have the right at all reasonable times to examine, copy or electronically poll all of Franchisee's books, records, tax returns and correspondence. Franchisor shall also have the right at any time to have an independent audit performed on the books and records of Franchisee and the Center. If any such examination discloses a deficiency in any payment to Franchisor, Franchisor shall give notice of the deficiency to Franchisee, and Franchisee shall pay the amount of the deficiency within ten (10) days after receipt of the notice, together with interest from the date such amount was due until paid at the rate of eighteen percent (18%) per annum, or at the maximum rate of interest permitted by applicable law, whichever is less. If any inspection discloses an understatement of Gross Sales for any period of more than two percent (2%), Franchisee shall, in addition, reimburse Franchisor for all costs in connection with the examination or audit. The foregoing remedies shall be in addition to any other remedies Franchisor may have under this Agreement.

G.      Upon execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment G to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by Franchisee with any state and/or federal taxing authority. This power of attorney shall survive the expiration or termination of this Agreement. Franchisee shall execute such additional documents as Franchisor shall require in connection with such appointment.

H.      Franchisee shall grant Franchisor or its agents, upon request of Franchisor, the right to contact and obtain information from third parties doing business with Franchisee regarding Franchisee's financial condition or business practices or policies. Franchisee agrees that any third party, including, without limitation, clients, vendors, suppliers, financial institutions, lessors and financiers, may release any and all information requested by Franchisor without obtaining any further permission from Franchisee.

13.     <u>Proprietary Marks</u>

A.      Franchisor hereby grants to Franchisee a license to use the Proprietary Marks during the term of this Agreement in accordance with the System and the standards and specifications attendant thereto, as prescribed by Franchisor from time to time which underlie the goodwill associated with and symbolized by the Proprietary Marks.

B.      With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

(1)    Franchisee shall use only the Proprietary Marks designated by Franchisor and shall use them only in the manner authorized and permitted by Franchisor. Any unauthorized use of the Proprietary Marks shall constitute an infringement of Franchisor's rights and a material event of default under this Agreement. Franchisee shall not use the name FASTSIGNS or any other Proprietary Mark in the corporate or other legal name of any corporation or other entity formed by or affiliated with Franchisee;

(2)    Franchisee shall use the Proprietary Marks only for the operation of the Center or in advertising for the Center. Franchisee shall permanently cease all use of the Proprietary Marks immediately upon termination or expiration of this Agreement and take appropriate action to remove the Proprietary Marks from the premises upon which the Center is located and to cancel any advertising relating to Franchisee's use of the Proprietary Marks, including Yellow Pages listings;

(3)    Franchisor shall have the right to approve any materials containing any of the Proprietary Marks, including, without limitation, signs, stationery, business cards, forms and other materials and supplies used by Franchisee;

(4)    During the term of this Agreement, Franchisee shall identify itself as the owner of the Center (i) in conjunction with any use of the Proprietary Marks, including without limitation, uses on invoices, order forms, receipts and contracts, and (ii) in a notice of such content and form and at such conspicuous locations at the Center premises as Franchisor may require;

(5)    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or any of its affiliates;

(6)    Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Center only under the mark FASTSIGNS without prefix or suffix;

(7)    Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability, and upon request of Franchisor, Franchisee shall provide it with a copy of such document(s); and

(8)    Franchisee and the Controlling Principals shall immediately notify Franchisor of any infringement of the Proprietary Marks or challenge to its use of any of the Proprietary Marks or claim by any person of any rights in any of the Proprietary Marks. Franchisee and the Controlling Principals agree that they will not communicate with any person other than Franchisor and Franchisor's counsel in connection with any such infringement, challenge, or claim. Franchisor shall have sole discretion to take such action as it deems appropriate and the right to exclusively control and conduct any litigation, or Patent and Trademark Office or other proceeding arising out of any infringement, challenge, or claim relating to any of the Proprietary Marks. Franchisee and each of the Controlling Principals agree to execute any and all instruments and documents, render such assistance, and perform such acts as may, in the opinion of Franchisor's counsel, be necessary or advisable to protect and maintain Franchisor's interests in any such litigation or Patent and Trademark Office or other proceeding or to otherwise protect and maintain Franchisor's interest in the Proprietary Marks.

C.    Franchisee and the Controlling Principals expressly acknowledge and agree that:

(1)    Franchisor is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them;

(2)    The Proprietary Marks are valid and serve to identify Franchisor as the source of origin of goods and services provided under them;

(3)    Neither Franchisee nor any Controlling Principal shall directly or indirectly contest the ownership or validity of the Proprietary Marks;

(4)    Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership or other interest in or to the Proprietary Marks, except the limited license granted pursuant to this Agreement;

(5)    Any and all goodwill and improvements to the System arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks; and

(6)    Franchisor reserves the right to substitute different Proprietary Marks for use in identifying the System and the businesses operating thereunder if the Proprietary Marks no longer can be used or such use is restricted, or if Franchisor, in its sole business judgment, determines that substitution of different marks will be beneficial to the System. Any costs incurred by Franchisee to comply with any change or modification of the Proprietary Marks shall be paid solely by Franchisee; provided that Franchisor shall reimburse Franchisee for reasonable expenses incurred which are directly related to such change or modification upon receipt of documentation satisfactory to Franchisor, such reimbursement to be limited to fifty percent (50%) of Franchisee's total expenses or $2,000.00, whichever is less.

## 14.    Confidential Manuals

A.    Franchisee shall receive on loan from Franchisor several manuals including, without limitation, the Site Selection Notebook, Romancing the Shopping Center Kit, Pre-Opening Manual, FASTSIGNS Operations Manual, Target Marketing Manual, Marketing Resource Manual, Customer Service Kit Audio/Video, Computer Manual, Typestyles & Symbols Manual, Employee Manual, Personnel Manual, Price List Manual, Presentation Manual, and any other materials designated by Franchisor from time to time (collectively, the "Manuals") concerning the operation, merchandise, equipment, supplies, sales, service, advertising, marketing and other aspects of the System. Franchisee and the Controlling Principals and all other employees shall at all times treat the Manuals, any other manuals created for or approved for use in operation of the Center, and the information contained therein as confidential and shall maintain such information as secret and confidential. One set of the Manuals shall be loaned at no expense to Franchisee. Franchisor also reserves the right to impose a reasonable fee for the replacement of any Manual loaned to Franchisee. Additional copies of the Manuals may be loaned to Franchisee by Franchisor at a reasonable cost. Neither Franchisee nor any of the Controlling Principals shall at any time copy, duplicate, record or otherwise reproduce the foregoing materials in whole or in part, nor otherwise disclose or make the same available to an unauthorized person.

B.    In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Proprietary Marks, Franchisee shall conduct its business in accordance with the Manuals, other written directives which Franchisor may issue to Franchisee from time to time whether or not such directives are made part of the Manuals, and any other manuals and materials created or approved for use in the operation of the Center.

C.    Franchisee and each of the Controlling Principals acknowledge and agree that it will abide by the specifications, standards and procedures contained in each of the Manuals.

D.    The Manuals, written directives, other manuals and materials, and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor, shall at all times be kept in a secure place on the Center premises and shall be returned to Franchisor immediately upon request or upon termination or expiration of this Agreement.

E.    Franchisor may from time to time revise the contents of the Manuals and the contents of any other manuals and materials created or approved for use in the operation of the Center. Franchisee

expressly agrees to insert all changes and additions into the correct Manual upon receipt of the same and agrees to comply with each new or changed standard.

      F.     Franchisee shall at all times ensure that the Manuals are kept current and up to date. In the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's corporate office shall be controlling.

## 15.    Confidential Information

      A.     Franchisee and each of the Controlling Principals shall not, during the term of this Agreement or any time thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation or other entity any confidential information, trade secrets, knowledge, know-how, or techniques concerning the methods of operation of the Center which, in addition to the Manuals described above, may be communicated or provided to Franchisee or Controlling Principals or of which they may be apprised by virtue of Franchisee's operation of the Center under the terms of this Agreement. Franchisee and Controlling Principals shall divulge such confidential information only to the General Manager and such of Franchisee's employees as must have access to such confidential information in connection with the operation of the Center. Any and all information, trade secrets, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor any of the Controlling Principals shall, at any time, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, or otherwise make the same available to any unauthorized person, without the prior written consent of Franchisor.

      B.     Franchisee shall require and obtain execution of covenants similar to those set forth in Sections 14 and 15.A from its General Manager and all other personnel of Franchisee who have received or will have access to confidential information. Such covenants shall be substantially in the form set forth in Attachment D. All of Franchisee's Principals also must execute such covenants. Franchisor may, in its sole discretion, modify Attachment "D" with respect to any Center personnel to remove the covenant-not-to-compete provisions if, pursuant to Section 19., Franchisor does not require execution of such covenants by Franchisee's personnel.

      C.     If Franchisee or any of the Controlling Principals develops any new concepts, processes, or improvements in the operation or promotion of the Center, Franchisee agrees to promptly notify Franchisor and provide Franchisor with all necessary information concerning the same, without compensation. Franchisee and Franchisee's Principals acknowledge that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to its developers, franchisees and other parties as it deems appropriate.

      D.     Franchisee and each of the Controlling Principals acknowledge that any failure to comply with the requirements of this Section 15 shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 15 without the necessity of posting bond. Franchisee and the Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 15.

## 16.    Default and Termination

      A.     Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee if Franchisee shall become insolvent or shall have made a general assignment for the benefit of creditors; or a petition under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state thereof shall have been filed by Franchisee or such a petition shall have been filed against and not opposed by Franchisee; or Franchisee admits in writing its inability to pay its debts when due; or

Franchisee shall have been adjudicated bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy law or any similar law or statute of the United States or any state thereof; or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets shall have been filed and not opposed by Franchisee; or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, shall have been appointed by any court of competent jurisdiction; or proceedings for a composition with creditors under any state or federal law shall have been instituted by or against Franchisee; or a final judgment against Franchisee shall have remained unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond shall have been filed); or if Franchisee is dissolved; or execution shall have been levied against Franchisee, Franchisee's Center or property; or suit to foreclose any lien or mortgage against the premises or equipment shall have been instituted against the premises or equipment of any business operated hereunder and not dismissed within thirty (30) days; or the real or personal property of any business operated hereunder shall be sold after levy thereupon by any sheriff, marshal or constable.

B.      Franchisee shall be in default and Franchisor may, in its sole discretion, immediately terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default (except as otherwise required by law) effective upon notice to Franchisee, upon the occurrence of any of the following events, each of which shall be deemed to be a material event of default:

(1)      If Franchisee operates the Center or sells any products or services authorized by Franchisor for sale at the Center at a location which has not been approved by Franchisor;

(2)      If Franchisee fails to acquire a site for the Center within sixty (60) days following the date of this Agreement, or if after the acquisition of an approved site, Franchisee is unable to obtain the required permits, licenses, and certifications required to commence construction within sixty (60) days after the location is approved or if Franchisee fails to acquire, within sixty (60) days following the date of this Agreement, sufficient financing to complete construction of the Center and to open the Center for business (unless any extension of such time periods is approved by Franchisor in writing); provided, however, under such circumstances, Franchisor shall, subject to Franchisee's compliance with the post-termination obligations under Section 17, refund the initial franchise fee actually paid by Franchisee pursuant to Section 3.A., without interest, less Four Thousand Dollars ($4,000.00) of such franchise fee. This refund is only applicable when Franchisee pays the full Twenty Thousand Dollar ($20,000.00) franchise fee. Such payment shall be made within thirty (30) days after the effective date of the termination. Franchisor shall not be obligated to return any fees paid by Franchisee in the event this Agreement is terminated by Franchisor pursuant to any other term of this Agreement or by Franchisee for any reason other than the reasons expressly set forth above;

(3)      Franchisee knowingly shall have made a false representation to Franchisor in any of the reports or statements which Franchisee may be required to furnish to Franchisor pursuant to this Agreement or pursuant to the Manuals;

(4)      Franchisee or any of the Controlling Principals shall have been convicted of or shall have entered a plea of <u>nolo contendere</u> to a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor shall believe reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interest therein;

(5)      If Franchisee shall have ceased to do business at the Center for seven (7) consecutive days, or shall have lost the right to possession of the premises, or otherwise shall have forfeited the right to do or transact business in the jurisdiction where the Center is located; provided, however, this provision shall not apply in cases of Force Majeure (as defined in Section 28.A) if, through no fault of Franchisee, the premises shall have been damaged or destroyed and Franchisee, within thirty (30) days after such damage or destruction has occurred, applies for Franchisor's approval to relocate or reconstruct the Center premises, which approval shall not be unreasonably withheld, but may be conditioned upon the payment of an agreed minimum Service Fee to Franchisor during the period in which the Center is not in operation;

(6)    If Franchisee fails to designate a qualified replacement General Manager thereto within thirty (30) days after such General Manager ceases to serve as such, as provided in Section 9.B above;

(7)    If Franchisee breaches or is in default under any of the representations, warranties and covenants contained in Section 5;

(8)    If a transfer or attempt to transfer any rights or obligations under this Agreement or any interest in Franchisee or the Center to any third party is made by Franchisee or the Controlling Principals without Franchisor's prior written consent, or without offering Franchisor a right of first refusal with respect to such transfer, contrary to the terms of Section 18 of this Agreement;

(9)    If Franchisee or any of the Controlling Principals fails to comply with the covenants in Section 15.A or 19.B hereof or if Franchisee fails to obtain the execution of the covenants required under Section 15.B or 19.I hereof within thirty (30) days following Franchisor's request that Franchisee obtain the execution of such covenants;

(10)    If an approved transfer upon death or permanent disability is not effected within the time period prescribed by Section 18.E hereof;

(11)    If Franchisee fails to open and operate the Center within one hundred twenty (120) days after the date of execution of this Agreement, or within any additional time period approved by Franchisor pursuant to Section 6.G of this Agreement;

(12)    If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or with the System, or Franchisor's rights therein and does not cure such default within twenty-four (24) hours following notice thereof from Franchisor;

(13)    If Franchisee fails to procure and maintain such insurance policies as required by Section 10 and Franchisee fails to cure such default within seven (7) days following notice thereof from Franchisor;

(14)    If Franchisee or any Controlling Principal fails, refuses, or neglects to promptly pay any monetary obligation owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial or other information required by Franchisor under this Agreement, and does not cure such default within ten (10) days following notice thereof from Franchisor;

(15)    If Franchisee is in default with respect to the payment of any monetary obligation due to Franchisor hereunder more than two (2) times during any immediately preceding twelve (12) month period of time, whether or not cured by Franchisee after notice by Franchisor; or

(16)    Except as provided in Section 16.B(15), if Franchisee or and Controlling Principal repeatedly is in default under Section 16.C hereof for failure to comply with any of the requirements imposed by this Agreement, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by Franchisee after notice by Franchisor.

(17)    Any default by Franchisee under the terms and conditions of any other agreement between Franchisor and Franchisee, or a default by Franchisee of his obligations to any Advertising Cooperative of which Franchisee is a member, shall be deemed to be a default of this Agreement. Furthermore, in the event of termination, for any cause, of any other agreement between the parties hereto, Franchisor may, at its option, terminate this Agreement.

(18)    If Franchisee fails to attend an annual franchisee convention once within every three (3) year period as provided in Section 8.C of this Agreement.

C.      Except as provided in Section 16.B above, upon any default by Franchisee which is susceptible of being cured, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the thirty (30) day period, and by promptly providing proof thereof to Franchisor. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(1)      If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by the Manuals, or fails to carry out the terms of this Agreement in good faith;

(2)      If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing;

(3)      If Franchisee fails, refuses or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

(4)      If Franchisee or any Controlling Principal engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

(5)      If Franchisee receives three (3) or more material customer complaints within a twelve (12) month period that are reported to Franchisor and are not resolved to Franchisor's complete satisfaction.

17.      <u>Obligations Upon Termination or Expiration</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and each of the following provisions apply:

A.      Franchisee shall immediately and permanently cease to use in any manner whatsoever any equipment, methods, procedures and techniques associated with the System, the name FASTSIGNS and all Proprietary Marks and distinctive trade dress and devices associated with the System, and Franchisee shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

B.      Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark FASTSIGNS or any other trademark or service mark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

C.      Franchisee and the Controlling Principals shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates. Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the termination or expiration of this Agreement (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief for the enforcement of any provision of this Section 17), which obligation shall, until paid in full, give rise to and remain a lien in favor of Franchisor against any and all of the personal property, furnishings, fixtures, equipment, signs and inventory owned by Franchisee and on the premises at the time of the termination or expiration. Franchisor shall have the right to file this Agreement as a financing statement with the proper offices to perfect its lien hereunder.

D.    Franchisee shall immediately deliver to Franchisor all manuals, including the Manuals, records, files (including electronic files), customer lists, point-of-sale databases, instructions, correspondence, and any and all other materials relating to the System and the operation of the business franchised hereunder in Franchisee's possession, and all copies thereof (all of which are acknowledged to be Franchisor's property), and Franchisee shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

E.    Franchisee, at Franchisor's option, shall assign to Franchisor all rights to the telephone number for the Center and any related Yellow Pages or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time to transfer such service and numbers to Franchisor. Notwithstanding any forms and documents which may have been executed by Franchisee under Section 4.C., Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. Franchisee shall thereafter use different telephone numbers at or in connection with any subsequent business conducted by Franchisee.

F.    Franchisee shall, at Franchisor's option, assign to Franchisor any interest which Franchisee has in any lease or sublease for the premises or with respect to any equipment used in the operation of the Center. Franchisor may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement. In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Center, Franchisee shall make such modifications or alterations to the premises operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of such premises from that of other FASTSIGNS centers under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with the requirements of this Section 17, Franchisor shall have the right to enter upon the premises where Franchisee's Center was operated, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

G.    Franchisor shall also have the option, but not the obligation, which it may exercise by providing written notice thereof within thirty (30) days after termination or expiration of this Agreement, to purchase any or all inventory, fixtures, equipment, furnishings and any and all other items bearing the Proprietary Marks, at Franchisee's cost or fair market value, whichever is less. If the parties cannot agree on a fair market value within thirty (30) days from Franchisor's notice, a qualified independent appraiser shall be designated by Franchisor, the determination of such appraiser to be binding on the parties. No value will be given to goodwill. If Franchisor elects to exercise any option to purchase items as herein provided, it shall have the right to set off all amounts due from Franchisee and the cost of the appraisal, if any, against any payment therefor. In the event Franchisor exercises this option, Franchisee shall deliver to Franchisor, in a form satisfactory to Franchisor, such bills of sale, assignments, releases of liens and other such documents which Franchisor deems reasonably necessary. The closing for such purchase shall be within thirty (30) days following the date the purchase price for such goods and items is determined, or such other date as the parties may mutually agree upon.

H.    Franchisee and each of the Controlling Principals agree, in the event any such party continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agree not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

I.    Franchisee and the Controlling Principals shall comply with the restrictions on confidential information contained in Sections 14 and 15.A and the covenants contained in Section 19.B of this Agreement. Any other person required to execute similar covenants pursuant to Section 15.B or 19.1 shall also comply with such covenants.

18.    Transfer of Interest

A.    Transfer by Franchisor

Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations hereunder to any person or legal entity and all rights hereunder shall inure to the benefit of Franchisor and its successors and assigns.

B.    Transfer by Franchisee

(1)    Franchisee and Controlling Principals acknowledge and agree that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted the franchise rights hereunder in reliance on the business skill, financial capacity and personal character of Franchisee and the Controlling Principals. Accordingly, neither Franchisee nor any initial or subsequent successor or assign to any part of Franchisee's interest in this Agreement or the Center, nor any individual, partnership, corporation, or other entity which directly or indirectly has or owns any interest in this Agreement, the Center or Franchisee shall sell, assign, transfer, convey, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement, the Center or Franchisee without the prior written consent of Franchisor; provided, however, that Franchisor's prior written consent shall not be required for a transfer of less than a one percent (1%) interest in any entity that is required to register its securities under Section 12 of the Securities Exchange Act of 1934, as amended. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section 18, shall be null and void and shall constitute a material event of default under Section 16.B(8) of this Agreement.

(2)    Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee, the Center or this Agreement; however, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

(a)    All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its subsidiaries and affiliates shall have been satisfied in a timely manner;

(b)    Franchisee or the Controlling Principals shall not be in default under any provision of this Agreement, any amendment or supplement hereto, or any other agreement between Franchisee or any of the Controlling Principals and Franchisor or any of its subsidiaries and affiliates;

(c)    The transferor and its principals (if applicable) shall have executed a general release, in a form prescribed by Franchisor, of any and all claims of the transferor, of whatever kind or nature, against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, employees, agents and representatives, including, without limitation, claims arising under this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries or affiliates and federal, state and local laws, regulations, rules or orders;

(d)    The transferee and its principals shall have demonstrated to Franchisor's satisfaction the following: transferee's meeting the criteria considered by Franchisor when reviewing a prospective franchisee's application for a franchise, including Franchisor's educational, managerial and business standards; transferee's character, business reputation, credit rating and financial capability; transferee's aptitude and ability to conduct the business contemplated hereunder (as may be evidenced by prior related business experience or otherwise); and transferee's completion of Franchisor's Confidential Questionnaire;

(e)     The transferee shall have entered into a written agreement, in a form prescribed by Franchisor, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements contained in this Agreement, and, if transferee is a corporation or a partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreement as transferee's principals;

(f)     At Franchisor's option, the transferee shall have executed for a term ending on the expiration date of this Agreement and with such renewal term as may be provided herein, the standard form franchise agreement then being offered to new System franchisees or a revised form of this Agreement, as Franchisor deems appropriate, and all other ancillary documents as Franchisor may require, which agreements shall supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement and may include, without limitation, higher service fees and advertising fees, and a revised Territory; provided, however, that the transferee shall not be required to pay any initial franchise fee; and if the transferee is a corporation, a limited liability company, or partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreements as transferee's principals, and guarantee the performance of all such obligations, covenants and agreements.  Any franchise agreement signed by the transferee shall contain substantially the terms and provisions set forth in Attachment I to this Agreement, except as Franchisor may otherwise consent to in writing;

(g)     Transferor shall have executed any documents reasonably required by Franchisor to evidence transferor's obligation to remain liable, except for those obligations surviving any termination of transferor's interest in Franchisee, the Center or this Agreement, for all of the obligations to Franchisor prior to the effective date of the transfer;

(h)     Transferee (or, if transferee is a corporation, limited liability company or a partnership, one of transferee's shareholders, partners or investors, as designated by Franchisor) and transferee's manager shall have completed any training programs then in effect for System franchisees upon such terms and conditions as Franchisor may reasonably require;

(i)     If transferee is a corporation, limited liability company or a partnership, transferee shall make and will be bound by any or all of the representations, warranties, and covenants set forth in Section 5 as Franchisor requests. Transferee shall provide to Franchisor evidence satisfactory to Franchisor that the terms of Section 5 have been satisfied and are true and correct on the date of transfer;

(j)     Transferee, at its expense, shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for Centers under the System, as Franchisor may require; and

(k)     If transferor proposes to transfer an interest in any Agreement, the Center or in Franchisee, as applicable, transferor must pay to Franchisor a transfer fee equal to a pro rata portion of $10,000.00 based upon the percentage of interest that is being transferred (e.g., if Franchisee wishes to transfer fifty-five percent (55%) of an interest or shares of Franchisee, transferor shall pay a transfer fee equal to fifty-five percent (55%) of $10,000.00 or $5,500.00).  If the proposed transfer is to or among Franchisee's Principals, or to or among the immediate family members of Franchisee or any of its Principals (defined as the spouse of transferor and transferor's children (including half-blood or adopted children)), transferor shall pay a transfer fee of $300.00, or such greater amount as is necessary to compensate Franchisor for its costs in reviewing such transfer (including attorneys' fees).  The fees referenced herein are to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the transfer and training costs for the transferee.

(3)     Franchisee shall not grant a security interest in this Agreement or the rights hereunder without Franchisor's prior written consent, which consent shall not be unreasonably withheld. In connection therewith, the secured party shall be required by Franchisor to agree that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right

and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee.

(4)    Franchisee and Franchisee's Principals acknowledge and agree that each condition which must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

C.    <u>Transfer for Convenience of Ownership</u>

In the event that the proposed transfer is to a corporation, a proprietorship, a partnership or limited liability company formed by Franchisee solely for the convenience of ownership, Franchisor's consent to such transfer shall be conditioned upon the requirements set forth in this Section 18 except for the requirements of Sections 18.B(2)(c), (d), (f) and (h); and provided that Franchisee shall pay a transfer fee of ($300.00), or such greater amount as is reasonably necessary to reimburse Franchisor for its expenses in connection with the approval of the transfer and shall deliver to Franchisor the documents described in Section 5.A above with respect to such corporation. Notwithstanding the foregoing, if such transfer by Franchisee is prior to commencement of the initial training program described in Section 8.A above, there shall be no transfer fee provided that Franchisee otherwise complies with the provisions of this Section 18.C. Franchisee shall be the owner of all the voting stock or interest of the corporation and if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

D.    <u>Right of First Refusal</u>

(1)    Any party holding a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), who desires to accept any <u>bona fide</u> offer from a third party to purchase such interest shall promptly notify Franchisor in writing of each such offer and shall provide such information and documentation relating to the offer as Franchisor may require including, without limitation, the name and address of the prospective purchaser, the terms of the offer and a copy of any letter of intent or proposed purchase contract. Franchisor shall have the right and option, exercisable for thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor or such later date as may be provided in the third party offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 18.D shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 18, with respect to a proposed transfer.

(2)    In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisor may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash part of the offer, an independent appraiser, qualified by training and experience to appraise such non-cash consideration, shall be designated by Franchisor to determine such amount, and his determination shall be binding on the parties. Franchisor shall have the right to set off the cost of such appraisal against the purchase price.

E.    <u>Transfer Upon Death or Permanent Disability</u>

(1)    Upon the death of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement, or any of the Controlling Principals or other persons with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%) (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall have six (6) months from the date of death to transfer such interest to a third party approved by Franchisor. If

no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor. If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within six (6) months after the death of the Deceased.

(2)     Upon the permanent disability of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement, or any Controlling Principal or other person with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), Franchisor may, in its sole discretion, require such interest to be transferred to a third party approved by Franchisor within six (6) months after notice to Franchisee. "Permanent disability" shall mean any physical, emotional, or mental injury, illness, or incapacity which would prevent a person from performing the obligations set forth in this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely. Permanent disability shall be determined upon examination of the person by a licensed practicing physician selected by Franchisor; or if the person refuses to submit to an examination, then such person shall be automatically deemed permanently disabled as of the date of such refusal for the purpose of this Section 18. The costs of any examination required by this Section 18.E(2) shall be paid by Franchisor.

(3)     Upon the death or claim of permanent disability of any person described in Sections 18.E(1) and 18.E(2), Franchisee or a representative of Franchisee must promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in Section 18 for any inter vivos transfer. If an interest is not transferred upon death or permanent disability as required in this Section 18.E, and in accordance with the terms and conditions of Section 18, such failure shall constitute a material event of default under Section 16.B(10).

F.     Non-Waiver of Claims

Franchisor's consent to a transfer of any interest in Franchisee or this Agreement shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

G.     Offerings by Franchisee

Securities or partnership interests in Franchisee may be offered to the public, by private offering or otherwise after the date hereof only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld. All materials required for such offering by federal or state law shall be submitted to Franchisor for a limited review as described below prior to their being filed with any government agency, and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor or any of its subsidiaries or affiliates is participating in an underwriting, issuance or offering of Franchisor's or Franchisee's or their subsidiaries, or affiliates' securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship among Franchisee, Franchisor and any subsidiaries or affiliates, if applicable. Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitation described in the preceding sentence. Franchisee, Controlling Principals and any other participants in the offering shall fully indemnify Franchisor, its subsidiaries, affiliates, successors and assigns and their respective directors, officers, shareholders, partners, employees, agents and representatives in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of $2,500.00 or such greater amount as is necessary to reimburse

Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section 18.G.

19.    <u>Covenants</u>

A.    Franchisee and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Franchisee and the Controlling Principals will receive valuable specialized training, trade secrets, and confidential information, including, without limitation, information regarding the management, operational and marketing methods and techniques of Franchisor and the System which are beyond the present skills and experience of Franchisee and the Controlling Principals and Franchisee's managers and employees. Franchisee and Controlling Principals acknowledge that such specialized training, trade secrets, and confidential information provide a competitive advantage and will be valuable to them in the operation of the Center, and that gaining access to such specialized training, trade secrets, and confidential information is, therefore, a primary reason why they are entering into this Agreement.

B.    In consideration for such specialized training, trade secrets, confidential information and exclusive rights described in Section 19.A above, Franchisee and the Controlling Principals covenant as follows:

(1)    With respect to Franchisee, during the term of this Agreement, or with respect to each of the Controlling Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of "Controlling Principal" (as described in Section 27.E), except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership, corporation or limited liability company:

(a)    divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System;

(b)    except as permitted by Section 9.D, employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Proprietary Marks or operates or licenses others to operate a business under the same or similar Proprietary Marks, that produces and offers for sale graphics, banners and signs.

(2)    With respect to Franchisee, and for a continuous uninterrupted period commencing upon the expiration or termination (regardless of the cause of termination) or transfer of this Agreement (or, with respect to each of the Controlling Principals, for a continuous uninterrupted period commencing upon the earlier of: (i) the expiration or termination of or transfer of all of Franchisee's interest in this Agreement or (ii) the time such individual or entity ceases to satisfy the definition of "Controlling Principal") and for two (2) years thereafter, except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company:

(a)    divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any

other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System;

        (b)    except as permitted by Section 9.D, employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

        (c)    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business that produces and offers for sale graphics, banners and signs, which business is, or is intended to be, located within the Territory, or within a ten (10) mile radius of any Center or sign making facility that is owned or operated by Franchisor or its affiliates, or any franchisee of Franchisor, in existence or under construction at any given time during such period; and

        C.    The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor. The parties agree that each of the covenants herein shall be construed as independent of any other covenant or provision of this Agreement. It is the express intention of the parties to this Agreement to comply with all laws applicable to the covenants contained in this Agreement. If any of the covenants contained in this Section 19 are found to exceed in duration, geographical area or scope those permitted by applicable law, it is expressly agreed that such restrictive covenant may be reformed or modified by the final judgment of a court of competent jurisdiction or other lawful constituted authority to reflect a lawful and enforceable duration, geographical area or scope, and such covenant automatically shall be deemed to be amended and modified so as to comply with the judgment or order of such court or authority. If any one or more of the provisions contained in this Section 19 shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein.

        D.    Franchisee and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Section 19.B in this Agreement, or any portion thereof, without their consent, effective immediately upon notice to Franchisee; and Franchisee and Controlling Principals agree that they shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 21 hereof.

        E.    Franchisee and Controlling Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 19.

        F.    Franchisee and Controlling Principals understand and agree that the restrictions contained in Section 19.B are reasonable and necessarily protect the legitimate interests of Franchisor.

        G.    Nothing contained in this Agreement shall prevent Franchisee or Controlling Principals from owning less than a one percent (1%) interest in any publicly traded equity or stock listed on a recognized national stock exchange.

        H.    Franchisee and each of Controlling Principals acknowledge that any failure to comply with the requirements of this Section 19 shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 19 without the necessity of posting bond. Franchisee and Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 19.

I.     Franchisee shall require and obtain execution of covenants similar to those set forth in this Section 19 (including covenants applicable upon the termination of a person's relationship with Franchisee) from Franchisee's General Manager and any other personnel employed by Franchisee who have received or will receive training from Franchisor and all of Franchisee's Principals that are not designated as Controlling Principals. Such covenants shall be substantially in the form set forth in Attachment "D". Failure by Franchisee to obtain execution of a covenant required by this Section 19.I shall constitute a material event of default under Section 16.B(8) hereof.

20.     Independent Contractor and Indemnification

A.     It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, affiliate, joint venturer, partner, employee, employer, joint employer, or servant of the other for any purpose whatsoever.

B.     During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor. Franchisee agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place in the franchised premises, the content and form of which Franchisor reserves the right to specify in the Manuals or otherwise in writing.

C.     Franchisee and Controlling Principals understand and agree that nothing in this Agreement authorizes Franchisee or Controlling Principals to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be deemed liable by reason of any act or omission of Franchisee or Controlling Principals in the conduct of business at the Center or for any claim or judgment arising therefrom.

D.     (1)     Franchisee and each of Controlling Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor, its subsidiaries, affiliates, successors, and assigns and their respective directors, officers, shareholders, partners, servants, employees, agents, and representatives from all "losses and expenses" (as defined in Section 20.D(4)(b)) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(a)     The infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Controlling Principals of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any rights in the Proprietary Marks or copyrights granted hereunder);

(b)     The violation, breach or asserted violation or breach by Franchisee or any of Controlling Principals of any contract, federal, state or local law, regulation, ruling, standard or directive or any industry standard;

(c)     Libel, slander or any other form of defamation of Franchisor or the System, by Franchisee or by any of Controlling Principals;

(d)     The violation or breach by Franchisee or by any of Controlling Principals of any warranty, representation, agreement or obligation in this Agreement or other agreement between Franchisee and Franchisor or its subsidiaries or affiliates; and

(e)     Acts, errors or omissions of Franchisee or any of Controlling Principals, or any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees, or representatives of Franchisee, its subsidiaries or affiliates in connection with the performance of the operation of the Center.

(2)     Franchisee and each of Controlling Principals agree to give Franchisor notice of any such action, suit, proceeding, claim, demand, inquiry or investigation. At the expense and risk of Franchisee and each of Controlling Principals, Franchisor may elect to assume (but under no circumstance is obligated to undertake), the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Franchisee and each of Controlling Principals to indemnify Franchisor and to hold it harmless.

(3)     In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, Franchisor may, at any time and without notice, as it, in its judgment deems appropriate, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in Franchisor's sole judgment, there are reasonable grounds to believe that:

(a)     any of the acts or circumstances enumerated in Section 20.D(1) above have occurred; or

(b)     any act, error, or omission of Franchisee or any of Controlling Principals or Controlling subsidiaries or affiliates may result directly or indirectly in damage, injury or harm to any person or any property.

(4)     (a)     All losses and expenses incurred under this Section 20.D shall be chargeable to and paid by Franchisee or any of Controlling Principals pursuant to its obligations of indemnity under this Section 20.D, regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

(b)     As used in this Section 20.D, the phrase "losses and expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorney's fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

(5)     The persons indemnified pursuant to Section 20.D do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee, any of Controlling Principals or Franchisee's subsidiaries and affiliates may contract, regardless of the purpose. Franchisee and each of Controlling Principals shall hold harmless and indemnify the persons indemnified pursuant to this Section 20.D for all losses and expenses which may arise out of any acts, errors or omissions of Franchisee, Franchisee's Principals, any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees or representatives of Franchisee, its subsidiaries or affiliates and any such third parties without limit and without regard to the cause or causes thereof or the negligence of Franchisor or any other party or parties arising in connection therewith, and whether such negligence be sole, joint or concurrent, active or passive.

(6)     Under no circumstances shall the persons indemnified pursuant to this Section 20.D be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee or any of Franchisee's Principals. Franchisee and each of Controlling Principals agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from Franchisee or any of Controlling Principals by the persons indemnified pursuant to this Section 20.D.

21.    Entire Agreement and Modification

This Agreement, the documents referred to herein and the Attachments hereto, set forth all of the promises, covenants, agreements and conditions between the Franchisor, Franchisee and the Controlling Principals and supersedes all prior and contemporaneous agreements and understandings, express or implied, oral or written. Except as otherwise provided herein, this Agreement may be amended, modified or canceled and any of the terms, covenants or conditions hereof may be waived only in writing and signed by both Franchisor and Franchisee.

22.    Approvals

A.    Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent granted shall be in writing.

B.    Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

23.    Non-Waiver and Remedies

A.    No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or Controlling Principals under any of the terms hereof, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power with respect to any other breach or default by Franchisee or Controlling Principals or of any other rights hereunder. Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee or Controlling Principals of any terms of this Agreement.

B.    All rights and remedies of the parties hereto shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any actual or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries and affiliates. The rights and remedies of the parties hereto shall be continuing and may be exercised at any time or from time to time. The expiration, earlier termination, or exercise of Franchisor's rights pursuant to Section 16 of this Agreement shall not discharge or release Franchisee or any of Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination, or the exercise of such rights under this Agreement.

C.    .    Franchisee shall, during the term of this Agreement and thereafter, promptly pay all sums owing to Franchisor and its subsidiaries and affiliates. Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of Franchisee's failure to perform its obligation hereunder (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief in connection with the enforcement of any provision of this Agreement).

24.    Dispute Resolution

A.    Arbitration. Franchisor and Franchisee agree that, subject to Paragraph B below, any claim, controversy or dispute between Franchisor (and its affiliates and their respective shareholders, officers, directors, agents, employees, successors and assigns) and Franchisee (and its Controlling Principals, Principals, guarantors, officers, directors, agents, employees, successors and assigns) arising out of or or relating to: (1) Franchisee's operation of the Center under this Agreement; (2) this Agreement

or any other agreement between Franchisee and Franchisor; (3) the relationship created by this Agreement; (4) the validity of this Agreement or any other agreement between Franchisee and Franchisor; or (5) any System standard relating to the establishment or operation of the Center, will be submitted for binding arbitration before one arbitrator in accordance with the then-current commercial arbitration rules of the American Arbitration Association. If such rules are in any way contrary to or in conflict with this Agreement, the terms of this Agreement shall control.

Arbitration shall take place at a location specified by the arbitrator within ten miles of Franchisor's principal place of business in Dallas County, Texas. The award of the arbitrator shall be final and judgment upon the award rendered in arbitration may be entered in any court having jurisdiction thereof. The costs and expenses of arbitration, including compensation and expenses of the arbitrator, shall be borne by the parties as the arbitrator determines. Franchisor and Franchisee further agree that, in any arbitration proceeding, each must submit or file any claim which would consitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either Franchisor or Franchisee.

Franchisor and Franchisee agree that arbitration will be conducted on an individual, not a class wide basis, and that an arbitration proceeding between Franchisor and Franchisee may not be consolidated with any other arbitration proceeding between Franchisor and any other person.

Franchisor and Franchisee waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statute.

B.    Injunctive Relief.  Notwithstanding any provision contained in Paragraph A above, either party may institute in a court of competent jurisdiction an action or actions for temporary or preliminary injunctive relief; provided, however, that such party must contemporaneously submit the dispute for arbitration on the merits as provided in Paragraph A above.

C.    Jurisdiction and Venue.  With respect to actions described in Paragraph B above and any other actions not subject to arbitration under Paragraph A above, Franchisee and Controlling Principals hereby agree that Franchisor may institute any action against either or both of them in the state courts of Dallas County, Texas and the federal district court for the Northern District of Texas, Dallas Division, and Franchisee and Controlling Principals irrevocably submit themselves to the jurisdiction of such courts. Franchisee and Controlling Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision. Franchisee and Controlling Principals hereby irrevocably agree that service of process may be made upon them in any legal proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Texas or federal law.

D. Governing Law.   All matters relating to arbitration will be governed by the Federal Arbitration Act. This Agreement and the relationship of the parties shall be interpreted and construed under Texas law (except for Texas choice of law rules), and except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et. seq.), the Federal Arbitration Act, or other federal law.

E.    Waiver of Certain Damages and Jury Trial.  Franchisor and Franchisee hereby waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statute.  Franchisor and Franchisee hereby irrevocably waive trial by jury on any action, proceeding or counterclaim, whether at law or in equity, brought by either of them.

25.    Notices

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or sent by prepaid telex, or facsimile (provided that the sender

confirms the telex or facsimile by sending an original confirmation copy thereof by certified or registered mail or expedited delivery service within three (3) business days after transmission thereof) to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

<table>
<tr><td>If to Franchisor:</td><td>FASTSIGNS International, Inc.:<br>2550 Midway Road, Suite 150<br>Carrollton, Texas 75006<br>Attn: Law Department<br>Facsimile No. (214) 346-5793</td></tr>
<tr><td>If to Franchisee or<br>Controlling Principals:</td><td>To the mailing address of the Center unless<br>otherwise provided in writing to Franchisor.</td></tr>
</table>

Any notice given hereunder by certified or registered mail shall be deemed to have been given five (5) business days after the date of mailing, and any notice given hereunder by telex or facsimile shall be deemed to have been given upon receipt thereof, provided that the telex or facsimile is confirmed as provided in this Section. Business days for the purpose of this Section excludes Saturday, Sunday, and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

## 26.    Limitations of Claims

Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes Franchisor, any and all claims arising out of or relating to this Agreement or Franchisor's relationship with Franchisee will barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

## 27.    Severability and Construction

A.    Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term, or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, or provisions of this Agreement as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, or provisions shall be deemed not to be part of this Agreement.

B.    Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and employees, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by Section 18 hereof, any rights or remedies under or by reason of this Agreement.

C.    All captions in this Agreement are intended solely for the convenience of the parties, and shall not affect the meaning or construction of any provision hereof.

D.    All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable; and, without limiting the obligations individually undertaken by Controlling Principals hereunder, all acknowledgments, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all of Controlling Principals.

E.      The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any general partner of Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee. The initial Franchisee's Principals shall be listed on Attachment C. The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder. For purposes of this Agreement, a publicly-held corporation is a corporation registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15(d) of such Act.

F.      Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

G.      This Agreement may be executed in counterparts, and each copy so executed shall be deemed an original.

H.      This Agreement shall not become effective until signed by an authorized officer of Franchisor.

28.    Force Majeure

A.      As used in this Agreement, the term "Force Majeure" shall mean any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire or other catastrophe, act of any government and any other similar cause not within the control of the party affected thereby.

B.      Except as provided in Section 16.B(5), if the performance of any obligation by any party under this Agreement is prevented, hindered or delayed by reason of Force Majeure, which cannot be overcome by use of normal commercial measures, the parties shall be relieved of their respective obligations to the extent the parties are respectively necessarily prevented, hindered or delayed in such performance during the period of such Force Majeure; provided, however, that a party shall not be released of its obligation to pay amounts then owing hereunder. The party whose performance is affected by an event of Force Majeure shall give prompt notice of such Force Majeure event to the other party by telephone or telegram (in each case to be confirmed in writing), setting forth the nature thereof and an estimate as to its duration, and shall be liable for failure to give such timely notice only to the extent of damage actually caused.

29.    Acknowledgments

Franchisee and Controlling Principals hereby represent, warrant, covenant and acknowledge to Franchisor that:

A.      Neither Franchisee nor any of Controlling Principals had any part in the creation or development of the System or the Proprietary Marks provided by Franchisor;

B.      Franchisor has made no representations or promises to or with Franchisee or a Franchisee's Principal which are not contained in this Agreement;

C.      Franchisee has conducted an independent investigation of the business venture contemplated by this Agreement and understands that the business venture involves substantial financial risks and largely depends upon the abilities of Franchisee;

D.      Franchisee has not relied upon, nor has Franchisor made, any representations, warranties or guarantees, expressed or implied, as to the potential volume, profits or success of the business venture contemplated herein;

E.      Franchisee has the full right and authority to enter into this Agreement without joinder of any other person;

F.      All information and materials provided to Franchisor by Franchisee and Controlling Principals, individually or collectively, are true and correct and complete to the best of their knowledge, information and belief;

G.      Franchisee has received a completed copy of this Agreement, the Addenda hereto and all agreements relating hereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges that it has received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed;

H.      Franchisee has received, read and understood this Agreement, the Addenda hereto, and all agreements relating hereto, if any, and Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement; and

I.      Franchisor's obligations and Franchisee's rights pursuant to this Agreement are expressly conditioned upon the continued truth of the representations and warranties set forth above at the time of execution hereof and throughout the term hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

FASTSIGNS INTERNATIONAL, INC.

By:
Name: _Gary Salomon_
Title: _CEO._

FRANCHISEE:

By: _Norman Gillett_
Name: Norman Gilbert
Title: _____
Date Signed: _10-26-01_

ATTEST:

_____

ATTEST:

_____

FRANCHISEE:

By: _____
Name: _____
Title: _____
Date Signed: _____

## CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 27.E of the Franchise Agreement;

(3) Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed. Upon default by Franchisee or upon notice from Franchisor, each will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee. Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased will be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

ATTEST:                                    CONTROLLING PRINCIPALS

_____                    _____
Witness                                    Name: Norman Gilbert

_____                    _____
Witness                                    Name: Susan Gilbert

## AMENDMENT TO FASTSIGNS INTERNATIONAL, INC
## FRANCHISE AGREEMENT
### FOR THE STATE OF CALIFORNIA

The FASTSIGNS International, Inc. Franchise Agreement between Norman Gilbert ("Franchisee" or "You") and FASTSIGNS International, Inc. ("Franchisor") dated ꞁ𝖣𝖾𝖼𝖾𝗆𝖻𝖾𝗋𝗂𝖺, 2001 (the "Agreement") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

### CALIFORNIA LAW MODIFICATIONS

1.      The California Department of Corporations requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. BUS. & PROF. CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq. To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

   a.      California Business and Professions Code Sections 20000 through 20043 provide rights to You concerning nonrenewal and termination of the Agreement. The Federal Bankruptcy Code also provides rights to You concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws will control.

   b.      If the Franchisee is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the California Franchise Investment Law and the California Franchise Relations Act.

   c.      If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

   d.      If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

   e.      If the Agreement requires litigation, arbitration, or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

   f.      If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

CAFAAM3.01

2.  Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of the California law applicable to the provision are met independent of this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the Franchisee acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment to the Agreement on _November 12, 2001_.

FASTSIGNS INTERNATIONAL, INC.

By:
Name: Gary Salomon
Title:

ATTEST:

FRANCHISEE:

By:
Name: Norman Gilbert
Title:
Date Signed: 10-26-01

_____
Witness

ATTEST:

FRANCHISEE:

By:
Name:
Title:
Date Signed:

_____
Witness

ATTEST:

FRANCHISEE:

By:
Name:
Title:
Date Signed:

_____
Witness

ATTEST:

FRANCHISEE:

By:
Name:
Title:
Date Signed:

_____
Witness

CAFAAM301

-2-

## CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the Franchise Agreement, as hereby amended, and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 27.E. of the Franchise Agreement;

(3) Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed. Upon default by Franchisee or upon notice from Franchisor, each will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee. Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased will be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

ATTEST:                                           CONTROLLING PRINCIPALS

_____           _____
Witness                                           Name: Norman Gilbert

_____           _____
Witness                                           Name: Susan Gilbert

_____           _____
Witness                                           Name:_____

_____           _____
Witness                                           Name:_____

Attachment "A"
to Franchise Agreement
Approved Location and Territory

1.    Approved Location

Pursuant to Section 1.A. of the Franchise Agreement, the Center shall be located at the following approved location:

2504 El Camino Real
Redwood City, CA 94061

2.    Territory

Pursuant to Section 1.C of the Franchise Agreement, the Territory shall be as shown on the map attached hereto as Attachment A.1.



Attachment "A" - Solo Page

Account Number : 137459                            Friday March 1, 2002

BUSINESS-FACTS: DAYTIME EMPLOYMENT REPORT
(BUSINESSES)
BY CLARITAS INC  800-234-5973
PREPARED FOR
AMERICAN FASTSIGNS, INC

COMBINED ZIP CODES                      SITE:   796089
REDWOOD CITY, CA                        COORD: 0:00.00   0:00.00

| BUSINESS EMPLOYMENT BY TYPE | TOTALS | | |
|---|---|---|---|
| | # BUS | # EMPS | #EMPS/BUS |
| TOTAL BUSINESSES | 7000 | 120376 | 17.2 |
| RETAIL TRADE | 1267 | 32762 | 25.9 |
| HOME IMPROVEMENT STORES | 64 | 503 | 7.9 |
| GENERAL MERCHANDISE STORES | 10 | 568 | 56.8 |
| FOOD STORES | 117 | 2175 | 18.6 |
| AUTO DEALERS & GAS STATIONS | 108 | 1561 | 14.5 |
| APPAREL & ACCESSORY STORES | 76 | 330 | 4.3 |
| FURNITURE/HOME FURNISHINGS | 230 | 20913 | 90.9 |
| EATING & DRINKING PLACES | 340 | 4777 | 14.1 |
| MISCELLANEOUS RETAIL STORES | 322 | 1935 | 6.0 |
| FINANCE-INSURANCE-REAL EST | 682 | 7085 | 10.4 |
| BANKS, SAVING & LENDING INST | 91 | 887 | 9.7 |
| SECURITIES BROKERS & INVEST | 156 | 1964 | 12.6 |
| INSURANCE CARRIERS & AGENTS | 114 | 1202 | 10.5 |
| REAL ESTATE-TRUST-HOLDING CO | 321 | 3032 | 9.4 |
| SERVICES | 3483 | 43820 | 12.6 |
| HOTELS & LODGING | 26 | 580 | 22.3 |
| PERSONAL SERVICES | 684 | 2558 | 3.7 |
| BUSINESS SERVICES | 1029 | 19283 | 18.7 |
| MOTION PICTURE & AMUSEMENT | 131 | 1469 | 11.2 |
| HEALTH SERVICES | 540 | 5992 | 11.1 |
| LEGAL SERVICES | 247 | 4157 | 16.8 |
| EDUCATION SERVICES | 138 | 4016 | 29.1 |
| SOCIAL SERVICES | 243 | 2027 | 8.3 |
| OTHER SERVICES | 445 | 3738 | 8.4 |
| AGRICULTURE | 138 | 987 | 7.2 |
| MINING | 5 | 23 | 4.6 |
| CONSTRUCTION | 472 | 5064 | 10.7 |
| MANUFACTURING | 396 | 11896 | 30.0 |
| TRANS, COMMUN/PUBLIC UTIL | 159 | 2520 | 15.8 |
| WHOLESALE TRADE | 259 | 4866 | 18.8 |
| GOVERNMENT | 139 | 11353 | 81.7 |

| | | | |
|---|---|---|---|
| DAYTIME POPULATION | 120376 | DAYTIME POP/BUS | 17.2 |
| RESIDENTIAL POPULATION | 161000 | RESIDENTIAL POP/BUS | 23.0 |
| | | | GI: 100 |

**Attachment "B" to Franchise Agreement**
**Statement of Ownership Interest**

A.     The following is a list of all shareholders, partners or other investors in Franchisee, including all investors who own or hold a direct or indirect interest in Franchisee, and a description of the nature of their interest:

| Name | Percentage of Ownership/Nature of Interest |
|------|--------------------------------------------|
| Norman Gilbert | 100% |

B.    In addition to the persons listed in paragraph A, the following is a list of all of Franchisee's Principals described in and designated pursuant to Section 27.E of the Franchise Agreement. Unless designated as a Controlling Principal, each of Franchisee's Principals shall execute the Confidentiality Agreement and Ancillary Covenants Not to Compete substantially in the form set forth in <u>Attachment D</u> (see Sections 15.B and 19.I of the Franchise Agreement):

Susan Gilbert

Attachment "C"
to Franchise Agreement
Lease Addendum

1.        Use of Premises.

        During the term of the Franchise Agreement, the premises may be used only for the operation of a retail sign business under the FASTSIGNS System which specializes in the production and marketing of signs, graphics, banners, ready-to-apply lettering, trade show displays, digital imaging and other complementary products and services, and which emphasize convenience and one-day service. Tenant shall be permitted to use all equipment and machines typical of other FASTSIGNS centers including photocopiers.

2.        Construction of Premises.

A.        Landlord shall provide Tenant with finish out of demising walls, glass walls and paint sheetrock.

B.        Landlord shall put carpet in front sales area and tile in back as per the specifications provided by Tenant as well as four (4) ceiling fans, all at Landlord's expense.

C.        Landlord shall provide to Tenant one dedicated circuit for computer room, one dedicated circuit for front counter, and eight (8) outlets at various locations throughout the premises, as designated by Tenant.

D        Landlord shall provide sufficient lighting typical of other FASTSIGNS centers.

E.        Landlord shall warrant that the leased premises, buildings and common areas meet current Americans With Disabilities Act requirements.

3.        Signs and Graphics Package.

A.        Tenant shall be permitted to install on the outside of the premises a red, white and/or blue FASTSIGNS facia sign or awning.

B.        Tenant shall be permitted from time to time to place a banner in the front, side or facia of the premises.

C.        Tenant shall be permitted to install the typical FASTSIGNS graphics package which includes a horizontal logo stripe across the front of the premises.

4.        Assignment and Notices.

A.        Notwithstanding anything to the contrary in this Lease, Tenant shall have the right to assign this Lease and all rights hereunder to FASTSIGNS International, Inc. ("FII") or its affiliates, subsidiaries or lenders upon the expiration or earlier termination of that certain Franchise Agreement dated _____, 20__ (the "Franchise Agreement"), by and between FII and Tenant. Landlord will consent to such assignment without the imposition of any assignment fee or similar charge and Landlord shall not accelerate the rent owed hereunder in connection with such assignment.

B.        Landlord agrees that Tenant shall not otherwise assign the Lease or renew or extend the term of the Lease without the prior written consent of FII.

C.        Landlord agrees to furnish FII with copies of any and all letters and notices sent to Franchisee pertaining to the Lease and the Premises, at the same time that such letters and notices are sent to Franchisee. Landlord further agrees that, if it intends to terminate the Lease, the Landlord will give FII thirty (30) days advance written notice of such intent, specifying in such notice all defaults that are the cause of the proposed termination. FII shall have after the expiration of the period during which Tenant may cure such default, an additional fifteen (15) days (or if there is no cure period, at least fifteen (15) days) to cure, at its sole option, any such default. If neither Franchisee nor FII

cures all such defaults within said time periods (or such longer cure period as may be specifically permitted by the Lease), then the Landlord may terminate the Lease, re-enter the Premises and exercise all of its other post-termination rights as set forth in the Lease.

D.      FII shall have the right to enter the premises to make any reasonable modification or reasonable alteration necessary to protect FII's interest in the FASTSIGNS business and Proprietary Marks or to cure any default under the Franchise Agreement or any development agreement entered into by FII and Tenant or under the Lease, and Landlord agrees that FII shall not be liable for trespass or any other crime or tort.

5.      Waiver of Landlord's Lien.

A.      Notwithstanding anything to the contrary in this Lease, Landlord expressly waives any and all liens it may have or acquire pursuant to the Lease or by law with respect to Tenant's fixtures, equipment and other personal property.  Landlord acknowledges and agrees that _____ owns/holds a security interest senior to that of Landlord in all such fixtures, equipment and personal property.

B.      Landlord shall permit _____ to enter the premises to remove such fixtures, equipment and personal property in the event Tenant defaults under the Lease, vacates, abandons or otherwise surrenders the premises, or upon mutual cancellation of the Lease, or otherwise jeopardizes _____ security interest in the fixtures, equipment and personal property.

6.      Financing.

        This Lease shall be expressly conditioned upon Tenant securing adequate financing.  Tenant shall give Landlord notice upon obtaining such financing.

7.      Parking and Common Areas.

        Landlord shall provide Tenant with not less than five (5) spaces in the parking lot adjoining the premises for exclusive use by Tenant, its employees, customers and invitees.

8.      Notices.

        All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

        If directed to Tenant, the notice shall be addressed to:

        _____
        _____
        _____
        Attention:_____ .
        Facsimile:_____


        If directed to Landlord, the notice shall be addressed to:

        _____
        _____
        _____
        Attention:_____
        Facsimile:_____

If directed to FII, the notice shall be addressed to:

> FASTSIGNS International, Inc.
> 2550 Midway Road, Ste. 150
> Carrollton, Texas 75006
> Attention: Legal Department
> Facsimile: (214) 346-5793

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by telex or facsimile shall be deemed given upon transmission, provided confirmation is made as provided above. Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving fifteen (15) days written notice of such change to the other parties. Business day for the purpose of this Agreement excludes Saturday, Sunday and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

9.    Amendments.

Landlord and Tenant will not amend or otherwise modify this Lease in any manner which would materially affect any of the foregoing provisions without FII's prior written consent.

The terms of this Lease Addendum will supersede any conflicting terms of the Lease.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year set forth in the Lease Agreement.

LANDLORD

_____

TENANT

_____

Attachment "D"

## CONFIDENTIALITY AND ANCILLARY NON-COMPETE AGREEMENT

This Agreement is made and entered into _____, 20__, between FASTSIGNS International, Inc., a Texas corporation ("FII"), _____ ("Franchisee") and _____ ("Covenantor").

## RECITALS

WHEREAS, FII has developed, is using and is the owner of all rights in a unique system (the "System") for the development and operation of centers under the name and mark FASTSIGNS ("Centers"); and

WHEREAS, the System includes but is not limited to certain trade names, service marks, trademarks, symbols, logos, emblems, and indicia of origin, including, but not limited to, the mark FASTSIGNS, "FASTSIGNS, The One Day Sign & Lettering Experts", "FASTSIGNS, For A Quality Sign That's Right. On Time", "Quality Signs. Done Right. On Time.", "Sign & Graphic Solutions Made Simple" and such other trade names, service marks, and trademarks as FII may develop in the future for the purposes of identifying the System, and such other distinguishing characteristics of the System including, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; uniform standards, technology, know-how and procedures for production of signs, graphics, digital imaging and banners; quality and consistency of products and services; inventory, management and financial control methods; training and assistance; and advertising and promotional programs; all of which may be changed, improved and further developed by Franchisor from time to time ("FII's Trade Secrets"); and

WHEREAS, FII's Trade Secrets provide economic advantages to FII and are not generally known to nor readily ascertainable by proper means by, FII's competitors who could obtain economic value from knowledge and use of FII's Trade Secrets; and

WHEREAS, FII has taken, and intends to take all reasonable steps to maintain the confidentiality and secrecy of FII's Trade Secrets; and

WHEREAS, FII has granted Franchisee a limited right to operate the Centers using the System and FII' Trade Secrets for the period defined in the franchise agreement made and entered into _____, 20__ ("Franchise Agreement") between FII and Franchisee; and

WHEREAS, FII and Franchisee have agreed in the Franchise Agreement on the importance to FII and to the Franchisee and other licensed users of the System of restricting use, access and dissemination of FII's Trade Secrets; and

WHEREAS, it will be necessary for certain employees, agents, independent contractors, officers, directors and interest holders of Franchisee, or any entity having an interest in Franchisee ("Covenantors") to have access to and to use some or all of FII's Trade Secrets in the development and operation of Franchisee's Centers using the System; and

WHEREAS, Franchisee has agreed to obtain from those Covenantors written agreements protecting FII's Trade Secrets and the System against unfair competition; and

WHEREAS, Covenantor wishes to remain, or wishes to become associated with or employed by Franchisee; and

WHEREAS, Covenantor wishes and needs to receive and use FII's Trade Secrets in the course of his employment or association in order to effectively perform his services for Franchisee; and

WHEREAS, Covenantor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

Confidentiality Agreement

     1.     FII and/or Franchisee shall disclose to Covenantor some or all of FII's Trade Secrets relating to the System. All information and materials, including, without limitation, any manuals, drawings, specifications, techniques and compilations of data which FII provides to Franchisee and/or Covenantor shall be deemed confidential Trade Secrets for the purposes of this Agreement.

     2.     Covenantor shall receive FII's Trade Secrets in confidence, maintain them in confidence, and use them only in the course of his employment by or association with Franchisee and then only in connection with the development and/or operation by Franchisee of Centers using the System for so long as Franchisee is licensed by FII to use the System.

     3.     Covenantor shall not at any time make copies of any documents or compilations containing some or all of FII's Trade Secrets without the express written permission of FII.

     4.     Covenantor shall not disclose or permit the disclosure of FII's Trade Secrets except to other employees or persons associated with Franchisee and only to the limited extent necessary to train or assist other employees of Franchisee in the operation or development of a Center using the System.

     5.     Covenantor shall surrender the Operations Manuals and any other material containing some or all of FII's Trade Secrets to Franchisee or to FII, upon request, or upon termination of employment by or association with Franchisee, or upon conclusion of the use for which Manuals or other information or material may have been furnished to Covenantor.

     6.     Covenantor shall not, directly or indirectly, do any act or omit to do any act, which would or would be likely to be injurious or prejudicial to the goodwill associated with the System.

     7.     All manuals are loaned by FII to Franchisee for limited purposes only and remain the property of FII and may not be reproduced, in whole or in part, without FII's written consent.

Covenants Not to Compete

     1.     In order to protect the goodwill and unique qualities of the System and the confidentiality and value of FII's Trade Secrets, and in consideration for the disclosure to Covenantor of FII's Trade Secrets, Covenantor further undertakes and covenants that, during the time he is employed by or associated with Franchisee, he will not:

        a.     Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, engage in or acquire any financial or beneficial interest in (including interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, help or make loans to any entity involved in business which is the same as or similar to that conducted at the Center including, but not limited to, any business located, within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Proprietary Marks or operates or licenses others to operate a business under the same or similar Proprietary Marks, that produces and offers for sale graphics, banners and signs.

        b.     Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of Franchisee's Center(s) to any competitor, including, but not limited to, other FASTSIGNS Centers operated by licensed uses of the System, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System.

---

     May be deleted if FII does not require the Franchisee to obtain the execution of these covenants by the Employee. See Section 20.I of the Franchise Agreement.

     c.     Employ or seek to employ any person who is at the time employed by FII or any franchisee or developer of FII, or otherwise directly or indirectly induce such persons to leave his or her employment.

2.     In further consideration for the disclosure to Covenantor of FII's Trade Secrets and to protect the uniqueness of the System, Covenantor agrees that for two (2) years following the earlier of the expiration, termination or transfer of all of Franchisee's interest in the Franchise Agreement or the termination of his employment by or association with Franchisee, Covenantor will not without the prior written consent of FII:

     *a.     Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, engage in or acquire any financial or beneficial interest in (including interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, help or make loans to any entity involved in business which is the same as or similar to that conducted at the Center including, but not limited to, any business which produces and offers for sale graphics, banners and signs which business is, or is intended to be located, within the Territory as defined in Section 1.C of the Franchisee's Franchise Agreement, and/or within a ten (10) mile radius of any Center or sign making facility that is owned or operated by Franchisor or its affiliates, or any franchisee of Franchisor, in existence or under construction at any given time during such period.

     b.     Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of Franchisee's Center(s) to any competitor, including, but not limited to, other FASTSIGNS Centers operated by other licensed users of the System, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System.

     c.     Employ or seek to employ any person who is at the time employed by FII or any franchisee or developer of FII, or otherwise directly or indirectly induce such persons to leave his or her employment.

     d.     Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, solicit, recruit, or otherwise contact customers of Franchisee's Center.

Miscellaneous

1.     Franchisee undertakes to use its best efforts to ensure that Covenantor acts as required by this Agreement.

2.     Covenantor agrees that in the event of a breach of this Agreement, FII and Franchisee would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions thereof, FII and/or Franchisee shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies which are made available to it at law or in equity, including the right to terminate the Franchise Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm, and without being required to furnish a bond or other security.

3.     . Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by FII and Franchisee in enforcing this Agreement.

4.     Any failure by FII or the Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

5.     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT FOR TEXAS CHOICE OF LAW RULES. COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF DALLAS COUNTY, TEXAS AND THE FEDERAL DISTRICT COURTS FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS, DIVISION. COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES

THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE DALLAS COUNTY, TEXAS; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION WHICH INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE WHICH HAS JURISDICTION.

6.     The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which FII is a party, Covenantor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.     This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.     All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to FII, the notice shall be addressed to:

> FASTSIGNS International, Inc.
> 2550 Midway Road, Suite 150
> Carrollton, Texas 75006
> Attention: Law Department
> Facsimile No.: (214) 346-5793

If directed to Franchisee, the notice shall be addressed to:

> _____
> _____
> _____
> Attention:_____
> Facsimile:_____

If directed to Covenantor, the notice shall be addressed to:

> _____
> _____
> _____
> Attention:_____
> Facsimile:_____

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by telex or facsimile shall be deemed given upon transmission, provided confirmation is made as provided above. Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving fifteen (15) days written notice of such change to the other parties. Business day for the purpose of this Agreement excludes Saturday, Sunday and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

9. The rights and remedies of FII under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective subsidiaries, affiliates, successors and assigns. The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of FII.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

FRANCHISEE

By:_____
Title:_____

FASTSIGNS INTERNATIONAL, INC.

By:_____
Title:_____

COVENANTOR

By:_____
Title:_____

Attachment "E"
to Franchise Agreement

STATE OF CALIFORNIA          §     IRREVOCABLE POWER OF ATTORNEY
                             §
COUNTY OF San Diego          §     KNOW ALL MEN BY THESE PRESENTS

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of assigning to Franchisor all of Franchisee's right, title and interest in and to any and all telephone numbers of Franchisee's franchise and all related Yellow Pages, White Pages and other business listings, including but not limited to, the execution and delivery of any Transfer of Service Agreement and any other transfer documentation required by the applicable telephone service company providing telephone services to Franchisee, hereby granting unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no person, firm or corporation dealing with Franchisor shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of funds or property paid or delivered to Franchisor. Any person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm or corporation acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of November 12, 2001 by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the 26 day of October _____, 20 04.

FRANCHISEE:

By: _Norman Gilbert_____

Name: Norman Gilbert_____
Title: _____

STATE OF CALIFORNIA          §
                             §
COUNTY OF_____   §


    BEFORE ME, the undersigned authority, on this day personally appeared Norman Gilbert, known to me to be the person whose name is subscribed to the foregoing instrument, who has acknowledged to me that he has executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 20____.


(SEAL)


                                    _____
                                    Notary Public in and for the
                                    State of California


My Commission Expires:


_____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of ___California___

County of ___San Diego___

On ___October 26, 2001___ before me, ___Colleen M. Bush___
DATE                                      NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared ___Norman Gilbert___
NAME(S) OF SIGNER(S)

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

COLLEEN M. BUSH
COMM. # 1243311
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
COMM. EXP. DEC. 10, 2003

_____
SIGNATURE OF NOTARY

━━━━━━━━━━━━━ OPTIONAL ━━━━━━━━━━━━━

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

### CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)      ☐ LIMITED
                  ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

### DESCRIPTION OF ATTACHED DOCUMENT

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

©1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

Attachment "F"
to Franchise Agreement

| | | |
|---|---|---|
| STATE OF CALIFORNIA | § | IRREVOCABLE POWER OF ATTORNEY |
| COUNTY OF San Diego | § | |
| | § | |

KNOW ALL MEN BY THESE PRESENTS

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of assigning to Franchisor all of Franchisee's right, title and interest in and to any and all web sites, web pages, listings, banners, URLs, advertisements or other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos ("Trademarks"), on or with the Internet, World Wide Web, Internet service providers, electronic mail services, communication providers, search engines or other similar services. Franchisor shall have the authority to execute and deliver on Franchisee's behalf any and all documentation required by the applicable company, the Internet, and regulatory agency, or other provider of services to Franchisee to transfer, modify or cancel such services, listings, or links and Franchisee hereby grants unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no person, firm or corporation dealing with Franchisor shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of funds or property paid or delivered to Franchisor. Any person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisee shall not take any action against any person, firm or corporation acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of November 2, 2001 by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas and shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the 26 day of October, _____, 20 01.

FRANCHISEE:

By: _Norman Gilbert_____

Name: Norman Gilbert
Title:_____

STATE OF CALIFORNIA      §
                                      §
COUNTY OF _____ §

         BEFORE ME, the undersigned authority, on this day personally appeared Norman Gilbert, known to me to be the person whose name is subscribed to the foregoing instrument, who has acknowledged to me that he has executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 20____.

(SEAL)

_____
Notary Public in and for the
State of California

My Commission Expires:

_____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of ___California___

County of ___San Diego___

On ___October 26, 2001___ before me, ___Colleen M. Bush___
DATE                                            NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared ___Norman Gilbert___
NAME(S) OF SIGNER(S)

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are
subscribed to the within instrument and ac-
knowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s),
or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

COLLEEN M. BUSH
COMM. # 1243311
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
COMM. EXP. DEC. 10, 2003

━━━━━━━━━━━━━━━━━━ OPTIONAL ━━━━━━━━━━━━━━━━━━

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent
fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)
_____
_____

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

©1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

Attachment "G"
to Franchise Agreement

STATE OF CALIFORNIA     §
                         §
COUNTY OF San Diego  §    **IRREVOCABLE POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS

That Norman Gilbert ("Franchisee") do hereby irrevocably constitute and appoint FASTSIGNS International, Inc., a Texas corporation ("Franchisor"), true and lawful attorney-in-fact and agent for Franchisee and in Franchisee's name, place and stead, to do or cause to be done all things and to sign, execute, acknowledge, certify, deliver, accept, record and file all such agreements, certificates, instruments and documents as, in the sole discretion of Franchisor, shall be necessary or advisable for the sole purpose of obtaining any and all returns, records, reports and other documentation relating to the payment of taxes filed by Franchisee with any state and/or federal taxing authority, including but not limited to the execution and delivery of any and all formal requests and other documentation as may be required by the applicable state and/or federal taxing authority, hereby granting unto Franchisor full power and authority to do and perform any and all acts and things which, in the sole discretion of Franchisor, are necessary or advisable to be done as fully to all intents and purposes as Franchisee might or could itself do, hereby ratifying and confirming all that Franchisor may lawfully do or cause to be done by virtue of this Power of Attorney and the powers herein granted.

During the term of this Power of Attorney and regardless of whether Franchisee has designated any other person to act as its attorney-in-fact and agent, no governmental agency, person, firm or corporation dealing with Franchisor, if acting in good faith, shall be required to ascertain the authority of Franchisor, nor to see to the performance of the agency, nor be responsible in any way for the proper application of documents delivered or funds or property paid or delivered to Franchisor. Any governmental agency, person, firm or corporation dealing with Franchisor shall be fully protected in acting and relying on a certificate of Franchisor that this Power of Attorney on the date of such certificate has not been revoked and is in full force and effect, and Franchisor shall not take any action against any person, firm, corporation or agency acting in reliance on such a certificate or a copy of this Power of Attorney. Any instrument or document executed on behalf of Franchisee by Franchisor shall be deemed to include such a certificate on the part of Franchisor, whether or not expressed. This paragraph shall survive any termination of this Power of Attorney.

This Power of Attorney shall terminate two (2) years following the expiration or termination of that certain Franchise Agreement dated as of November 12, 2001 by and between Franchisor and Franchisee. Such termination, however, shall not affect the validity of any act or deed that Franchisor may have effected prior to such date pursuant to the powers herein granted.

This instrument is to be construed and interpreted as an irrevocable Power of Attorney coupled with an interest. It is executed and delivered in the State of California and the laws of the State of Texas and shall govern all questions as to the validity of this Power of Attorney and the construction of its provisions.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the 26 day of October _____, 20 01 .

FRANCHISEE:

By: _Norman Gilbert_____

Name: Norman Gilbert_____
Title: _____

STATE OF CALIFORNIA          §
                             §
COUNTY OF _____    §


    BEFORE ME, the undersigned authority, on this day personally appeared Norman Gilbert, known to me to be the person whose name is subscribed to the foregoing instrument, who has acknowledged to me that he has executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 20____.


(SEAL)

                                          _____
                                          Notary Public in and for the
                                        State of California


My Commission Expires:


_____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

No. 5907

State of ___California___

County of ___San Diego___

On ___October 26, 2001___ before me, ___Colleen M. Bush___
        DATE                              NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC"

personally appeared ___Norman Gilbert___
                                              NAME(S) OF SIGNER(S)

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are
subscribed to the within instrument and ac-
knowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s),
or the entity upon behalf of which the
person(s) acted, executed the instrument.

[Notary Seal: COLLEEN M. BUSH, COMM. # 1243311, NOTARY PUBLIC-CALIFORNIA, SAN DIEGO COUNTY, COMM. EXP. DEC. 10, 2003]

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

━━━━━━━━━ OPTIONAL ━━━━━━━━━

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

### CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
           TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                      ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER:_____

_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____

### DESCRIPTION OF ATTACHED DOCUMENT

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

©1993 NATIONAL NOTARY ASSOCIATION • 8236 Remmet Ave., P.O. Box 7184 • Canoga Park, CA 91309-7184

Attachment K to Franchise Agreement
ELECTRONIC FUNDS TRANSFER
AUTHORIZATION TO HONOR CHARGES DRAWN BY AND PAYABLE TO FASTSIGNS
INTERNATIONAL, INC./NATIONAL ADVERTISING COUNCIL, INC.

FASTSIGNS INTERNATIONAL, INC./NATIONAL ADVERTISING COUNCIL, INC./PAYEE

BANK NAME          ACCOUNT #          ABA          FEIN

_____      _____      _____      _____

The undersigned Depositor hereby authorizes and requests the Depository designated below to honor and to charge to the following designated account, checks, and electronic debits (collectively, "debits") drawn on such account which are payable to the above named Payee. It is agreed that Depository's rights with respect to each such debit shall be the same as if it were a check drawn and signed by Depositor. It is further agreed that if any such debit is not honored, whether with or without cause and whether intentionally or inadvertently, Depository shall be under no liability whatsoever. This authorization shall continue in force until Depository and Payee have received at least thirty (30) days written notification from Depositor of its termination.

The Depositor agree with respect to any action taken pursuant to the above authorization:

(1)      To indemnify the Depository and hold it harmless from any loss it may suffer resulting from or in connection with any debit, including, without limitation, execution and issuance of any check, draft or order, whether or not genuine, purporting to be authorized or executed by the Payee and received by the Depository in the regular course of business for the purpose of payment, including any costs or expenses reasonably incurred in connection therewith.

(2)      To indemnify Payee and the Depository for any loss arising in the event that any such debit shall be dishonored, whether with or without cause and whether intentionally or inadvertently.

(3)      To defend at Depositor's own cost and expense any action which might be brought by a depositor or any other persons because of any actions taken by the Depository or Payee pursuant to the foregoing request and authorization, or in any manner arising by reason of the Depository's or Payee's participation therein.

Name of Depository:_____

Name of Depositor:_____

Designated Bank Acct.:_____
(Please attach one voided check for the above account)

Center Location:_____

Center #:_____

For information call:_____

Address:_____

Phone #:_____

Fax #:_____

Name of Franchisee/Depositor (please print)_____

By:_____
Signature and Title of Authorized Representative

Date:____10 - 26 - 01_____

**Exhibit B**

# WARNING

### THESE MATERIALS PROTECTED BY COPYRIGHT

To reproduce or adapt them in whole or in part, for any purpose whatsoever, by any means mechanical or electronic, including photocopying, reprinting, or any form of computer storage or programming is not only a violation of copyright law, but is unethical and unprofessional. As a condition of your acceptance of these materials, you agree you will not reproduce or adapt the materials in any manner or permit others to do so.

It is the publisher's responsibility to maintain and enforce all copyrights that have been entrusted to it, not only to protect its own interest, but also to protect its author's interests.

FASTSIGNS International, Inc., accepts this responsibility and will vigorously enforce all copyrights on its materials. Your cooperation in complying with the copyright laws is very much appreciated.

© 1999 FASTSIGNS International, Inc.

## 1.  PHILOSOPHY

Manual Objectives................................................................Page 1.1
FASTSIGNS Mission and Objectives ...........................Page 1.2
Policy Requirements...........................................................Page 1.4
Code of Ethics Policy ........................................................Page 1.5
Center Hours Policy ...........................................................Page 1.7
Trade-out Policy for Advertising ....................................Page 1.8
Additional Center Criteria Policy ...................................Page 1.9
UK Additional Center Criteria Policy.............................Page 1.12
Flexible or Light Industrial Center Space Policy .......Page 1.15
Resale Policy ........................................................................Page 1.17
FASTSIGNS Center Technology Guidelines ...............Page 1.19
Employment Policy .............................................................Page 1.25
Toll-Free, RCF, and Future Number Policy..................Page 1.26
Off-Site Production Facility Policy ................................Page 1.28
Email Address Policy .........................................................Page 1.29
Email Filtering Policy..........................................................Page 1.30
Internet Policy......................................................................Page 1.31
FSOL Intranet Service Participation Policy .................Page 1.33
FTP Site Policy ....................................................................Page 1.37
E-Commerce Participation Policy ..................................Page 1.39
Attachment A to the FTP Site, FSOL Intranet Service & E-Commerce... Page 1.42
Privacy Statement ..............................................................Page 1.46
US Limited Services Policy ..............................................Page 1.47
SIGNWAVE AU Limited Services Policy .......................Page 1.49
Yellow Pages Policy (US, CN)..........................................Page 1.51
Yellow Pages Policy (UK) .................................................Page 1.53
Yellow Pages Policy (AU) .................................................Page 1.55
Directory Assistance & White Pages Policy................Page 1.56
Store Décor Policy .............................................................Page 1.58
POS Policy .............................................................................Page 1.61
Credit Card Data Security Policy ...................................Page 1.62
Pet Policy ..............................................................................Page 1.65
Advertising Specialty Products Policy .........................Page 1.66
Temporary ASP Reporting Policy...................................Page 1.68
Local Pay-Per-Click Policy ..............................................Page 1.69

## 2.  SYSTEM OVERVIEW

Customer Order Phase .....................................................Page 2.1
Production Phase.................................................................Page 2.6
Customer Sign Pick-Up .....................................................Page 2.12

## 3.  PRODUCTION MANAGEMENT

Introduction ..........................................................................Page 3.1
Safety......................................................................................Page 3.2
Production Tools..................................................................Page 3.4
Production Materials...........................................................Page 3.7
Production Techniques......................................................Page 3.31
Gatekeeper System ...........................................................Page 3.37
Workflow Management.......................................................Page 3.40
Minimizing Inventory..........................................................Page 3.55
Facility Layout .....................................................................Page 3.57
Quality Engineering ...........................................................Page 3.64

OPERATIONS MANUAL                    TABLE OF CONTENTS

Production Capacity ............................................................ Page 3.65

4.    **RETAIL OPERATIONS**
      Overview ............................................................... Page 4.1
      Sign Design Theory ................................................... Page 4.2
      Typestyles ............................................................ Page 4.6
      Color ................................................................. Page 4.8
      Schemes ............................................................... Page 4.10
      Design Guidelines ..................................................... Page 4.14
      Ten General Orders of Customer Selling ................................ Page 4.16

5.    **SUBCONTRACTING**
      Introduction .......................................................... Page 5.1
      Guidelines for Subcontracting ......................................... Page 5.2
      Subcontracting Resources .............................................. Page 5.8
      Types of Subcontracting ............................................... Page 5.9
      Using a Purchase Agreement ............................................ Page 5.32
      Managing Your Subcontracted Relationship .............................. Page 5.35
      Non-Standard Pricing .................................................. Page 5.57
      Sign Terms Glossary

6.    **MANPOWER PLANNING**
      Introduction .......................................................... Page 6.1
      Goals of Successful Personnel Management .............................. Page 6.2
      Manpower Planning Guidelines .......................................... Page 6.3

7.    **SALES MANAGEMENT**
      Overview .............................................................. Page 7.1
      Twenty-one Ideas You Can Use .......................................... Page 7.2
      Selecting Salespeople ................................................. Page 7.10
      Myths ................................................................. Page 7.11
      Tips for Winning Bids ................................................. Page 7.13
      Compensation .......................................................... Page 7.14
      Training .............................................................. Page 7.17
      Bench marking ......................................................... Page 7.25
      Sales Meeting ......................................................... Page 7.39

8.    **FINANCIAL MANAGEMENT**
      Purpose/General Overview .............................................. Page 8.1
      Annual ................................................................ Page 8.3
      Cash Flow/Operating Budget ............................................ Page 8.5
      Seasonalized First Year Averages ...................................... Page 8.18
      Weekly ................................................................ Page 8.21
      Accounts Payable ...................................................... Page 8.21
      Purchasing and Payables ............................................... Page 8.22
      Purchase Order ........................................................ Page 8.24
      Petty Cash ............................................................ Page 8.25
      Weekly Royalty Report ................................................. Page 8.26
      Royalty Reduction ..................................................... Page 8.27
      Daily Activities/Receivables .......................................... Page 8.31
      Accounts Receivable Management ........................................ Page 8.32
      Credit Application .................................................... Page 8.36

OPERATIONS MANUAL                    TABLE OF CONTENTS

Credit Reference Request ...................................................................... Page 8.37
Credit Approval Letter ........................................................................... Page 8.38
Credit Denial Letter ............................................................................... Page 8.39
30-Day Letter ........................................................................................ Page 8.40
60-Day Letter ........................................................................................ Page 8.41
Final Letter ............................................................................................ Page 8.42
Please Order Me .................................................................................... Page 8.43
Records Retention ................................................................................. Page 8.45
Disaster/Catastrophe Plan ................................................................... Page 8.50

## 9.    FORMS

Forms Listing ......................................................................................... Page 9.1

## FSOL Intranet Service Participation Policy

The following are the terms and conditions for use of FASTSIGNS Online ("FSOL") service including without limitation email, and other services, which may be offered from time to time by FII for use with Franchisees' ("You" or "Your") FSOL account (each feature individually and collectively referred to as the "Service").

The Service is offered to You conditioned on the terms, conditions, and notices contained herein ("TOS").

**1.**  Member Account, Password, and Security

For each new FASTSIGNS owner, FII will provide (currently at no charge) two accounts for each of Your centers. At Your option, You may purchase additional accounts with individual User ID & passwords for Your center(s).

You are entirely responsible for maintaining the confidentiality of Your User ID & password for the account. You agree not to post Your password in or near Your computer where a third party can find it. Further, You agree not to share Your password or transfer Your FSOL account. You agree to immediately notify FII when it is necessary to terminate an individual User ID and Password in order to deny an individual access to FSOL. Furthermore, You are entirely responsible for any and all activities that occur under Your account.

**2.**  Member Privacy

It is FII's policy to respect the privacy of its members. FII will not monitor, edit, or disclose any personal information about You or Your use of the Service, including its contents, without Your prior permission unless FII has a good faith belief that such action is necessary to: (1) conform to legal requirements or comply with legal process; (2) protect and defend the rights or property of FII; (3) enforce the TOS; or (4) act to protect the interests of its members or others. All data or information submitted to FII through the Service will be subject to FII's Privacy Statement. Any data or information submitted to FII through the Service to any party or person (other than FII) would be transmitted at Your own risk. We make no guaranty regarding, and assume no liability for, the security and privacy of any data or information You transmit via the Service (including without limitation data or information transmitted via any server designated as "secure").

You agree that FII may access Your account, including its contents, as stated above or for the purpose of addressing service or technical issues.

**3.**  Center Technology Required for Access

In order to access the Service, Your center must have the following:

3.1        The center must have an internet connection;

3.2        The center must have the most current version of FirstClass Client. This can be obtained at no expense to you from www.CENTRINITY.com; and

3.3        The center must have internet browsing software. FII recommends Microsoft Internet Explorer 6.0 or higher.

**4.**   Message Storage, Outbound Messages and Other Limitations

The amount of email storage space per member is limited. Some email messages may not be processed due to space constraints or outbound message limitations. Based on this You agree to the automatic deletion of messages or files that have reached or exceed a forty-Five (45) day period. You further agree that space limitations may be implemented that require the deletion of messages less then forty-Five (45) days old for the purpose of allowing new messages to be posted to Your account. You agree that FII is not responsible or liable for the deletion or failure to center messages or other information.

**5.**   Member Conduct

As a condition of Your use of the Service, You warrant to FII that You will not use the Service for any purpose that is unlawful or prohibited by these terms, conditions, and notices.

The Service is provided to Franchisees as a private communication vehicle for Franchisees, corporate personnel and vendors; and, to provide a mechanism for the dissemination and collection of shared information in a real-time manner.

You agree to abide by all applicable local, state, national and international laws and regulations and are solely responsible for all acts or omissions that occur under Your account or password, including the content of Your transmissions through the Service. By way of example, and not as a limitation, You agree not to:

- Use the Service in connection with surveys (other than provided by FII), contests, pyramid schemes, chain letters, junk email, spamming or any duplicative or unsolicited messages (commercial or otherwise).

- Defame, abuse, harass, stalk, threaten or otherwise violate the legal rights (such as rights of privacy and publicity) of others.

- Publish, distribute or disseminate any inappropriate, profane, defamatory, infringing, obscene, indecent or unlawful material or information.

- Advertise or offer to sell or buy any goods or services for any personal purpose.

- Harvest or otherwise collect information about others, including email addresses, without their consent.

- Create a false identity for the purpose of misleading others as to the identity of the sender or the origin of a message.

- Use, download or otherwise copy, or provide (whether or not for a fee) to a person or entity that is not authorized to participate in the Service any directory of Service participants or other user or usage information or any portion thereof other than in the context of Your use of the Service as permitted under the TOS.

- Transmit or upload any material that contains viruses, Trojan horses, worms, time bombs, cancelbots, or any other harmful or deleterious programs.

- Transmit or upload any material that contains software or other material protected by intellectual property laws, rights of privacy or publicity or any other applicable law unless You own or control the rights thereto or have received all necessary consents.

- Interfere with or disrupt networks connected to the Service or violate the regulations, policies or procedures of such networks.

- Attempt to gain unauthorized access to the Service, other accounts, computer systems or networks connected to the Service, through password mining or any other means.

- Violate any applicable laws or regulations including, without limitation, laws regarding the transmission of technical data or software exported from the United States through the Service.

- Interfere with another member's use and enjoyment of the Service or another individual's or entity's use and enjoyment of similar services.

FII has no obligation to monitor the Service or any user's use thereof or retain the content of any user session. However, FII reserves the right at all times to monitor, review, retain and/or disclose any information as necessary to satisfy any applicable law, regulation, legal process or governmental request.

**6.**    Links to Third Party Sites

THE LINKS INCLUDED WITHIN THE SERVICE MAY LET YOU LEAVE THE SERVICE WEB SITES ("LINKED SITES"). THE LINKED SITES ARE NOT UNDER THE CONTROL OF FII AND FII IS NOT RESPONSIBLE FOR THE CONTENTS OF ANY LINKED SITE OR ANY LINK CONTAINED IN A LINKED SITE, OR ANY CHANGES OR UPDATES TO SUCH SITES. FII IS

PROVIDING THESE LINKS TO YOU ONLY AS A CONVENIENCE, AND THE INCLUSION OF ANY LINK DOES NOT IMPLY ENDORSEMENT BY FII OF THE SITE OR ANY ASSOCATION WITH ITS OPERATORS.

7.    Participation in Promotions of Advertisers

Any dealings with advertisers on the Service or participation in promotions, including the delivery of and the payment for goods and services, and any other terms, conditions, warranties or representations associated with such dealings or promotions, are solely between You and the Advertiser or other third party. FII shall not be responsible or liable for any part of any such dealings or promotions.

8.    Miscellaneous

FII reserves the right to add to, revoke, change this policy from time to time on reasonable notice, and FII expects that such changes will be needed as a result of legal developments concerning the Internet, changes in technology, etc. FII also reserves the right to discontinue operation of the Site.

9.    Legal Provisions

Please see Attachment A for all legal provisions to the TOS.

For additional information or clarification, contact:

**FASTSIGNS International, Inc.**
**Vice President of IT**
**Phone: (800) 827-7451**
**Fax: (972) 250-6807**

## FTP Site Policy

The following are the terms and conditions for Franchisees' ("You" or "Your") use of FII File Transfer Protocol Site ("FTP Site").

Use of the FTP site offered to You conditioned on Your acceptance of the terms, conditions, and notices contained herein.

**1.**   General

    1.1        You are engaged in the operation of a FASTSIGNS center pursuant to a Franchise Agreement between You and FII.

    1.2        FII has established a FTP Site for Your use in sending and retrieving large graphic files from Your customers.

**2.**   File Transfer Protocol

FII will provide You with the use of its FTP Site to send and retrieve large graphic files from customers. Your use of the FTP Site is restricted to FASTSIGNS center customer business. FII has the right to monitor, edit, and approve Your submissions to the FTP Site.

You will be provided with storage space of 150mb ("Maximum Space"). To add additional files when You have reached the Maximum Space, You will need to delete or remove existing files. Further, You agree to the automatic deletion of all files older than fifteen (15) days. These files will not be backed up and cannot be restored once deleted.

FII does not guarantee that the transfer of files will always be accurate or complete. Therefore, You agree that FII is not responsible or liable for the deletion or failure of files to transmit during the transfer phase.

As a condition of Your use of the FTP Site, You warrant to FII that You will not use the FTP Site for any purpose that is unlawful or prohibited.

**3.**   Miscellaneous

FII reserves the right to add to, revoke, change this policy from time to time on reasonable notice, and FII expects that such changes will be needed as a result of legal developments concerning the internet, changes in technology, etc. FII also reserves the right to discontinue operation of the FTP Site.

**4.**   Legal Provisions

Please see Attachment A for all legal provisions to this Agreement.

For additional information or clarification, contact:

**FASTSIGNS International, Inc.**
**Vice President of IT**
**Phone:  (800) 827-7451**
**Fax:  (972) 250-6807**

## E-Commerce Participation Policy

The following are the terms and conditions for Franchisees' ("You" or "Your") participation in FII e-commerce initiative ("E-Commerce Participation").

Participation is offered to You conditioned on Your acceptance of the terms, conditions, and notices contained herein.

**1.** General

    1.1        You are engaged in the operation of a FASTSIGNS center pursuant to a Franchise Agreement between You and FII.

    1.2        FII has established an e-commerce program for Your customers to order the products and services offered by the FASTSIGNS System.

    1.3        FII has created a website ("Site") and will allow You to participate on its Site through an individual page under FII's homepage.

**2.** Store Technology Blueprint

Your center must adhere to the guidelines established by the FII Store Technology Blueprint in order to participate in e-commerce. (Refer to the Store Technology Blueprint Policy.)

**3.** Center Technology Required for Access

Your Center must meet the requirements of the Store Technology Blueprint in order to participate in e-commerce; refer to the Store Technology Blueprint Policy.

**4.** Center Sites

You will be provided with the following:

    4.1        An individual center page at no expense located on FII's webpage;

    4.2        The option to have a customized galleries of Your work product, a request for quote form, and direct access to the FTP Site. At FII's option, You will be responsible for any fees associated with Your expanded web page; and

4.3        In conjunction with 4.2 above You will have the option to
           have the "My Catalog" and the option of the "Shared
           Catalog" functionality.   At FII's option, You will be
           responsible for any expense associated with building and
           maintaining catalogs. This will allow You to select preferred
           customers to place orders for their signage needs. You will
           have the option of making each catalog to be accessible by
           only You and the respective customer.

4.4        FII will allow You access and use of the Site and will provide
           you an individual center page only if You are in good standing
           under Your Franchise Agreement and adhere to the policies
           and procedures relating to the Site.  If You are not in good
           standing under Your Franchise Agreement or if You do not
           adhere to the policies and procedures relating to the Site, FII
           reserves the right in its sole discretion to temporarily or
           permanently stop Your use of the Site and to remove any of
           your individual pages in the Site.

4.5        You may not maintain, operate, or authorize a webpage for
           Your center other than the Site that FII provides.   This
           includes any other presence on the Internet, other websites,
           electronic services or otherwise.

4.6        If You have an existing website, You must immediately cease
           all operation and use of that website and, if FII requests,
           transfer the domain name to FII.  In such case, FII will
           reimburse You for the cost You incurred to obtain the
           domain name registration up to a maximum cost of thirty-five
           dollars ($35) per year for the remaining term of the
           registration.

5.   Miscellaneous

5.1        FII reserves the right to add to, revoke, change this policy
           from time to time on reasonable notice, and FII expects that
           such changes will be needed as a result of legal developments
           concerning the internet, changes in technology, etc.  FII also
           reserves the right to discontinue operation of the Site and the
           provision of Franchisee pages on the Site.

5.2        All intellectual property contained on or represented by the
           Site is property of FII.

5.3        FII shall own and have sole use of information collected or
           gathered on or through the Site.

OPERATIONS MANUAL                              PHILOSOPHY
                                 E-Commerce Participation Policy

6.    Legal Provisions

Please see Attachment A for all legal provisions to this Agreement.

For additional information or clarification, contact:

**FASTSIGNS International, Inc.**
**Vice President of IT**
**Phone:  (800) 827-7451**
**Fax:  (972) 250-6807**

## Attachment A To The FTP Site, FSOL Intranet Service, E-Commerce

## Participation Policies (The "Policies")

### Legal Provisions

1.  Disclaimers/Limitation of Liability

The information and services included in or available through the FTP Site, Service or E-Commerce Participation may include inaccuracies or typographical errors. Changes are periodically added to the information herein. FII and/or its respective suppliers may make improvements and/or changes in the FTP Site, the Service or the E-Commerce Participation Policies at any time.

FII does not represent or warrant that the FTP Site, the Service or E-Commerce Participation will be uninterrupted or error-free, that defects will be corrected, or that the FTP Site, the Service or the server that makes it available, are free of viruses or other harmful components. FII does not warrant or represent that the use or the results of the use of the FTP Site, the Service, E-Commerce or the materials made available as part of the FTP Site, the Service or E-Commerce Participation will be correct, accurate, timely, or otherwise reliable.

You specifically agree that FII shall not be responsible for unauthorized access to or alteration of Your transmissions or data, any material or data sent or received or not sent or received, or any transactions entered into through the FTP Site, the Service or E-Commerce Participation. You specifically agree that FII is not responsible or liable for any threatening, defamatory, obscene, offensive or illegal content or conduct of any other party or any infringement of another's rights, including intellectual property rights. You specifically agree that FII is not responsible for any content sent using and/or included in the FTP Site, the Service or E-Commerce Participation by any third party.

FII MAKES NO REPRESENTATIONS ABOUT THE SUITABILITY, RELIABILITY, AVAILABILITY, TIMELINESS, AND ACCURACY OF THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION FOR ANY PURPOSE. THE FTP SITE, THE SERVICE AND E-COMMERCE PARTICIPATION IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. FII AND/OR ITS RESPECTIVE SUPPLIERS HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH REGARD TO THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, INCLUDING ALL IMPLIED WARRANTIES AND CONDITIONS OF

MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.

IN NO EVENT SHALL FII BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL DAMAGES OR ANY DAMAGES WHATSOEVER INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF USE, DATA OR PROFITS, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OR PERFORMANCE OF THE FTP SITE, THE SERVICE OR RELATED WEB SITES OR E-COMMERCE PARTICIPATION, WITH THE DELAY OR INABILITY TO USE THE FTP SITE, THE SERVICE OR RELATED WEB SITES OR PARTICIPATE IN E-COMMERCE, THE PROVISION OF OR FAILURE TO PROVIDE THE FTP SITE, THE SERVICE, E-C0MMERCE CAPABILITIES, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS, SERVICES AND RELATED GRAPHICS OBTAINED THROUGH THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, OR OTHERWISE ARISING OUT OF THE USE OF THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF FII OR ANY OF ITS SUPPLIERS HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU. IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE FTP SITE, THE SERVICE OR E-C0MMERCE PARTICIPATION, OR WITH ANY OF THESE TERMS OF USE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE FTP SITE, THE SERVICE AND ITS RELATED WEB SITES OR PARTICIPATING IN E-COMMERCE.

2.   Indemnification

You agree to indemnify and hold FII, its subsidiaries, affiliates, officers and employees, harmless from any claim, demand, or damage, including reasonable attorneys' fees, asserted by any third party due to or arising out of Your use of or conduct on the FTP Site, the Service, or Your E-Commerce Participation, or Your failure to abide by the FTP Site, the Service or E-commerce Participation Policies.

3.   Compliance/Termination

You agree to comply with all applicable laws and regulations regarding electronic communication, information collection, and other applicable laws.  You will be granted access to the FTP Site, the Service and be permitted to participate in e-commerce as long as You comply with the Policies and remain in compliance of Your Franchise Agreement.

FII may limit or terminate Your access to any part or all of the FTP Site, the Service, E-Commerce Participation and any related service(s) at any time, with or without cause, with or without notice, effective immediately, for any reason whatsoever.

Upon termination of the FTP Site, the Service or Your E-Commerce Participation, Your right to use the FTP site, the Service or Your right to participate in e-commerce immediately ceases.

FII shall have no obligation to maintain any content in Your account or to forward any unread or unsent messages to You or any third party.

4.    Proprietary Rights to Content

You acknowledge that content, including but not limited to text, software, music, sound, photographs, video, graphics or other material contained in either sponsor advertisements or electronically distributed, commercially produced information presented to You by the FTP Site, the Service, by FII, or FII's Advertisers or other content providers, is protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws. You may make a copy of this content for Your personal, non-commercial use only, provided that You keep all copyright and other proprietary notices intact. You may not modify, copy, reproduce, republish, upload, post, transmit, or distribute in any way content available through the FTP Site, the Service and its associated Web sites, including code and software.

5.    Modifications to Terms of FTP Site, the Service, E-Commerce Participation and Member Policies

FII reserves the right to change the FTP Site, the Service and/or the E-Commerce Participation terms or policies regarding the use of the FTP Site, the Service or E-Commerce Participation at any time and to notify You by posting an updated version of the FTP Site, the Service and/or the E-Commerce Participation terms on FSOL. You are responsible for regularly reviewing the FTP Site, the Service and E-Commerce Participation terms. Continued use of the FTP Site, the Service or E-Commerce Participation after any such changes shall constitute Your consent to such changes.

6.    General

The laws of the State of Texas, and the United States of America govern the Policies. Use of the FTP Site, the Service and E-Commerce Participation is unauthorized in any jurisdiction that does not give effect to all provisions of these terms and conditions, including without limitation this paragraph. You agree that no joint venture, partnership, employment, or agency relationship exists between You and FII as a result of these agreements, use of FTP Site, the Service and E-Commerce Participation. FII's performance of these Policies are subject to existing laws and legal process, and nothing contained in these Policies are in derogation of FII's right to

comply with governmental, court and law enforcement requests or requirements relating to Your use of the FTP Site, the Service, E-Commerce Participation or information provided to or gathered by FII with respect to such use. If any part of the Policies are determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid, enforceable provision that most closely matches the intent of the original provision and the remainder of the Policies shall continue in effect. A printed version of the Policies and of any notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to the Policies to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. You and FII agree that any cause of action arising out of or related to use of the FTP Site, this Service or Your E-Commerce Participation must commence within one (1) year after the cause of action arose; otherwise, such cause of action is permanently barred. The section titles in the FTP Site, the Service or the E-Commerce Participation Policies are solely used for the convenience of the parties and have no legal or contractual significance.

7.    Language

It is the express will of the parties that the Policies and all related documents have been drawn up in English.

COPYRIGHT AND TRADEMARK NOTICES: All contents of the Service are: Copyright © 2000 - 2005 FASTSIGNS International, Inc., 2550 Midway Road, Suite 150, Carrollton, Texas 75006 U.S.A. All rights reserved.

TRADEMARKS. FASTSIGNS; FASTSIGNS, The One Day Sign & Lettering Experts; FASTSIGNS, For A Quality Sign That's Right. On Time.; Quality Displays. In Just Days.; Quality Signs. Done Right. On Time.; Sign & Graphic Solutions Made Simple; FASTSIGNS.com; DISPLAY WORLD; and Imagine Click & Quote; FASTSIGNS (stylized); and From Concept to Completion referenced herein are either trademarks or registered trademarks of FII.

For additional information or clarification, contact:

**FASTSIGNS International, Inc.**
**Director of Legal**
**Phone: (800) 827-7451**
**Fax: (972) 250-6807**

## Privacy Statement

This privacy statement applies specifically to Franchisees' ("You" or "Your") participation in the FTP Site, FASTSIGNS Online and E-Commerce. Questions regarding this statement should be directed to FII's Legal Department.

It's important to FII which owns and operates the FTP Site, FASTSIGNS Online and FII's E-commerce ("Services"), to help You retain Your privacy when You take advantage of the Services FII has to offer.

What this means to You is, FII is committed to protecting Your privacy and developing technology that gives You the most powerful, safe, online experience that You can get anywhere.

### Privacy Principles

Because You are important to FII, FII operates by the following principles:

**Principle 1**

FII explicitly asks when it needs to provide information that personally identifies You to others ("Personal Information").

**Principle 2**

FII keeps all of Your Personal Information private and does not share it with any third parties. FII will not disclose Your Personal Information unless acting under a good faith belief that such action is necessary to: (1) conform to legal requirements or with legal process; (2) protect and defend the rights or property of FII; (3) enforce the Services; or (4) act to protect the interests of its members or others.

**Principle 3**

FII will not send You any unsolicited information, including email, except as mentioned below. Under certain circumstances, FII may be required to send You information about the Services or your account, but FII will not send You unsolicited email regarding any commercial offers or advertisements at any time.

**Principle 4**

If at any time You believe that FII has not adhered to these principles, please notify FII by email at administrator@fastsigns.com and FII will use all commercially reasonable efforts to promptly determine and correct the problem.

For additional information or clarification, contact:

**FASTSIGNS International, Inc.**
**Director of Legal**
**Phone: (800) 827-7451**
**Fax: (972) 250-6807**

## US Limited Services Policy

In an effort to maintain and enforce the integrity of the FASTSIGNS franchise system, a Limited Services Policy has been developed. This policy was effective September 1, 2000. Within this policy, some services that we currently make available to all FASTSIGNS franchisees, regardless of their compliance status, will be eliminated for those that have exercised certain infractions. These infractions may involve compliance issues and in some cases, direct violations of the Franchise Agreement. Limited Services are enacted prior to enforcing default provisions. The following list reflects the penalties of Limited Services. These penalties will be reviewed and lifted once the designated infraction (s) has been corrected.

**Penalties**:

- Removal from FSOL or any other FII email system;

- not eligible to receive NAP orders;

- not eligible to attend owner's meetings and the annual convention;

- FII would limit center visits to only what is required by the Franchise Agreement - not eligible for additional visits or training trade out visits.

- Removal from the E-commerce portion of the FASTSIGNS website. The franchisee would not be eligible for My Catalog or Shared Catalog functions or able to receive a Request For Quote (RFQ), Send A File (SAF), Photo Library, or center page; however, the center would still be present in the center locator section of the website (for customer convenience);

- not eligible to attend Field training sessions;

- not eligible to attend Field Marketing planning sessions;

- not eligible to attend Dallas training sessions; and/or

- not eligible to attend operations or town hall meetings.

**All** penalties will apply for a designated infraction. In the event we do not see corrective action within a reasonable period of time, we will resort to whatever legal action may be appropriate for the given infraction. Once the given infraction is corrected, full services will be restored on the 1st of the month following the correction.

Address questions or concerns about this policy to the attention of:

### FASTSIGNS International, Inc.

**Senior Vice President of Franchise Services**
**Phone: (800) 827-7451**
**Fax: (972) 248-8201**

# Exhibit C

Dear Strategic Partner:

As you know, FII has been working diligently for several months on an e-commerce strategy. This project has consisted of a revision (re-writing) of the FASTSIGNS homepage, creating an avenue for conducting business over the web, and developing a new approach for locating individual stores on the web site, among other things. As part of the project, we felt it necessary to establish clear policies for participation in both our on line system (FSOL) as well as our e-commerce program. These new policies are enclosed.

- The "Service Participation Policy" relates specifically to FSOL.

- The "E-Commerce Participation Policy" relates to the e-commerce aspect of our new web site, and the individual store pages available to you as part of our new web site.

- The "FTP Site Policy" relates to your use of the FTP Site.

- "Attachment A to the Service and E-commerce Participation Policies" relate to both of the above.

- The last item is our Privacy Statement.

Unfortunately, these policies must be written in legal terms, which often makes it confusing to interpret the intent. Therefore, we have provided below a bullet point summary for each document, hopefully clarifying in "plain English" what each document is meant to be stating.

FSOL INTRANET Service Participation Policy
Item 1 - Passwords assigned to accounts for your store must be secured at all times, and you accept responsibility accordingly. You are to advise FII immediately of any necessary changes to individual user IDs (i.e. terminations, etc.)

Item 2 - FII will access your account only if necessary, and we assume no liability for the security or privacy of information.

Item 3 - This is the software and hardware required to access the service.

Item 4 - You acknowledge that FII must designate space limitations for the e-mail system, including the enforcement of automatic deletion guidelines.

Item 5 - You agree to not use the Service for any illegal or inappropriate activities (pyramid schemes, junk e-mail, pornographic purposes, etc.)

Item 6 - Links to 3rd parties are provided as a convenience, and FII does not assume any liability for content nor imply endorsement of such site

Item 7 - All dealings with advertisers/promotions are at your own risk.

Item 8 – FII reserves the right to change or alter this policy as is deemed appropriate.

E – Commerce Participation Policy
Item 1 – a general description of the purpose of our e-commerce program.

Item 2 - Participation in the FII E-commerce program will require your compliance or acknowledgement of the following:

You or one of your current staff members must have successfully completed the E-media certification program.

Item 3 - Your Center must exceed Level 1 requirements of the Store Technology Blueprint.

Item 4 - FII will provide you with use of the FTP site, and your use will be restricted to FASTSIGNS Center customer business. File storage on the site will be limited to 45 days, and FII does not guarantee nor accept liability for the accuracy or completion of the transfer of files.

You will not use the FTP site for any unlawful or prohibited purposes.

Item 5 - Provides details of exactly what you will be provided with regarding individual store sites. This section also clarifies that you must not maintain a site for your center other than what FII provides, and that if you have such a site you must immediately cease operation.

Item 6 - FII reserves the right to change this policy, as we deem appropriate.

FTP Site Policy
Item 1 – a general description of the purpose of the FTP Site.

Item 2 – The use of the site is restricted to FASTSIGN business and FII. Further, FII has the right to approve or disapprove submissions to the site.



Your storage space is limited to 150mb.

There is no guarantee that the transfer of files will be accurate and FII bears no responsibility associated with this.

You will not use the site for any purpose that is unlawful or prohibited.

Item 3 – FII can change the policy at anytime or discontinue use of the site.

Item 4 – Refers to Attachment A – Legal Provisions.

Attachment to both of the above Policies

Item 1 – this provides disclaimers for FII to clarify that we are not to be held responsible for in any way for the Services provided.

Item 2 – You agree to indemnify FII and all related parties from any claims regarding these Services.

Item 3 – FII has full authority to limit service and access to which it wishes.

Item 4 – All information provided on either Service is copyright and trademark protected.

Item 5 – FII reserves the right to change policies or conditions of service, as we deem appropriate.

Item 6 – addresses the legal aspects of enforcement of these policies.

Item 7 – believe it or not this item states the Policies are written in English.

FII reserves the right to make changes to the Policies from time to time.

Please sign below and return this page to the attention of Stephanie Choate, Legal Department to acknowledge your acceptance of these policies. Acceptance is mandatory in order to participate in these Services.

_Norman Cutler_ Accept

11/19/01

_____Decline

Store Number _64201_

FASTSIGNS International, Inc. • 2550 Midway Road, Ste. 150 • Carrollton, TX 75006 • 214/346-5600 • FAX 972/248-8201

**FSOL INTRANET SERVICE PARTICIPATION POLICY**

The following are the terms and conditions for use of FASTSIGNS Online ("FSOL") service including without limitation email, and other services, which may be offered from time to time by FASTSIGNS International, Inc. ("FII") for use with Franchisees' ("You" or "Your") FSOL account (each feature individually and collectively referred to as the "Service").

The Service is offered to You conditioned on the terms, conditions, and notices contained herein ("TOS").

1.   MEMBER ACCOUNT, PASSWORD, AND SECURITY

FII will provide You (currently at no charge) one account for each of Your Centers. At Your option, You may purchase additional accounts with individual User ID & passwords for Your Center(s).

You are entirely responsible for maintaining the confidentiality of Your User ID & password for the account. You agree not to post Your password in or near Your computer where a third party can find it. Further, You agree not to share Your password or transfer Your FSOL account. You agree to immediately notify FII when it is necessary to terminate an individual User ID and Password in order to deny an individual access to FSOL. Furthermore, You are entirely responsible for any and all activities that occur under Your account.

2. MEMBER PRIVACY

It is FII's policy to respect the privacy of its members. FII will not monitor, edit, or disclose any personal information about You or Your use of the Service, including its contents, without Your prior permission unless FII has a good faith belief that such action is necessary to: (1) conform to legal requirements or comply with legal process; (2) protect and defend the rights or property of FII; (3) enforce the TOS; or (4) act to protect the interests of its members or others. All data or information submitted to FII through the Service will be subject to FII's Privacy Statement. Any data or information submitted to FII through the Service to any party or person (other than FII) would be transmitted at Your own risk. We make no guaranty regarding, and assume no liability for, the security and privacy of any data or information You transmit via the Service (including without limitation data or information transmitted via any server designated as "secure").

You agree that FII may access Your account, including its contents, as stated above or for the purpose of addressing service or technical issues.

3. CENTER TECHNOLOGY REQUIRED FOR ACCESS

In order to access the Service, Your Center must have the following:

   3.1    The Center must have an internet connection;

   3.2    The Center must have the most current version of FirstClass Client. This can be obtained at not expense to you from www.firstclass.com; and

   3.3    The Center must have internet browsing software. FII recommends Microsoft Internet Explorer 5.0.

4. MESSAGE STORAGE, OUTBOUND MESSAGES AND OTHER LIMITATIONS

The amount of email storage space per member is limited. Some email messages may not be processed due to space constraints or outbound message limitations. Based on this You agree to the automatic deletion of messages or files that have reached or exceed a Forty-Five (45) day

period. You further agree that space limitations may be implemented that require the deletion of messages less then Forty-Five (45) days old for the purpose of allowing new messages to be posted to Your account. However, You have the option to purchase additional email storage space. You agree that FII is not responsible or liable for the deletion or failure to store messages or other information.

## 5. MEMBER CONDUCT

As a condition of Your use of the Service, You warrant to FII that You will not use the Service for any purpose that is unlawful or prohibited by these terms, conditions, and notices.

The Service is provided to Franchisees as a private communication vehicle for Franchisees, corporate personnel and vendors; and, to provide a mechanism for the dissemination and collection of shared information in a real-time manner.

You agree to abide by all applicable local, state, national and international laws and regulations and are solely responsible for all acts or omissions that occur under Your account or password, including the content of Your transmissions through the Service. By way of example, and not as a limitation, You agree not to:

- Use the Service in connection with surveys (other than provided by FII), contests, pyramid schemes, chain letters, junk email, spamming or any duplicative or unsolicited messages (commercial or otherwise).

- Defame, abuse, harass, stalk, threaten or otherwise violate the legal rights (such as rights of privacy and publicity) of others.

- Publish, distribute or disseminate any inappropriate, profane, defamatory, infringing, obscene, indecent or unlawful material or information.

- Advertise or offer to sell or buy any goods or services for any personal purpose.

- Harvest or otherwise collect information about others, including email addresses, without their consent.

- Create a false identity for the purpose of misleading others as to the identity of the sender or the origin of a message.

- Use, download or otherwise copy, or provide (whether or not for a fee) to a person or entity that is not authorized to participate in the Service any directory of Service participants or other user or usage information or any portion thereof other than in the context of Your use of the Service as permitted under the TOS.

- Transmit or upload any material that contains viruses, trojan horses, worms, time bombs, cancelbots, or any other harmful or deleterious programs.

- Transmit or upload any material that contains software or other material protected by intellectual property laws, rights of privacy or publicity or any other applicable law unless You own or control the rights thereto or have received all necessary consents.

- Interfere with or disrupt networks connected to the Service or violate the regulations, policies or procedures of such networks.

- Attempt to gain unauthorized access to the Service, other accounts, computer systems or networks connected to the Service, through password mining or any other means.

-2-

- Violate any applicable laws or regulations including, without limitation, laws regarding the transmission of technical data or software exported from the United States through the service.

- Interfere with another member's use and enjoyment of the Service or another individual's or entity's use and enjoyment of similar services.

FII has no obligation to monitor the Service or any user's use thereof or retain the content of any user session. However, FII reserves the right at all times to monitor, review, retain and/or disclose any information as necessary to satisfy any applicable law, regulation, legal process or governmental request.

6. LINKS TO THIRD PARTY SITES

THE LINKS INCLUDED WITHIN THE SERVICE MAY LET YOU LEAVE THE SERVICE WEB SITES ("LINKED SITES"). THE LINKED SITES ARE NOT UNDER THE CONTROL OF FII AND FII IS NOT RESPONSIBLE FOR THE CONTENTS OF ANY LINKED SITE OR ANY LINK CONTAINED IN A LINKED SITE, OR ANY CHANGES OR UPDATES TO SUCH SITES. FII IS PROVIDING THESE LINKS TO YOU ONLY AS A CONVENIENCE, AND THE INCLUSION OF ANY LINK DOES NOT IMPLY ENDORSEMENT BY FII OF THE SITE OR ANY ASSOCATION WITH ITS OPERATORS.

7. PARTICIPATION IN PROMOTIONS OF ADVERTISERS

Any dealings with advertisers on the Service or participation in promotions, including the delivery of and the payment for goods and services, and any other terms, conditions, warranties or representations associated with such dealings or promotions, are solely between You and the Advertiser or other third party. FII shall not be responsible or liable for any part of any such dealings or promotions.

8. MISCELLANEOUS

FII reserves the right to add to, revoke, change this policy from time to time on reasonable notice, and FII expects that such changes will be needed as a result of legal developments concerning the Internet, changes in technology, etc.  FII also reserves the right to discontinue operation of the Site.

9. LEGAL PROVISIONS

Please see Attachment A for all legal provisions to the TOS.

E-COMMERCE PARTICIPATION POLICY

The following are the terms and conditions for Franchisees' ("You" or "Your") participation in FASTSIGNS International Inc.'s ("FII") e-commerce initiative ("E-Commerce Participation").

Participation is offered to You conditioned on Your acceptance of the terms, conditions, and notices contained herein.

1. GENERAL

    1.1    You are engaged in the operation of a FASTSIGNS Center pursuant to a Franchise Agreement between You and FII.

    1.2    FII has established an e-commerce program for Your customers to order the products and services offered by the FASTSIGNS System.

    1.3    FII has created a website ("Site") and will allow You to participate on its Site through an individual page under FII's homepage.

2. E-MEDIA FRIENDLY CERTIFICATION

You or one of Your current employees must be E-Media Friendly certified by completing the E-Media Friendly Certification Program offered by FII's Technical Support Department (refer to the E-Media Certification Guide for details) in order to participate in e-commerce.

3. CENTER TECHNOLOGY REQUIRED FOR ACCESS

Your Center must exceed Level 1 requirements of the Store Technology Blueprint in order to participate in e-commerce. This consists of the following:

    3.1    The Center must be networked;

    3.2    The Center must have a high speed internet connection;

    3.3    The Center must have internet sharing capabilities; and

    3.4    The Center must have Graphics Advantage, Microsoft Office and Corel Draw or Anagraph, Microsoft Office and Corel Draw software.

4. STORE SITES

You will be provided with the following:

    4.1    An individual store page at no expense located in FII's home page;

    4.2    The option to have several pages, including a customized gallery of Your work product, a request for quote form on Your store page and direct access to the FTP Site. At FII's option, You will be responsible for any fees associated with Your expanded web page; and

    4.3    In conjunction with 4.2 above You will have the option to have microsites. At FII's option, You will be responsible for any expense associated with acquiring microsites. An FII approved developer will develop the microsites. This will allow You to select preferred customers to have secure direct internet access to Your Center to place orders for their signage needs. Each microsite will be accessible by only You and the respective customer.

4.4    FII will allow You access and use of the Site and will provide you an individual store page only if You are in good standing under Your Franchise Agreement and adhere to the policies and procedures relating to the Site. If You are not in good standing under your Franchise Agreement or if You do not adhere to the policies and procedures relating to the Site, FII reserves the right in its sole discretion to temporarily or permanently stop Your use of the Site and to remove any of your individual pages in the Site.

4.5    You may not maintain, operate, or authorize a webpage for Your Center other than the Site that FII provides. This includes any other presence on the Internet, other websites, electronic services or otherwise. In accordance with FII's Internet Policy, You are permitted to have links.

4.6    If You have an existing website, You must immediately cease all operation and use of that website and, if FII requests, transfer the domain name to FII. In such case, FII will reimburse You for the cost You incurred to obtain the domain name registration up to a maximum cost of thirty five dollars ($35) per year for the remaining term of the registration.

5. MISCELLANEOUS

5.1 FII reserves the right to add to, revoke, change this policy from time to time on reasonable notice, and FII expects that such changes will be needed as a result of legal developments concerning the internet, changes in technology, etc. FII also reserves the right to discontinue operation of the Site and the provision of Franchisee pages on the Site.

5.2 All intellectual property contained on or represented by the Site is property of FII.

5.3 FII shall own and have sole use of information collected or gathered on or through the Site.

6. LEGAL PROVISIONS

Please see Attachment A for all legal provisions to this Agreement.

FTP SITE POLICY

The following are the terms and conditions for Franchisees' ("You" or "Your") use of FASTSIGNS International Inc.'s ("FII") File Transfer Protocol Site ("FTP Site").

Use is offered to You conditioned on Your acceptance of the terms, conditions, and notices contained herein.

1. GENERAL

    1.1    You are engaged in the operation of a FASTSIGNS Center pursuant to a Franchise Agreement between You and FII.

    1.2    FII has established a FTP Site for Your use in sending and retrieving large graphic files from Your customers.

2. FILE TRANSFER PROTOCAL

FII will provide You with the use of its FTP Site to send and retrieve large graphic files from customers. Your use of the FTP Site is restricted to FASTSIGNS Center customer business. FII has the right to monitor, edit and approve Your submissions to the FTP Site.

You will be provided with storage space of 150mb ("Maximum Space"). To add additional files when You have reached the Maximum Space, You will need to delete or remove existing files. Further, You agree to the automatic deletion of all files older than fifteen (15) days. These files will not be backed up and can not be restored once deleted.

FII does not guarantee that the transfer of files will always be accurate or complete. Therefore, You agree that FII is not responsible or liable for the deletion or failure of files to transmit during the transfer phase.

As a condition of Your use of the FTP Site, You warrant to FII that You will not use the FTP Site for any purpose that is unlawful or prohibited.

3. MISCELLANEOUS

FII reserves the right to add to, revoke, change this policy from time to time on reasonable notice, and FII expects that such changes will be needed as a result of legal developments concerning the internet, changes in technology, etc. FII also reserves the right to discontinue operation of the FTP Site.

4. LEGAL PROVISIONS

Please see Attachment A for all legal provisions to this Agreement.

ATTACHMENT A TO THE FTP SITE, FSOL INTRANET SERVICE AND E-COMMERCE

PARTICIPATION POLICIES (THE "POLICIES")

LEGAL PROVISIONS

1. DISCLAIMERS/LIMITATION OF LIABILITY

The information and services included in or available through the FTP Site, Service or E-Commerce Participation may include inaccuracies or typographical errors. Changes are periodically added to the information herein. FII and/or its respective suppliers may make improvements and/or changes in the FTP Site, the Service or the E-Commerce Participation Policies at any time.

FII does not represent or warrant that the FTP Site, the Service or E-Commerce Participation will be uninterrupted or error-free, that defects will be corrected, or that the FTP Site, the Service or the server that makes it available, are free of viruses or other harmful components. FII does not warrant or represent that the use or the results of the use of the FTP Site, the Service, E-Commerce or the materials made available as part of the FTP Site, the Service or E-Commerce Participation will be correct, accurate, timely, or otherwise reliable.

You specifically agree that FII shall not be responsible for unauthorized access to or alteration of Your transmissions or data, any material or data sent or received or not sent or received, or any transactions entered into through the FTP Site, the Service or E-Commerce Participation. You specifically agree that FII is not responsible or liable for any threatening, defamatory, obscene, offensive or illegal content or conduct of any other party or any infringement of another's rights, including intellectual property rights. You specifically agree that FII is not responsible for any content sent using and/or included in the FTP Site, the Service or E-Commerce Participation by any third party.

FII MAKES NO REPRESENTATIONS ABOUT THE SUITABILITY, RELIABILITY, AVAILABILITY, TIMELINESS, AND ACCURACY OF THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION FOR ANY PURPOSE. THE FTP SITE, THE SERVICE AND E-COMMERCE PARTICIPATION IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. FII AND/OR ITS RESPECTIVE SUPPLIERS HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH REGARD TO THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, INCLUDING ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.

IN NO EVENT SHALL FII BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL DAMAGES OR ANY DAMAGES WHATSOEVER INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF USE, DATA OR PROFITS, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OR PERFORMANCE OF THE FTP SITE, THE SERVICE OR RELATED WEB SITES OR E-COMMERCE PARTICIPATION, WITH THE DELAY OR INABILITY TO USE THE FTP SITE, THE SERVICE OR RELATED WEB SITES OR PARTICIPATE IN E-COMMERCE, THE PROVISION OF OR FAILURE TO PROVIDE THE FTP SITE, THE SERVICE, E-C0MMERCE CAPABILITIES, OR FOR ANY INFORMATION, SOFTWARE, PRODUCTS, SERVICES AND RELATED GRAPHICS OBTAINED THROUGH THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, OR OTHERWISE ARISING OUT OF THE USE OF THE FTP SITE, THE SERVICE OR E-COMMERCE PARTICIPATION, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF FII OR ANY OF ITS SUPPLIERS HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU. IF YOU ARE

DISSATISFIED WITH ANY PORTION OF THE FTP SITE, THE SERVICE OR E-C0MMERCE PARTICIPATION, OR WITH ANY OF THESE TERMS OF USE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE FTP SITE, THE SERVICE AND ITS RELATED WEB SITES OR PARTICIPATING IN E-COMMERCE.

## 2. INDEMNIFICATION

You agree to indemnify and hold FII, its subsidiaries, affiliates, officers and employees, harmless from any claim, demand, or damage, including reasonable attorneys' fees, asserted by any third party due to or arising out of Your use of or conduct on the FTP Site, the Service, or Your E-Commerce Participation, or Your failure to abide by the FTP Site, the Service or E-commerce Participation Policies.

## 3. COMPLIANCE/TERMINATION

You agree to comply with all applicable laws and regulations regarding electronic communication, information collection, and other applicable laws. You will be granted access to the FTP Site, the Service and be permitted to participate in e-commerce as long as You comply with the Policies and remain in compliance of Your franchise agreement.

FII may limit or terminate Your access to any part or all of the FTP Site, the Service, E-Commerce Participation and any related service(s) at any time, with or without cause, with or without notice, effective immediately, for any reason whatsoever.

Upon termination of the FTP Site, the Service or Your E-Commerce Participation, Your right to use the FTP site, the Service or Your right to participate in e-commerce immediately ceases.

FII shall have no obligation to maintain any content in Your account or to forward any unread or unsent messages to You or any third party.

## 4. PROPRIETARY RIGHTS TO CONTENT

You acknowledge that content, including but not limited to text, software, music, sound, photographs, video, graphics or other material contained in either sponsor advertisements or electronically distributed, commercially produced information presented to You by the FTP Site, the Service, by FII, or FII's Advertisers or other content providers, is protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws. You may make a copy of this content for Your personal, non-commercial use only, provided that You keep all copyright and other proprietary notices intact. You may not modify, copy, reproduce, republish, upload, post, transmit, or distribute in any way content available through the FTP Site, the Service and its associated Web sites, including code and software.

## 5. MODIFICATIONS TO TERMS OF FTP SITE, THE SERVICE, E-COMMERCE PARTCIPATION AND MEMBER POLICIES

FII reserves the right to change the FTP Site, the Service and/or the E-Commerce Participation terms or policies regarding the use of the FTP Site, the Service or E-Commerce Participation at any time and to notify You by posting an updated version of the FTP Site, the Service and/or the E-Commerce Participation terms on FSOL. You are responsible for regularly reviewing the FTP Site, the Service and E-Commerce Participation terms. Continued use of the FTP Site, the Service or E-Commerce Participation after any such changes shall constitute Your consent to such changes.

## 6. GENERAL

The laws of the State of Texas, and the United States of America govern the Policies. Use of the the FTP Site, the Service and E-Commerce Participation is unauthorized in any jurisdiction that does not give effect to all provisions of these terms and conditions, including without limitation this

paragraph. You agree that no joint venture, partnership, employment, or agency relationship exists between You and FII as a result of these agreements, use of FTP Site, the Service and E-Commerce Participation. FII's performance of these Policies are subject to existing laws and legal process, and nothing contained in these Policies are in derogation of FII's right to comply with governmental, court and law enforcement requests or requirements relating to Your use of the FTP Site, the Service, E-Commerce Participation or information provided to or gathered by FII with respect to such use. If any part of the Policies are determined to be invalid or unenforceable pursuant to applicable law including, but not limited to, the warranty disclaimers and liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid, enforceable provision that most closely matches the intent of the original provision and the remainder of the Policies shall continue in effect. A printed version of the Policies and of any notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to the Policies to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. You and FII agree that any cause of action arising out of or related to use of the FTP Site, this Service or Your E-Commerce Participation must commence within one (1) year after the cause of action arose; otherwise, such cause of action is permanently barred. The section titles in the FTP Site, the Service or the E-Commerce Participation Policies are solely used for the convenience of the parties and have no legal or contractual significance.

## 7. LANGUAGE

It is the express will of the parties that the Policies and all related documents have been drawn up in English.

COPYRIGHT AND TRADEMARK NOTICES: All contents of the Service are: Copyright © 2000 FASTSIGNS International, Inc., 2550 Midway Road, Suite 150, Carrollton, Texas 75006 U.S.A. All rights reserved.

TRADEMARKS. FASTSIGNS; FASTSIGNS, The One Day Sign & Lettering Experts; FASTSIGNS, For A Quality Sign That's Right. On Time.; Quality Displays. In Just Days.; FASTPANEL; FASTSTAND; Quality Signs. Done Right. On Time.; FASTFLEX; Sign & Graphic Solutions Made Simple; FASTSHIP; FASTSIGNS.com; E-MEDIA FRIENDLY; and DISPLAY WORLD referenced herein are either trademarks or registered trademarks of FII.

© 2000 FASTSIGNS International, Inc.  All rights reserved.

**PRIVACY STATEMENT**

This privacy statement applies specifically to Franchisees' ("You" or "Your") participation in the FTP Site, FASTSIGNS Online and E-Commerce. Questions regarding this statement should be directed to FII's Legal Department.

It's important to FASTSIGNS International, Inc. ("FII"), which owns and operates the FTP Site, FASTSIGNS Online and FII's E-commerce ("Services"), to help You retain Your privacy when You take advantage of the Services FII has to offer.

What this means to You is, FII is committed to protecting Your privacy and developing technology that gives You the most powerful, safe, online experience that You can get anywhere.

Privacy Principles

Because You are important to FII, FII operates by the following principles:

**Principle 1.**
FII explicitly asks when it needs to provide information that personally identifies You to others ("Personal Information").

**Principle 2.**
FII keeps all of Your Personal Information private and does not share it with any third parties. FII will not disclose Your Personal Information unless acting under a good faith belief that such action is necessary to: (1) conform to legal requirements or comply with legal process; (2) protect and defend the rights or property of FII; (3) enforce the Services; or (4) act to protect the interests of its members or others.

**Principle 3.**
FII will not send You any unsolicited information, including email, except as mentioned below. Under certain circumstances, FII may be required to send You information about the Services or your account, but FII will not send You unsolicited email regarding any commercial offers or advertisements at any time.

**Principle 4.**
If at any time You believe that FII has not adhered to these principles, please notify FII by email at administrator@fastsigns.com and FII will use all commercially reasonable efforts to promptly determine and correct the problem.

If You have questions about this policy, please email FII at legal@fastsigns.com.

© 2000 FASTSIGNS International, Inc. All rights reserved