DOUGLAS W. DAL CIELO (SBN 157109)
GREGORY M. GENTILE (SBN 142424)
ROPERS, MAJESKI, KOHN & BENTLEY
50 West San Fernando Street, Suite 1400
San Jose, CA 95113
Telephone:  (408) 287-6262
Facsimile:  (408) 918-4501
ddalcielo@rmkb.com
ggentile@rmkb.com

Attorneys for Plaintiff
NORMAN GILBERT

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT (SAN FRANCISCO)

| | |
|---|---|
| NORMAN GILBERT,<br><br>Plaintiff,<br><br>v.<br><br>FASTSIGNS INTERNATIONAL INC.<br>and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO. 3:08-CV-03043-VRW<br><br>**SUPPLEMENTAL DECLARATION OF NORMAN GILBERT IN SUPPORT OF PRELIMINARY INJUNCTION**<br><br>Date:   August 7, 2008<br>Time:  2:30 p.m.<br>Judge: Hon. Vaughn R. Walker |

I, NORMAN GILBERT, declare as follows:

1.  I am a franchisee of FASTSIGNS INTERNATIONAL INC., the Defendant in this matter ("FASTSIGNS", "FII", or "Defendant"). I am also the Plaintiff and the President of Mid-Peninsula Marquee, Inc., a California corporation doing business as FASTSIGNS of Redwood City. I make this Supplemental Declaration in support of my motion for a Preliminary Injunction.

2.  I have personal knowledge of the information set forth below and can competently testify thereto if called as a witness.

3.  I have been a franchisee in good standing of FASTSIGNS since November 12, 2001. I have spent the last six plus years building the FASTSIGNS brand with business customers, both small and large, in my trading area. During this time, I have processed and paid

/ / /

to FASTSIGNS full royalty and fees of over $150,000.00 on almost 9,000 individual transactions in my six years in business. Excluding the disputed transaction, my sales and royalty payments have increased by 17% in 2008 over the same period in 2007. My business is very successful, growing and profitable. It is my sole livelihood and the sole livelihood of my employees.

4. I am presently involved in a "dispute" with FASTSIGNS over the royalty treatment of but a single transaction of the 9,000 transactions I have done as a franchisee. FII sent me a notice of default dated May 19, 2008. Attached as Exhibit A is a true and correct copy of the notice. In light of the dispute, Defendant seeks to terminate my franchise and provided notice to terminate on May 27, 2008. However, I have requested, in a timely manner, binding arbitration as provided by the Franchise Agreement with FASTSIGNS. FASTSIGNS falsely claimed non-receipt of my arbitration request and ignored my requests for arbitration. It has refused to negotiate in good faith and, instead, has unilaterally terminated my franchise and attempted to disconnect all my electronic services using this dispute as a pretext to force me out of the FASTSIGNS system. As a consequence thereof, I sought injunctive relief to preserve the status quo pending arbitration. However, it bears repeating that I demanded arbitration, through my counsel, in a letter dated June 2, 2008. However, instead of acknowledging this demand, FII's initial response was to deny it ever received the demand. (FII subsequently acknowledged that it did receive the demand). FII's response to this demand was to shut off electronic services on June 9, forcing my attorneys to seek injunctive relief pursuant to the Agreement. The only reason why the Superior Court was required to get involved was because FII shut off electronic service. I maintain that this matter belongs in arbitration as required under the Agreement.

5. The audit performed by Defendant's agents and referenced in Defendant's Opposition discovered nothing out of line except the single brokered transaction which I believed did not constitute a sale under the definition of gross sales in the franchise agreement which states that **"As used in this agreement, "Gross Sales" shall include all revenues from the sale of any and all services and products by Franchisee . . . at or from the center"**. (Exhibit A, p. 3, ¶c

///

///

attached to the Declaration of Stephanie Brooks). In the single transaction in question, we delivered no products or services at or from the center and in fact, the work in question was performed 100% by a third party at the client's off site location.

6. When it was pointed out to me by the auditor that I very likely owed royalties because I ran money through my FASTSIGNS bank account, I accepted that might be one way of looking at it. However, because the franchise agreement definition of Gross Sales goes on to state "**... and all other revenues of every kind and nature related to the operation of the Center.**" to accept FII's view would also mean that any sales of assets that were done by an owner that ran the revenues through the owner's FASTSIGNS bank account would also give rise to a royalty event, in which case every owner who ever sold raw materials, or a piece of equipment or a vehicle or accepted training or expense reimbursements from FASTSIGNS and deposited the money in their bank account would be potentially committing a terminable offense and could have their business seized or forced to sell. Thus, there is clearly an issue or issues for the arbitrator to resolve which may also have an effect on other franchisees within the system.

7. However, I must emphasize that I did not believe, at the time of this transaction, that an actual sale had taken place, since no products or services were delivered at or through my center, nor were my employees involved in any aspect of the transaction. In light of my contention that this transaction did not constitute an actual sale, I have demanded binding arbitration.

8. Nonetheless, I did not want to get into a battle with FASTSIGNS over the interpretation of the Franchise Agreement and tried to settle the matter financially and quietly. I submitted via Cashier's Check on May 14, 2008 a payment of $9,587.21 as the amount I believed was owing for royalties and fees on the disputed transaction. Attached as Exhibit B is a true and correct copy of the letter submitting this check. To the best of my knowledge, FASTSIGNS cashed this check.

9. I also submitted a payment on June 30, 2008 of all royalties and fees due FASTSIGNS for all other May sales in the aggregate amount of $5,663.68. FASTSIGNS cashed these checks (#5340 and #5341) even though I was supposedly terminated as a franchisee.

10. I also submitted a payment on of all royalties and fees due FII for sales for the month of June, in the aggregate amount of $5,622.12 (checks #5357 & #5358). I assume Defendant will cash these checks, as well. In short, despite my dispute with Defendant, I have attempted to comply with the Franchise Agreement and the obligations hereunder and FASTSIGNS is still receiving royalty payments from me.

11. I also acknowledged my financial obligation to pay all audit fees and expenses upon the substantiation thereof by FASTSIGNS. However, such substantiation has never been provided to me by FASTSIGNS. I do not believe that FASTSIGNS is exercising good faith in light of its failure to provide me with substantiation of the above, and this will be a further issue for the arbitrator to decide.

12. If this injunction is granted, I will continue to pay my royalties and fees when due as I always have and wish to remain a franchisee in good standing with FASTSIGNS.

13. Despite my attempts to settle this dispute any and all such attempts have been rebuffed and rejected by FASTSIGNS, forcing upon me expensive litigation in the courts to preserve my rights under the Franchise Agreement. FASTSIGNS is not acting in good faith.

14. FASTSIGNS is attempting to wrongly use against me the e-mail dated July 14, 2008 attached to the Declaration of Shane Beard. The statements made in that e-mail should be placed within the context in which they were made. My statements in that e-mail were made in hindsight of the events that had taken place and after I had the benefit of reviewing the relevant parts of the Franchise Agreement. As I stated in the e-mail, I wish to maintain my franchise and in an attempt to do so, I was reaching out to my fellow franchisees to intervene on my behalf with the franchisor with the expectation that the e-mail would be viewed as such by the franchisor. I knew at the time that if I sent the e-mail to any number of franchisees that it would ultimately find its way to FII. However, I was expecting a different result from this e-mail and to a certain extent, I feel betrayed since FII is now using this e-mail against me.

15. FASTSIGNS is using this transaction at issue as an excuse to terminate my franchise. The real reason why FASTSIGNS is seeking to terminate my franchise is because I have been a frequent, and vocal internal critic of the Company and its management within the

group of other owners on many issues. The real reasons for termination are that: I called out FASTSIGNS' management team as incompetent; and it would like to see the franchise transferred to a more favored and compatible franchisee at a discount price. Publicly however, I have been extremely positive and supportive of FII to potential franchisees, customers, and vendors. Even in this case, my customers, vendors and the majority of other owners are not yet aware of this dispute.

16. I view myself as an honest, reputable and successful franchisee and FASTSIGNS has clearly benefited from my business. My rate of sales growth is outpacing the FASTSIGNS system as a whole. Attached as Exhibit C is a sales comparison graph which shows that without my center's sales in the calculation, FASTSIGNS is experiencing a sales decline in every month of 2008. It should be clear that FII benefits greatly from my business.

17. Allowing me to continue to operate while we arbitrate the nature of a single disputed transaction will result in a steadily growing stream of royalty revenue to FASTSIGNS and it has offered no credible hardship to itself as a valid reason to believe I will not continue to timely pay my royalties as I have for the last six years. Shutting my center down by seizing assets, turning off my electronic services or forcing a quick sale to a new and inexperienced owner will actually result in diminished revenue to FASTSIGNS. However, the real hardship will inure to me and the people I employ.

18. At my location, I employ three full time people and I am additionally the principal source of income for an independent installation contractor. These people are counting on me to keep my center open, preserve the status quo, and protect their jobs. They are concerned and their interests cannot be discounted since the termination of services will in effect be the termination of the franchise which will have repercussions on them. If this injunction is denied and electronic services are shut off, my employees will lose their jobs since the sales will fall such that I would have to dismiss them for lack of work or an ability to pay them. The employees are aware of this dispute and it is very difficult to explain to them what is happening and why. This litigation and the constant threats from FASTSIGNS are a distraction to them, causing them undue anxiety, and we suffer a loss of productivity because of it. My employees ask me why this

is happening. It doesn't make any sense to them why FASTSIGNS is trying to destroy a successful franchisee. They are all fearful of losing their jobs or of the consequences of new ownership or a FASTSIGNS seizure of the business.

19. The success of my business is directly attributable to the team of employees we've built, whose productivity as measured by sales per employee is double that of the FASTSIGNS system as a whole. It is also dependent on the electronic services which in this modern day is the lynch-pin for doing business and staying competitive.

20. The unique selling proposition, competitive advantage and oft stated theme of all FASTSIGNS advertising and marketing is that FASTSIGNS uses Technology to Make The Sign Buying Process Simple for Customers.

21. Full electronic services (i.e., "Technology") are an integral part of that promise to our customers. Electronic communication is vital to customer satisfaction and to the financial health of the business. The business could not long survive on just retail walk-in customers. The amount of business done face to face or over the counter is at lower sales volumes and is declining as a percentage of overall sales.

22. I am precluded by contract from providing any of my own electronic services and must rely on FASTSIGNS for such services. If I were to provide my own electronic services, it would give FASTSIGNS a further excuse to seek termination.

23. A constant flow of new customers is critical to the success of the business. Seven of my top ten customers in 2008 are different than my top ten customers in 2007. A majority of new customers find my business on the Internet and engage with us electronically rather than face to face or by telephone. FASTSIGNS' own marketing studies have confirmed this fact.

24. Loss of electronic services provided by FASTSIGNS would prevent potential customers from even finding out about my business, its capabilities, how to contact us, our location or seeing actual examples of the work performed by my business. It would also prevent customers and prospects from seeking a quote electronically to the further detriment of the business.

25. Further, loss of electronic services would prevent customers from submitting their

computer generated artwork to us to be used in their signs and would prevent us from sending customers a proof of their sign design prior to its manufacture. Loss of electronic services would prevent my active participation in the "FRANCHISE ADVISORY COUNCIL" or interacting with other owners to discuss common issues. It would hinder my ability to collect revenue from our customers because customers would have no legal method of communicating with us electronically to provide credit card data other than the US Postal Service or via telephone. Our customers fully expect us to have an e-mail address to which they can reply. Even our fax system is a virtual system and is tied into the FASTSIGNS provided e-mail service.

26. Moreover, loss of electronic services would interfere with my ability to locate and interact with vendors and wholesalers and would impact my business relationships. It would also remove my access to FASTSIGNS Marketing tools such as FASTMAIL and THE ON DEMAND ZONE, which are means to advertise the business to existing customers. This clearly has an impact on my business.

27. Also, loss of electronic services would remove my access to the financial monitoring and sales performance tools called RPM and would deny me access to all forms of technical and production support. It would make my center ineligible for receiving work from the FASTSIGNS National Accounts Program.

28. In substance and effect, loss of electronic services would make it appear to almost everyone, be it prospects, vendors, FASTSIGNS corporate employees, other franchisees or customers, that I had gone out of business. I would be forced to reveal to customers and vendors the nature of this dispute and convince them that my company was still viable and open for business. This will have an immediate effect on my business and breach of contract damages cannot possibly compensate me for the loss, including the potential loss of employees, business momentum and future sales.

29. Making this dispute public to customers and vendors, as it would be necessary to do if electronic services are shut off, would put the entire FASTSIGNS system in a negative light. It would be the worst kind of publicity, not just for my location but for all FASTSIGNS locations. I could not recover from such an action.

30. It cannot be discounted that denial of electronic services will put me out of business and cause and deny me the revenue to continue to employ four people who are looking to me for their livelihood and welfare.

31. Perception is reality and without electronic services, and with everyone falsely believing that I had gone out of businesses, my revenue stream would quickly dry up; our present, measured high level of customer satisfaction would drop precipitously, and in effect I would be put out of business by FASTSIGNS without ever having had the opportunity to actually arbitrate my dispute on the merits with it.

32. By the time the case could be heard by an arbitrator, without electronic services and the protection of this Court, I would be out of business. No amount of monetary damages could possibly serve to resuscitate my failed business if I prevail in arbitration once FASTSIGNS destroys it by shutting off electronic services or trying to enjoin my use of the trademarks.

33. Further, forcing me out of business, as FASTSIGNS wishes to do, practically insures significantly lower royalty revenues coming to FASTSIGNS from my territory. FASTSIGNS is willing to pay this price or in fact any price to rid themselves of a vocal critic to their leadership.

34. I continue to seek the protection of the courts to maintain the status quo so we can arbitrate this dispute on its merits.

35. It should be up to an arbitrator to decide if the failure to report a single "brokered" event out of 9,000 transactions over six years justifies the termination of the franchise. I have made every possible effort to financially cure this matter in an attempt to avoid protracted and expensive litigation. I believe this termination to be a personal vendetta on the part of FASTSIGNS management and that nothing will satisfy FASTSIGNS except my complete and utter financial destruction.

36. It is my belief that FASTSIGNS does not actually want to arbitrate the matter and is using its superior financial power to silence a critic and achieve a result it could not otherwise obtain in arbitration.

I declare under penalty of perjury that the foregoing is true and correct and if called upon

1  as a witness could competently testify thereto. Executed this 24 day of July, 2008, in Redwood
2  City, California.

   _____
   NORMAN GILBERT

**EXHIBIT A**

# FASTSIGNS

May 19, 2008

Via Federal Express and Electronic Mail

Mid-Peninsula Marquee, Inc.
Attn: Norm Gilbert
FASTSIGNS
2504 El Camino Real
Redwood City, CA 94061

Re: FASTSIGNS International, Inc. ("FII") Franchise
    Location Number 64201

Dear Norm:

We are in receipt of your checks and correspondence. We accept your clarification of the deposits made on 3/7/05, 6/8/05, and 8/2/05.

Norm, as previously communicated, the order in question is not eligible for royalty reduction due to the time limitation. We will allow the "exemption" on shipping charges, however you need to submit a copy of the invoice for this sale processed through your POS (this needs to be done regardless of the shipping issue in order for your system to be accurate).

Additionally, you did not include payment for the audit expenses. Again, the total due for the audit is $5,317.39. Attached is a revised Attachment A that shows the amount you still owe to FII and the NAC. The total amount due is $9,029.78. Also, as previously requested, please submit copies of your federal and sales tax returns for the past three years. It has been more than 30 days since our initial request for this information. We request all issues, including payment in full, be resolved by end of business Wednesday, May 21.

Nothing contained herein is intended to constitute an election of any remedy by FII nor does FII waive any right that it may otherwise possess.

If you have any questions, please give me a call at (800) 827-7451, ext. 5640.

Very truly yours,

Larry Lane
President

cc: Gary Salomon
    Mary Ryan
    Susan Last
    Trent Lensch
    Drue Townsend
    Douglas W. Dal Cielo, Esq.
    Dennis Wieczorek, DLP Piper

**EXHIBIT B**



May 14, 2008

Via UPS Next Day Air

Mr. Larry Lane
President
FASTSIGNS International, Inc.
2542 Highlander Way
Carrolton, TX 75006

Dear Larry:

Enclosed please find a check made payable to FASTSIGNS International in the amount of $7,619.28 as payment in full for royalty arguably owed FASTSIGNS International, Inc. for the Astound Broadband transaction of 2007.

Also, find a separate check made payable to the FASTSIGNS National Advertising Council in the amount of $1,967.93 as payment in full for all NAC Advertising fees arguably owed the Council as a result of the Astound Broadband transaction of 2007.

You will also find enclosed a Royalty Reduction Form and copies of supporting documentation detailing how the above amounts were calculated. Please note that freight charges of $6,337.27 are not subject to royalty or NAC fee.

Lastly, please find the additional proofs we discussed regarding banking transactions from 2005 identified in your letters of May 2 and May 13. These documents along with copies of canceled checks and deposit slips previously provided to you should be sufficient to substantiate the fact that there is but one and only one unreported transaction deemed to be a sale as outlined in Mr. Dal Cielo's letter of May 8, 2008.

I reserve all rights under California and Texas law as well as all rights and remedies provided by the Agreement.

If you have any questions, please contact Douglas Dal Cielo directly at (408) 287-6262.

Very truly yours,


Norm Gilbert
President
Mid-Peninsula Marquee, Inc.

cc:   Douglas Dal Cielo

**EXHIBIT C**

7/23/08

Sales Comparison - GILBERT vs. FASTSIGNS BAY AREA STORES

| | Stores Monthly | | 12 Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|
| All Other Bay Area Stores Excluding Plaintiff's | | Last Year | | $837,910 | $707,988 | $963,581 | $1,005,387 | $993,451 | $924,869 |
| | | This Year | | $729,617 | $748,975 | $810,123 | $945,718 | $1,031,217 | $995,040 |
| | | Variance | | -12.92% | 5.79% | -15.93% | -5.93% | 3.80% | 7.59% |
| | YTD | Last Year | | $837,910 | $1,545,898 | $2,509,479 | $3,514,866 | $4,508,317 | $5,433,186 |
| | | This Year | | $729,617 | $1,478,592 | $2,288,715 | $3,234,433 | $4,265,650 | $5,260,690 |
| | | Variance | | -12.92% | -4.35% | -8.80% | -7.98% | -5.38% | -3.17% |
| Plaintiff's | Store | Last Year | | $48,004 | $51,648 | $58,342 | $56,941 | $49,154 | $48,257 |
| | | This Year | | $70,281 | $55,441 | $49,028 | $50,154 | $71,504 * | $70,276 |
| | | Variance | | 46% | 7% | -16% | -12% | 45% | 46% |
| | YTD | Last Year | | $48,004 | $99,652 | $157,994 | $214,935 | $264,089 | $312,346 |
| | | This Year | | $70,281 | $125,722 | $174,750 | $224,904 | $296,408 | $366,684 |
| | | Variance | | 46% | 26% | 11% | 5% | 12% | **17%** |

\* Excludes Disputed Transaction of $159,640 in May